Eric Chase, SBN# 148030
2600 West Olive Ave, 5th Floor
Burbank, California 91505
(818) 487-7400
echase@criminaldefensegroup.com

Attorney for Defendant,
BRIAN CAPUTO

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Criminal No. 1:14CR00041-001 LJQ |
| Plaintiff, | |
| vs. | |
| BRIAN CAPUTO, | DEFENDANT'S SENTENCING MEMORANDUM |
| Defendant. | |

**DEFENDANT'S SENTENCING MEMORANDUM**

Defendant BRIAN CAPUTO is to be sentenced by this Court after his guilty plea to one count of violating 18 USC §2252A(a)(2), Receipt and Distribution of Material Involving the Sexual Exploitation of Minors.  Defendant pleaded guilty pursuant to a Plea Agreement that attributes an adjusted offense level of at least 32 points. No agreement was made as to Criminal History Category ("CHC"), although the Presentence Investigation Report ("PSR") places the Defendant in CHC category III, based on four points attributable to 2 misdemeanor California petty theft convictions, and committing the instant offense while on probation.  The offense carries a statutory minimum sentence of five years in prison, and a statutory maximum sentence of twenty years in prison; the authorized term of supervised release shall be not less than 5 years to life.

As a condition of his Plea Agreement, Defendant agreed not to argue for a sentence of less than 60 months. The Defendant therefore asks this Court to impose a sentence of 80 months.

/

## I. LEGAL PRINCIPLES

This Court has broad discretion after *United States v. Booker*, 543 U.S. 220, 260-1 (2005), to consider all factors that may be relevant to the imposition of a just and appropriate sentence and to implement a reasonable sentence outside of the Guidelines range. While the Court must still correctly calculate the Guidelines range, the Court "may not presume that the Guidelines range is reasonable" but rather "must make an individualized assessment based on the facts presented," consider all of the § 3553(a) factors, and explain how the facts relate to the purposes of sentencing. *See Gall v. United States,* 552 U.S. 38; 48-50; 53-60 (2007).

The Court must consider the Guidelines as simply "one factor among several" to be considered in imposing an appropriate sentence under §3553(a). *Kimbrough v. United States*, 552 U.S. 85, 90 (2007). Furthermore, the Court may vary from the Guidelines based exclusively on policy considerations, including disagreements with the Guidelines. *Kimbrough v. United States,* 552 U.S. 85 (2007); *see also Rita v. United States,* 551 U.S. 338, 351 (2007) (holding that Courts may take into account arguments which the "Guidelines sentence itself fails to properly to reflect §3553(a) considerations.") As reasoned in *Kimbrough*, …[T]he district court is free to make its own reasonable application of the §3553 factors, and to reject (after due consideration) the advice of the Guidelines." *Kimbrough*, 552 U.S. at 113.

In *Gall v. United States*, 128 S Ct 586 (2007), the Supreme Court announced the following:

1.   It rejected a rule that required "extraordinary circumstances" to justify a sentence outside of the guideline range or a mathematical formula which uses the percentage of departure from the guidelines as a measurement of sufficiency;

2.   It rejected any notion, either explicit or implicit, that a sentence outside of the guidelines will be presumed unreasonable;

3.   It made it clear that the only standard for appellate review of a sentence is abuse of discretion;

4.   It recognized the district court's "superior position" in making an individualized assessment based on the facts present;

The relevant text of 18 USC 3553(a) provides:

"The court shall impose a sentence sufficient, but not greater than necessary to comply with the purposes set forth in paragraph (2) . . . [And] shall consider –

 (1) the nature and circumstances of the offense and the history and characteristics of the defendant;

 (2) the need for the sentence imposed –

 (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

 (B) to afford adequate deterrence to criminal conduct;

 (C) to protect the public from further crimes of the defendant; and

 (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

 (3) the kinds of sentences available;

 (4) the kinds of sentence and the sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines;

 (5) any pertinent policy statements [of the Sentencing Commission] . . .

 (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct;

 (7) the need to provide restitution to victims of the offense.

To reiterate, this Court, before deciding what sentence is sufficient, but not greater than necessary, must consider the nature and circumstances of the offenses, Defendant's history and characteristics, and the concerns of §3553(a)(2)-(7).  Because the Sentencing Guidelines are now only advisory, this Court can vary its sentence from the advisory guideline range so long as the Court imposes a sentence which meets the requirements of 18 USC §35539(a). There is no presumption or assumption that a sentence which varies from the guideline range is reasonable or unreasonable and this Court is free to disagree with the advisory guideline range on general policy grounds, individualized fact grounds, or because this Court concludes a different sentence is appropriate "regardless" of the guideline range. *Rita v. United States*, 551 U.S. 338, 351

1  (2007). An analysis of the factors in §3553(a) should convince the Court that a sentence of 100
2  months is "sufficient but not greater than necessary".
3       Section 3553(a)(1) requires this Court to consider "the history and characteristics" of
4  Defendant as a factor in the sentencing calculus.  It is particularly appropriate for a court to
5  consider a defendant's history and characteristics because the guidelines do not address a
6  defendant's personal characteristics except for criminal history.  *Rita v. United States, supra*, 551
7  U.S. 364-365 and n.3. (Stevens, J., concurring.)

**II.  BRIAN CAPUTO: A PRODUCT OF ABUSE, NEGLECT AND BIOLOGY**

9       Brian Caputo committed terrible offenses, by employing grotesque offense conduct,
10  when he assumed several false identities in order to coerce preteen and teenage girls to create
11  and deliver to him pornographic images and videos of themselves, some of which he
12  redistributed to others as part of a scheme to elicit other coerced images. In so doing, he preyed
13  upon the youth and naivete of the girls and displayed a level of cruelty completely out of
14  character of the kind, helpful, considerate person he has always presented himself to be. The
15  offense conduct is incomprehensible, without an examination of Brian's life leading up to that
16  conduct, as well as the significant disabilities that have continued to plague him before, during
17  and after the conduct.
18       The picture that emerges through examination of Brian's life is that of an individual with
19  severe neurological disabilities, left essentially to his own devices due to family circumstances
20  which were utterly beyond his control, who was mercilessly bullied at school. This boy,
21  completely without the psychological or social resources to deal with that treatment by others,
22  eventually became a bully, in one of the most pernicious ways imaginable and contrary to all the
23  other indications about the type of person he was. The acts by which he received the images at
24  issue were, in essence, bursts of rage; the horribly misguided attempts of a profoundly disabled
25  young man to deal with the many traumas that invaded his malformed mind. Brian Caputo is no
26  monster, and although he clearly deserves punishment for the things he did, and for the trauma
27  he caused, he also deserves some leniency, for the traumas visited upon him by his heredity,
28  which in no small measure caused those monstrous acts.

The many family members, friends and coworkers who submitted character letters on Brian's behalf have all described him positively. His uncle, Tony Caputo, summarized those descriptions: "He was gentle, soft-spoken, kind, loving and mannerly. He helped around the house with the chores, and was always there for you. He would sit and listen to you, and was willing to do whatever it took to make you happy. He was honest and trustworthy." (Character letters attached to the PSR as Document 91-4, hereafter "Letters," P.4).

Others had similar assessments of Brian: his uncle, Mike Caputo, wrote that, "there was not a mean bone in his body," (Letters, p.7); his uncle, Gianfranco Caputo, described him as the "nicest, most loving, and respectful human being I know," (Letters, p. 8); his sister, Christina Torres, wrote of Brian being, "a great uncle. Good to his family and friends. The kind of person to give you the shirt off his back." (Letters, p. 11.) Eutimio Torres, Brian's brother-in-law, wrote that Brian "was always understanding, very respectful and helpful." (Letters, p.12.) His younger sister, Priscillia Caputo, described Brian as "one of the most caring people in this world." (Letters, p. 13.) His long-time friend, Nicholas Wolford, described Brian as "a loving, caring, honest person." (Letters, p. 16.) His former manager at Burger King, Eustolia Villa, described Brian as a "calm, respectful, hard-working employee." (Letters, p. 17.) Finally, his mother, Patricia Caputo, described her son as a person with "no hate or animosity in him" and as "a kind-hearted, forgiving, gentleman." (Letters, pp. 18-19.)

These descriptions are obviously incompatible with the acts to which Brian has admitted. Three main factors contributed to those monstrous acts having been committed by this individual: abuse, neglect and biology. First, the abuse: as noted at paragraph 66 in the PSR, Brian reported that he was fondled by an adult for about six or seven months while he was in the second grade. This abuse was a prelude to the vicious bullying that would become normal for Brian during his school years. He reported in his presentence interview that he was bullied in school because of his speech impediment and behavioral issues. However, the extent of the bullying he suffered is more thoroughly discussed by those who knew him at the time. His Uncle Mike wrote, "He was always happy despite being gravely bullied in school, I remember stories he told me honestly it made me cry!" (Letters p. 7.) His Uncle Gianfranco, who spent a great

deal of time with him when Brian was a child, wrote: "I felt like something was wrong but I never spoke of it. He started to come home bruised, he'd tell me stories about mean kids at school but he didn't let it bother him." (Letters, p. 8.) His mother described the abuse: "Children and people who sensed his vulnerability took advantage and treated him cruel, bullying and judging him by his demeanor of low self-esteem and insecurities." (Letters P.18).

Without a question, Brian was bullied. Also without question, the circumstances of his childhood left him entirely without the means to deal with the abuse. Parental neglect played a primary role. Notably absent from the included character letters is anything from Brian's father. As Brian described in his presentence interview, and as his mother confirmed, his biological father was abusive toward his mother before Brian was born, during her pregnancy, and after his birth, before absenting himself from their lives when Brian was very young. (PSR, para. 64-65.) Brian's Uncle Gianfranco wrote: "Brian's father was never present. He was in and out of their lives constantly until Patricia figured out he was causing more harm than good in their lives." (Letters, p. 8.)

His mother, who had Brian when she was 16, admits that she was ill-equipped to raise him: "a mother who didn't have a clue how to relate to a male." (Letters, p. 18.) In addition, as Brian described, his mother used methamphetamine for at least part of his childhood, and did not even have the wherewithal to intervene when Brian reported sexual abuse to her. (PSR, para. 66.) As his Uncle Tony wrote, "Because of the severe family life of such difficult circumstances, Brian must have been affected emotionally, psychologically, and physically, as a child, and financially as an adult." (Letters, p. 4.)

The effects of external forces were magnified by the unfortunate biological difficulties Brian unknowingly endured. The Defense submitted a report from John David Sabow, M.D., a forensic neurologist. His report and associated literature, as well as his Curriculum Vitae, are attached as (Attached to PSR as document 91-3, hereafter "Sabow"). Dr. Sabow diagnosed Brian with a "spectrum of congenital brain abnormalities," including colpocephaly, which is associated with a number of neurological syndromes. This includes one with which Brian is afflicted, agenesis of the corpus callosum, which "results in a number of disabilities including moderate to

severe intellectual disability and social difficulties, even when their intelligence quotient is normal." Further, Dr. Sabow noted the presence on an MRI study of a "prominent enhancing lesion in the pons," as well as several other lesions," the presence of which have led Dr. Sabow to conclude that Brian suffers from cerebral autosomal dominant arteriopathy with subcortical infarcts and leukoencephalopathy ("CADASIL").

An article from the National Institute of Neurological Disorders and Stroke, from its CADASIL Information Page, which is also included in (Sabow P.3), notes that, in addition to migraine headaches and strokes progressing to dementia, other symptoms include "cognitive deterioration, seizures, vision problems, and psychiatric problems such as severe depression and changes in behavior and personality."  The article further notes that, "By age 65, the majority of persons with CADASIL have cognitive problems and dementia. Some will become dependent due to multiple strokes." (Sabow p.1.) Further, the provided Wikipedia article related to Agenesis of the Corpus Callosum, also included in (Sabow p.6), lists a variety of social and psychological symptoms, including, "cognitive disabilities (difficulty in complex problem solving) and social difficulties (missing subtle social cues), even when their intelligence quotient is normal." (Sabow p.2)

Unfortunately for Brian, his lack of family or social support combined with his significant developmental deficits to magnify the effects of the bullying that was so much a part of his life. A scholarly article, Learning Disabilities and Bullying: Double Jeopardy, by Faye Mishna, PhD, an assistant professor of social work at the University of Toronto, describes a complex interplay of behaviors and responses related to bullying, in which some who are bullied become bullies themselves: "Approximately 10% to 20% [Cite] of victims are bullies as well, also described as provocative or  aggressive victims [Cite] They exhibit provocative behaviors that peers and adults find irritating, such as disruptiveness, hyperactivity, and aggression." Mishna, Faye, *Learning Disabilities and Bullying: Double Jeopardy*, Journal of Learning Disabilities, Vol. 36, No. 4, 336-347 (2003.)

The article goes on to draw a strong link between the presence of learning disabilities and victimization by bullies, before suggesting a range of interventions, both toward specific victims

and more generally. Brian was most certainly victimized by bullies, just as he had been victimized by the adult male who molested him in the second grade. However, as his sister, Priscilla, noted, he was never afforded any of the interventions that could have helped him to process or cope with the lasting effects of the abuse he suffered. Little wonder, then, that this child with few emotional or intellectual coping resources at his disposal, grew to despise himself so thoroughly.

His uncle Tony described a meeting with Brian after the latter had emerged from those years of bullying, of coming upon Brian standing near a bus stop, realizing it was his nephew, stopping to offer to buy him lunch, and being told to save his money, because Brian didn't feel he was worth it. (Letters, p.4). Tony Caputo continued: "I insisted, and while we were together, I learned he was feeling lonely, depressed, anxious, and was saddened about life in general. He expressed he didn't want to live anymore." (Letters, p. 2.)

By this point in his life, about the time that he began his offense conduct, Brian hated himself. However, encouraged by his uncle Tony, Brian attempted to assert himself in the world. He got a job at Burger King. It is impossible to ascertain with any certainty what happened to turn this victim into an aggressive victim, as described in the Mishna article. However, it can easily be hypothesized that, once Brian decided to assert himself, some part of him needed to somehow exorcise the demons of his self-hate and feelings of worthlessness. Having seen others do so by victimizing him, and without any of the resources one needs to find other, productive ways to do so, Brian struck out at whomever he could.

In the "tween" girls Brian victimized on Facebook, he found the most accessible of victims—they were strangers to him, so the kindness that he has always exhibited to those he knows did not create any barrier to his bullying; and, due in no small measure to their immaturity, they were relatively easily manipulated, even by one with Brian's deficits in guile. He became the bully, like the bullies by whom his fragile psyche had been so misshaped. In so doing, he was the archetype of the aggressive victim.

Brian has continued to display many of the characteristics of the aggressive victim, both in his interactions with the victims, and during his presentencing incarceration. Perhaps if

Brian's father had not been abusive, and then absent in his life; perhaps if his mother had been older, wiser, and more observant when she had him; perhaps if the educational system had intervened to deal with his significant social and learning deficits, as well as the bullying that plagued him throughout his time there, things may have been different. His sister, Christina Torres, summed up those failings: "My brother Brian has always been different and now that I have a son with special needs I know my brother was always special needs. He never got the care he needed. I wish he was involved in programs to help him no one ever reached out. We all thought if we didn't think about it, it wasn't there."

**III.    18 USC §3553(a)(1): THE NATURE AND CIRCUMSTANCES OF THE OFFENSE AND THE HISTORY AND CHARACTERISTICS OF DEFENDANT**

The nature and circumstances of Defendant's crime is that for a period of time he used fictitious identities to contact minor females by way of the social networking site, Facebook. After contacting the girls, he used threats and intimidation, including the threatened dissemination of pornographic photographs involving the girls and their friends, to coerce the girls to create and deliver to Mr. Caputo more such images. By the time of his arrest, Mr. Caputo had between 300 and 600 images on his possession, stored in his cellular telephone.

The images of child pornography recovered in this case, and especially Mr. Caputo's conduct in obtaining those images, are unquestionably and profoundly disturbing. Mr. Caputo, by all outward appearances, and based on his actions with respect to all those who knew him personally, would be incapable of committing such deeds. However, it is clear from the circumstances of his upbringing, his childhood experiences of abuse, and his profound neurological defects that his offense conduct was not that of a sociopath, a rational actor who made a clear-eyed choice to disregard social mores and the dictates of the law, but rather was that of a profoundly damaged young man, lashing out as a method of coping, because he was unable to cope in any other way.

Mr. Caputo admits that he committed this offense, as he did when he was first interviewed by officers on February 28, 2014. As he wrote at length in his allocution letter, Letters pp.1-2, he is deeply ashamed of his conduct, truly sorry for all of the harm he has visited

upon his victims and their loved ones: "I truely [sic] want to cry, not for being caught, but for the pain, suffering, and fear I've caused for the victims. It kills me inside to think of the constant nightmare I've put the victims through…" Having in some way come to recognize that he became the monsters he so feared and despised, he is truly remorseful and recognizes that he has devastated his family by his behavior.  He will bear his own shame and society's scorn for the rest of his life.

**IV.    18 USC §3553(a)(2)(A): THE NEED FOR THE SENTENCE IMPOSED TO REFLECT THE SERIOUSNESS OF THE OFFENSE, TO PROMOTE RESPECT FOR THE LAW, AND TO PROVIDE JUST PUNISHMENT FOR THE OFFENSE . . .**

Defendant's offense is serious.  But a sentence of 80 months adequately reflects the seriousness of the offense, promotes respect for the law, and provides just punishment. That term represents twice the statutory minimum for the offense of conviction, which reflects the conduct above and beyond the receipt of images. However, it also reflects the tragic confluence of difficulties that contributed to Mr. Caputo's commission of the offense.

A sentence of 80 months in prison also promotes respect for the law and is a just and sufficient punishment for Defendant.  Defendant has never been in prison, and has only ever been incarcerated for a handful of days in 2007, the result of two petty theft convictions. Six and one-half years in prison is a long time for a young man with limited life experience, and with significant social deficits and medical and cognitive issues.

Even his experience while in custody pretrial suggests that he will have a more difficult time than the average offender even making it through those years. As noted in the PSR, Brian has been treated with antipsychotic medications while incarcerated, and has been placed on suicide watch on more than one occasion. (PSR, para. 73.) At the same time as he has been suicidal and on the verge of psychosis, he has repeatedly acted out, having "numerous disciplinary actions for being disruptive, disrespectful towards staff, possessing contraband, threatening lawsuits and other problematic behavior." (PSR, para. 58.) Mr. Caputo, a person whose ability to adjust to the world around him is significantly limited by his congenital brain

abnormalities, is not adjusting to life in custody, and is thus attempting anything he can to make his custodians adjust to him. Regardless of whether his problematic behavior is blameworthy, it certainly bodes ill for his remaining time in custody.

In *United States v. Parish*, 308 F.3d 1025 (9th Cir. 2002), the Ninth Circuit Court of Appeals recognized that as part of an individualized determination of the appropriate sentence a court could consider that a term in prison can differently affect different individual offenders. There the district court recognized that a sentence within the Guidelines range would be unduly harsh when the offender was particularly susceptible to abuse in prison.  A sentence length appropriate for one offender is not necessarily appropriate for another.

 A term of supervised release of at least five years is additional just and sufficient punishment. *Gall v. United States, supra,* 552 U.S. at p. 48.  Such a term is a long period of supervision and continued treatment, if it is warranted.  In addition, supervised release for Defendant's offense has its own repercussions.  If Mr. Caputo commits another similar offense while on supervised release, his release must be revoked and he must return to prison for at least 5 years in addition to the penalties for the new criminal conduct.  18 USC §3583(k).  The Court should also consider the added penalty that Mr. Caputo is required to register as a sex offender wherever he resides and will be subject to numerous restrictions on residence, employment, and opportunities for decades, if not the rest of his life.

**V.    18 USC §3553(a)(2)(B): THE NEED FOR THE SENTENCE IMPOSED TO AFFORD ADEQUATE DETERRENCE TO CRIMINAL CONDUCT.**

An 80-month sentence is adequate deterrence for Mr. Caputo, who has never been imprisoned, and for anyone else who might think that offense conduct like his has no consequences. Additionally, lifetime sex offender registration acts as additional deterrence.

**VI.   18 USC §3553(a)(2)(C): THE NEED FOR THE SENTENCE IMPOSED TO PROTECT THE PUBLIC FROM FURTHER CRIMES OF THE DEFENDANT**

Defendant has only the most minor of prior convictions: two for petty theft within months of each other, nearly ten years ago, when he was 18 years old. Mr. Caputo is not the kind of hardened criminal for whom ten years in Federal prison might not have the desired deterrent

1  effect. By the time he leaves prison, he will be well into his thirties, past the age at which most
2  convicts commit crimes.

3  More importantly to guaranteeing that Mr. Caputo is deterred from committing any more
4  offenses is the fact that his significant social, emotional, psychological and intellectual
5  impairments, the result of a range of congenital neurological defects, have now come to light.
6  His family members are devoted to helping Mr. Caputo re-integrate into society after he leaves
7  prison. His uncle Tony, his uncle Mike, his uncle Gianfranco, and his mother, Patricia Caputo
8  have all pledged to commit to this task. As his mother wrote, "Your honor, please allow Brian
9  leniency, allow Brian to come home to a network of family and friends who are now aware of his
10 circumstances and their seriousness and are willing to be involved in his life… I desperately
11 want a second chance to be able to be a good mother to my only son Brian." (Letters p. 18.)

12 As Brian's mother noted, he never had a good mother. Further, as his uncle Tony noted,
13 "Brian never had a father figure in his life." (Letters, p. 4.) His sister, Christina Torres, wrote,
14 "He never got the care he needed… For Brian to develop normally or thrive he should have been
15 involved in programs and received special attention." (Letters, p. 11.) Nobody ever stopped the
16 abuse he endured at home and at school. Nor did anybody recognize and ameliorate the effects of
17 his significant developmental deficits. Brian acted badly. On his release from custody, Brian will
18 find a network of support where there had been none, and that network, apprised of Brian's
19 difficulties and the origins thereof, will be empowered to finally help him integrate into the
20 world around him in a meaningful way. This will protect the community from future criminality
21 more than any additional time in prison ever could.

22 Further, it is fair to say that the risk Mr. Caputo poses after his release is limited to
23 computer/internet offenses like the one in this case. His social functioning, along with his
24 deteriorating mental condition, make it virtually unimaginable that he would have the
25 wherewithal or even the ability to commit a hands-on offense. He will likely never be able to live
26 on his own and will certainly be limited to living with a family member or other caretaker as he
27 did prior his arrest. In such a circumstance, his computer use can be effectively curtailed through
28

-12-

the caretaker's intervention coupled with the certain limitations of supervised release following his incarceration.

## VII. 18 USC §3553(a)(2)(D): THE NEED FOR THE SENTENCE IMPOSED TO PROVIDE THE DEFENDANT WITH NEEDED EDUCATIONAL OR VOCATIONAL TRAINING, OR OTHER CORRECTIONAL TREATMENT IN THE MOST EFFECTIVE MANNER.

Brian has significant neurological deficits, for which he desperately needs medical treatment and special educational, vocational and social skills-building programs. Several letter-writers noted Brian's evident desire to work, the pride he took in working, being productive and providing for his family. As his former manager, Eustolia Villa, wrote, "Since he started working in 2013. [sic] He has been the head of household, to single mother and young sister. He was trying to better himself, by going to school… while I was working [with him] Brian was a good employee." (Letters, p. 13.)

His uncle Mike employed Brian for a short time after he turned 18, and noted that Brian "worked very hard." (Letters, p. 7.) However, he detailed Brian's difficulties at work: "[]It took more than I ever imagined to teach him, these were simple things at least what I felt were simple things. Without shame he realized he was hard of learning and he tried his hardest!" (Letters, p. 7). Brian wants to work, he wants to contribute, he wants to feel good about his place in the world. He is going to need a tremendous amount of help coming to that point, and it is unclear whether the Federal Bureau of Prisons will have programs appropriate to his very specialized needs.

## VIII. 18 USC §3553(a)(3) AND (a)(4): THE KINDS OF SENTENCES AVAILABLE AND THE SENTENCING RANGE ESTABLISHED.

As noted in the PSR, the offense of conviction precludes a sentence less than five years in prison. Furthermore, Mr. Caputo's total offense level of 37 places him well outside the range of probationary and split sentences. Thus, there is only one kind of sentence available for Defendant – a prison sentence and supervised release. The PSR calculates the Defendant's Criminal History Category ("CHC") as Level III, based on four points, resulting from two convictions in

2007 for petty thefts, and having committed the instant offense while on probation. Based upon those calculations, defendant's advisory guideline range is 210 to the statutory maximum of 240 months.

The Probation Officer recommends a sentence of 180 months. However, the Defendant contends that the calculation of his CHC should be disregarded, pursuant to this Court's authority under §4A1.3(b)(1), because the CHC "substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes."

The Commentary to that Guideline, at Note 3, states:

> A downward departure from the defendant's criminal history category may be warranted if, for example, the defendant had two minor misdemeanor convictions close to ten years prior to the instant offense and no other evidence of prior criminal behavior in the intervening period.

USSG §4A1.3 (Comment Note 3).

The offenses in Mr. Caputo's case occurred closer in time, but that temporal closeness should be offset by the distinct nature of the offenses. In the Commentary's example, the departure may be warranted, even though a defendant has two petty theft convictions, followed ten years later by a residential burglary conviction. Unlike Mr. Caputo's prior offenses, those suggest a return to form—a person, who, when faced with similar circumstances, recidivates in a similar way.

No such recidivist tendency is shown by the relationship between Mr. Caputo's prior offenses and his current offense. The prior offenses—petty thefts, for which Mr. Caputo spent negligible time in custody—are properly characterized as dalliances, with no discernible logical relationship to the *mens rea* of his current offense.[1] Nor should Mr. Caputo's technical status as a probationer at the time he committed the instant offense be considered as suggestive of a tendency to recidivate. Because the earlier convictions were California misdemeanors, he was placed on "informal," unsupervised probation, such that he had no contact with a probation officer and no special conditions of probation with which to comply. In essence, by being placed

---

[1] It should be noted that the online communications that are the focus of this case began in 2013, well after the end of the previous misdemeanor probation. It is only because some images found on his devices had time stamps prior to that time that this enhancement is applicable.

-14-

on probation for three years, Mr. Caputo was given no reminder of his need to "be good", other than that given to every person, probationer or no, so that, in committing the instant offense, he violated the same agreement—commit no offense—that every person does who commits a crime.

Furthermore, the Guidelines calculation in the PSR includes a seven-point upward adjustment under USSG §2G2.2(b)(3)(E) for distribution to a minor that was intended to persuade, induce, entice, coerce… the minor to engage in prohibited sexual conduct, as well as a five-level upward adjustment under USSG §2G2.2(b)(5) for engaging in a pattern of activity involving the sexual abuse of a minor. The Defendant conceded that the application of each adjustment is legally proper, and thus not technically objectionable. See, U.S.S.G. § 1B1.1 cmt. n. 4.

However, the Defendant contends that, in his case, application of both adjustments is duplicative and, in combination, cause an overstatement of the seriousness of his conduct. The seven-point adjustment is applied when the distribution of images to minors is intended to induce the minor to engage in prohibited conduct including the production of child pornography. The five-point enhancement applies to a pattern of conduct exploiting minors including the production of child pornography. Here, the pattern of conduct was only the inducement to produce child pornography which is the same conduct punished by the seven-point enhancement except that the latter includes the additional element of distribution to the minor.  Therefore, although the addition of points under each of those provisions is technically accurate, the Defendant submits that inclusion of points for both provisions overstates his culpability, in a §3553 analysis.

For reference, only, if the additional five point for pattern of abuse were deducted from the PSR calculation and a criminal history of II was used instead of III, the guideline range would be 135-168 months. With a similar reduction as that recommended in the PSR for Mr. Caputo's medical and other circumstances, the defense recommendation of 80 months is reasonable.

**IX. 18 USC §3553(a)(6): THE NEED TO AVOID UNWARRANTED SENTENCE DISPARITIES AMONG DEFENDANTS WITH SIMILAR RECORDS WHO HAVE BEEN FOUND GUILTY OF SIMILAR CONDUCT.**

While it would be appropriate for the Court to look at other cases and other defendants in general in considering disparity issues, Defendant specifically asks the Court to consider the case of *United States v. Parish*, 308 F.3d 1025 (9th Cir. 2002.) The defendant therein pleaded guilty to possession of child pornography. The *Parish* Court focused its sentencing inquiry largely on the defendant's susceptibility to abuse in prison. It focused on the small stature, demeanor, naivete and nature of the offense so far as those characteristics would subject the defendant to abuse in prison.

Mr. Caputo's characteristics leave him particularly susceptible to abuse, even more so than the defendant in *Parish*. Mr. Caputo is an individual whose degenerative neurological abnormalities leave him increasingly unable to interact socially in appropriate ways or to create meaningful bonds with others. As detailed in the Mishna Article, those defects combine with his personal characteristics to place him in double jeopardy for abuse: his small stature, slurred speech and awkward demeanor make will cause him to be a target in prison, just as they caused him to be a target in school. Combine with this his susceptibility as a result of his offense conduct, and his inability to "get along" with prison authorities, and Mr. Caputo may well be among the offenders most susceptible to abuse in the entire Bureau of Prisons.

**X. CONCLUSION**

Defendant acknowledges that punishment for his crime is appropriate and his sentence must reflect the seriousness of his offense, promote respect for the law, and provide just punishment. 18 USC §3553(a)(2). He simply asks the Court, in light of all the information before it, to impose a sentence of 80 months followed by a 10-year term of supervised release. This sentence is "sufficient but not greater than necessary".

Respectfully submitted,

/s/ Eric A. Chase

Counsel for Defendant