1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. LAWRENCE J. O'NEILL

UNITED STATES OF AMERICA,          )
                                   )  1:14-cr-041 LJO-SKO
            Plaintiff,             )
                                   )  SENTENCE
        vs.                        )
                                   )
BRIAN CAPUTO,                      )
                                   )
            Defendant.             )
_____)

Fresno, California                 Monday, November 7, 2016


REPORTER'S TRANSCRIPT OF PROCEEDINGS

**APPEARANCES OF COUNSEL**:

For the Government:        **MICHAEL TIERNEY**
                           Assistant U.S. Attorney
                           2500 Tulare Street, Rm. 4401
                           Fresno, California  93721

For the Defendant:         The Criminal Defense Group
                           2600 West Olive Avenue, Suite 500
                           Burbank, CA 91505
                           BY:  **ERIC A. CHASE**




REPORTED BY:  PEGGY J. CRAWFORD, RDR, CRR, Official Reporter



Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

2

<u>INDEX</u>

<u>EXHIBITS</u>

<u>COURT'S</u>                                                    Marked

  1  and  2                                                   20

1   Monday, November 7, 2016                    Fresno, California

2   10:01 a.m.

3           THE COURT:  Let's call the case of United States

4   versus Caputo.

5           Could I have your appearances, please.

6           MR. TIERNEY:  Good morning, your Honor.  Michael

7   Tierney for the United States.

8           MR. CHASE:  Good morning, your Honor.  Eric Chase on

9   behalf of Mr. Caputo, who is present.

10          THE COURT:  Good morning.

11          Sir, what is your name?

12          THE DEFENDANT:  Brian Caputo.

13          THE COURT:  Mr. Caputo, have you had a chance to

14  review the Presentence Report with your attorney?

15          THE DEFENDANT:  Yes.

16          THE COURT:  Do you have any questions about it?

17          THE DEFENDANT:  As far as any questions, my head

18  buzzes when it comes to just all those thoughts, so I can't

19  get my thoughts together as to -- to make any questions.

20          THE COURT:  Did you go through the Presentence Report

21  with your attorney?

22          THE DEFENDANT:  Yes.

23          THE COURT:  Did you understand what he was telling

24  you when you were talking back and forth with one another?

25          THE DEFENDANT:  Um, to some extent, yes, but at the

4

1  same time, my -- like my head was buzzing to where I -- you

2  know, he just went over it, and I kept saying, "All right, all

3  right, all right," just because my stress level, you know,

4  will give me a stroke.  I have already suffered five.

5          And the facility I'm in does nothing for those.  So I

6  wanted to avoid that.

7          THE COURT:  You can have a seat, if you wish.

8          MR. CHASE:  Go ahead, Brian.

9          THE COURT:  The Court has received and reviewed the

10  Presentence Report, numerous letters.

11          MR. CHASE:  Excuse me, your Honor.  May I, before the

12  Court begins?

13          THE COURT:  Yes.

14          MR. CHASE:  The family has asked me -- and I

15  recognize what the answer to this will be or might probably

16  be -- but the family has asked me to request that they be

17  permitted to audio-record the proceedings.

18          THE COURT:  For what purpose?

19          MR. CHASE:  So that they can be sure that everything

20  is taken down properly, is what they have informed me.

21          THE COURT:  That's what a court reporter is for.

22          MR. CHASE:  I understand, your Honor.

23          THE COURT:  The request is denied.

24          MR. CHASE:  Thank you.

25          THE COURT:  I have 12 letters, including one from the

5

1  defendant.  I have medical reports and medical records,

2  articles.

3       I have the 11(c) agreement.  I have the defendant's

4  sentencing memorandum.  I have an additional letter from the

5  defendant.

6       I note that the offense level is indicating that it

7  is 37.  Criminal History Category is III.  Guideline range --

8  hang on just one second -- it should be 262 to 327, if the

9  Criminal History Category is properly III.

10       Probation is recommending 180 months.

11       There are extensive 3553(a) factors.

12       I have a preliminary question.  And the first

13  question is to you, Mr. Tierney, and that is, did you read the

14  letter from the defendant's mother?

15       MR. TIERNEY:  I did, your Honor.

16       THE COURT:  And did you take a look at the medical

17  reports, specifically from Dr. Sabow, S-a-b-o-w?

18       MR. TIERNEY:  Yes, your Honor.

19       THE COURT:  What is your impression?

20       MR. TIERNEY:  Well, your Honor, I'm glad that the

21  Court raised it.  This was number one on my list of issues to

22  raise as well.

23       I have no reason to dispute that the defendant

24  suffers from this syndrome that's in the doctor's letter,

25  CADASIL, I think is the acronym that's used for it.

1        I think the question for the Court is twofold.

2   Number one, from a legal perspective, does that impact his

3   competency in any way.

4        THE COURT:  Right.

5        MR. TIERNEY:  Because there are some reports that

6   this causes dementia, it causes a different personality, it is

7   progressive over time, so we have got to answer that question.

8        And then, of course, if that question is answered in

9   essentially the affirmative, that we can go forward, then how

10  does the Court take that into the mix of 3553(a) factors.

11       As to that first question, what I would say is that

12  we should take a look at the record, your Honor.  The Court

13  did hear from the defendant twice during the suppression

14  hearing.  He testified twice.

15       And you may recall that he testified with a high

16  level of detail about what had occurred a couple of years

17  previous to that.

18       As a matter of fact, on the transcript, page 221 of

19  the transcript of the suppression hearing, the Court noted

20  that his testimony was very precise, very detailed, and that

21  he recalled events, persons present at those events, and the

22  dialogue that occurred in those events.

23       Also, your Honor, the Court, in addition to the

24  letter from the defendant's mother, the defendant has written

25  a couple of letters to the Court.  He wrote one very recently,

1   and then he wrote one back in July of 2016, that he sent

2   directly to the Court.

3        And I have spoken about this issue with defense

4   counsel as well.  Defense counsel indicated that he has

5   additional submissions for the Court today in written form.

6        And I think what we see through all of those

7   submissions is that the defendant is quite articulate, and

8   that his mental functioning, to the extent that that is

9   relevant for these proceedings, that he knows what the

10  proceedings are, that he is able to competently consult with

11  counsel, that he knows the difference between right and wrong.

12        All of those things are met in the record as he has

13  given them to us, in his testimony at the suppression hearing,

14  and then his letters to the Court.

15        So I don't see any reason that the Court should

16  believe that he is not competent or that the Court should

17  order a competency inquiry under 18 U.S.C. 4241 or 4242.

18        And I believe that we can proceed onward with the

19  sentencing hearing.

20        THE COURT:  On this limited issue, Mr. Chase, do you

21  wish to be heard?

22        MR. CHASE:  I do, briefly, your Honor.

23        First, a small correction.  I don't have additional

24  written submissions.

25        MR. TIERNEY:  Oh.

1        MR. CHASE:  What I informed Mr. Tierney of is that

2    Mr. Caputo has written out two statements for the Court that

3    he will be reading to the Court.  One of them is his personal,

4    oral statement, and the second one is a letter that he would

5    like to have sent to the victims.  It is his letter of

6    apology.

7        It would have been our plan to deliver that letter to

8    Mr. Tierney and have him make the decision whether it was

9    appropriate or not to make that delivery.

10       And I will tell the Court that I actually agree with

11   Mr. Tierney, that in my communications with Mr. Caputo,

12   although he certainly is affected by the CADASIL, it affects

13   his speech, it affects how he approaches issues, I think

14   Dr. Sabow is very correct in his analysis, and we certainly

15   will be using that, we have used it in our memorandum and will

16   continue to use it, but in terms of his ability to understand

17   the proceedings, he was able to go through the Presentence

18   Report with me, he asked appropriate questions, and appeared

19   to understand my answers.

20       THE COURT:  Okay.  What else would you like to tell

21   me now that is more expanded?  I'm not asking you to be

22   limited to the 4241 issue.

23       MR. CHASE:  Are you asking me to make my argument at

24   this time?

25       THE COURT:  I am.

1          MR. CHASE:  Thank you.

2          Before the Court, Brian Caputo poses a unique

3   challenge for sentencing.  As Mr. Tierney has pointed out, he

4   is in agreement that, without question, Brian suffers from

5   CADASIL and related degenerative organic brain abnormalities

6   which affected his participation in these offenses.

7          I think it is important to note that his admission to

8   the Bakersfield hospital, that Dr. Sabow refers to, for the

9   severe migraines, which is one of the indices of the CADASIL,

10  happened at and around the time that the significant offenses

11  of contacting minors began.  And I don't think it can be

12  ignored, the effect that this disease has had on these

13  offenses.

14         So the unique challenge for the Court is weighing

15  sympathy and understanding of how someone like Brian, who not

16  only suffers from this degenerative disease, which will get

17  worse as he is in custody, we have the considerations of how

18  the Bureau of Prisons will be able to treat him.

19         The consideration, as considered in the guidelines,

20  of how he will adjust to prison and how prison will affect him

21  from nutrition, to stress, to exercise, to proper medical

22  treatment; it will have a different and worse effect on Brian

23  than it would have on anybody else.

24         And I think we are all in agreement that those

25  factors are present in this case.

1          And on the other side of the scale, is protection of

2     the community, which, of course, is an appropriate and proper

3     consideration for any Court in passing sentence.  I would

4     suggest to the Court that there really is no concern for

5     future protection of the community.

6          As I stated in my brief, everything we know about

7     Brian, not just at the time the CADASIL flared in 2013, but

8     going back to his childhood, he has had the speech impediment

9     that the Court has been able to hear as he has addressed the

10    Court on all occasions since he was a very young child.  And

11    as some of the letter writers pointed out, it affected his

12    treatment by others, and he was severely bullied as a child.

13         But in 2013, there was this significant event.  And

14    if we go back to the bail hearing, I know the Court was very

15    concerned that his family had not shown the proper ability to

16    stop Brian from committing these acts.

17         What I think it's important to note is the CADASIL

18    wasn't diagnosed until after his arrest.  After his arrest, he

19    went through a Social Security hearing process that caused

20    this diagnosis to be made.

21         And Dr. Sabow's involvement and the treatment by

22    other specialists, although we certainly wish it had been more

23    while he had been in custody, so now with their understanding

24    of how it affects him and his ability to control his impulses,

25    they certainly, with the additional intervention of the

1    supervised release officer who will be assigned to the case,

2    there is the ability to control his access to the Internet and

3    to make the types of contacts that led -- that are of this

4    offense.

5           And as I pointed out, seeing who Brian is from the

6    time he grew up and the type of personality he has, it is not

7    just that he was always a good kid until the CADASIL hit him;

8    it is that with his panoply of degenerative conditions, I

9    think it is safe to say that he doesn't have the wherewithal,

10   the ability, to go out, to go to some street corner and submit

11   some hands-on offense.

12          And I think that through Pretrial Services and his

13   family, there is the ability to protect society.

14          THE COURT:  Well, he didn't exactly go to a street

15   corner to commit this offense or these offenses either, did

16   he?

17          MR. CHASE:  No, he did not, your Honor, and that, I

18   think, is precisely my point.

19          THE COURT:  And look at the damage he did,

20   nonetheless.

21          MR. CHASE:  No doubt there was significant damage.

22   As I point out in my brief, we recognize that.  The

23   significant damage was caused to individuals, and that can't

24   be ignored.

25          But the damage can be stopped.  We can protect from

1   that damage, which is the use of the Internet, which is, I

2   would submit that it is clear that that type of anonymous

3   crime, you know, sitting in the lonely confines of your

4   bedroom and typing on a screen, it is the only crime he is

5   capable of.

6           THE COURT:  It may be, but is that of any comfort at

7   all to the victims?  I mean truly, it takes -- it is of no joy

8   that anybody thinks about the specifics and the victims of

9   these crimes.

10          But we have situations where girls between ages 11

11  and 15 were required not only to, out of total fear, required

12  not only to take photos of themselves, but also to perform

13  sexual acts on themselves, that were then not only given to

14  him, and the girls knew it, but then they were distributed to

15  others.

16          And I don't think that anybody needs to be reminded

17  how devastating that would be at that age to anybody, male or

18  female, to know that that was what was happening.  It would be

19  devastating to an adult, who would understand the -- what was

20  being done and how it was being perceived, but to an 11, 12,

21  13, 14, 15-year-old girl, the devastation, the damage that

22  would be done at that age that would go on is just

23  catastrophic.

24          So what I'm trying to say here, and trying to say it

25  a little more succinctly than I am, is that it makes no

1  difference to those victims whether he is sitting at home

2  doing this or whether he is at the street corner, touching.

3      When you, out of fear, are required to touch yourself

4  in this matter, it is a direct violation.

5      MR. CHASE:  Your Honor, I didn't mean by my

6  comments -- and I hope the Court didn't take it that way -- I

7  didn't mean to minimize his past conduct.

8      THE COURT:  No, I didn't take it that you are trying

9  to minimize.  I took it that you were focusing in on what he

10 specifically did, and what I'm doing is I'm broadening the

11 focus to indicate not just what he did, but what he did to

12 someone else and the catastrophic consequences of that to the

13 victims, who couldn't care less where he was.  Whether he was

14 in the confines of a Beverly Hills hotel or whether he was in

15 a tent, the consequences to the victims were the same.

16     MR. CHASE:  I understand, your Honor.  And my point

17 was not about what he did.  We recognize all the things the

18 Court said.  We are in full agreement.

19     My point was about the future.  My point was limited

20 to protection of society, which is the -- that's the point I'm

21 addressing, is future protection once Brian is out of custody.

22     Because his ability to commit offenses is, I think,

23 clearly limited to the types of offenses he has committed in

24 the past, which requires a working Internet connection and

25 access to a device to get on the Internet and make the types

1   of contacts he made, that's all he is mentally capable of, in

2   the past and all he will be mentally capable of in the future.

3        My point is now that his family is aware of this

4   diagnosis, which I will again repeat, happened at about the

5   same time -- well, the event that led to his diagnosis

6   happened at about the same time that the offenses began.

7        Now that his family is aware of the predilections

8   that this disease may cause in Brian, and through the further

9   intervention of Pretrial Services, my only point was that we

10  can adequately protect society from any potential dangers that

11  Brian Caputo may pose in the future.  It wasn't directed at

12  the past.

13        And we recognize the suffering of the victims, and

14  that it was -- they suffered just as bad as someone who was --

15  who something may have happened to in person.

16        I didn't mean to imply that their suffering was any

17  less, because I agree with the Court that their suffering is

18  real, significant, and perhaps long-lasting.

19        THE COURT:  I think we can probably take the

20  "perhaps" out of it.  You know, we have, all of us have chosen

21  enough jurors along the way in sexual molest or sexual-related

22  cases, crimes, where we have adults that are well into their

23  30s, 40s, 50s, 60s and 70s, who, when the question is asked

24  just in a very general way of the jury panel, we have people

25  who break down.  They don't get over it.

1          MR. CHASE:  I certainly agree, your Honor.  I just

2     don't like to predict the future.  And perhaps I should have

3     taken "perhaps" out.

4          I don't know these people, of course, and I have

5     never spoken to them, and I apologize for the use of the word

6     "perhaps" in that circumstance.

7          But we understand, you know, the Court -- what makes

8     this difficult is the Court has to look at two things.  There

9     is the punishment side and there is the protection side.

10          I would suggest that on the punishment side, the harm

11     to the victims, which is grotesque and as horrific as the

12     Court has described, and we agree, and I personally agree, is

13     in some manner offset by the organic abnormalities in Brian's

14     brain that caused him to do it.

15          And so now the Court is in the position where they

16     have to weigh what I think should be an appropriate

17     understanding of his physical -- I'm going to call it a

18     physical condition.  This is not a psychological condition

19     that would be treated by a psychologist through psychotherapy

20     and talk therapy.  This is a physical abnormality in his brain

21     tissue which Dr. Sabow was able to identify in the MRI to make

22     his diagnosis.

23          This is not the administration of a multiple choice

24     test, which, because of some statistical analysis, they are

25     able to reach some conclusion.

16

1          This is a physical deformation in Bryan's brain.  And

2  that should cause the Court -- well, I suggest that the Court

3  can take into consideration in deciding how to weigh the harm

4  side of it against the protection of society, which I think we

5  can ensure through supervised release and through the

6  intervention of his family.

7          I know that Brian has two things he wants to say to

8  the Court.  There is also two family members who would like to

9  make statements.

10          THE COURT:  All right.  With regard to Mr. Caputo,

11  did you say he has a couple of writings?

12          MR. CHASE:  He has a couple of things he would like

13  to read to the Court.

14          THE COURT:  Does he wish me to read them?

15          MR. CHASE:  Do you wish to read them or give them to

16  the Judge?

17          THE DEFENDANT:  I would like to read them.

18          MR. CHASE:  They are short.  He is going to read

19  them.

20          Start wherever you want.

21          THE DEFENDANT:  Well, your Honor, if I may, I feel

22  horrible for what I've -- your Honor, if I may, I feel

23  horrible for what I have done.  I am hurt over all the lives I

24  have hurt, such as the victims, their families, as well as

25  mine.  I have learned my lesson for the wrongs I have

1 | committed.

2 |     (The defendant is crying.)

3 |        THE COURT:  I may need to read these.

4 |        MR. CHASE:  I understand.

5 |        THE COURT:  I understand the emotionalism of crying,

6 | but I am not going to be able to hear what he is saying, and

7 | the court reporter isn't going to be able to take down what he

8 | is saying.

9 |        So if he wants a true record of this, he probably

10 | needs to have me read these.  From his submissions before, his

11 | handwriting is very readable.

12 |        So it is up to you, but that's my concern.

13 |     (Counsel and the defendant conferred off the record.)

14 |        THE DEFENDANT:  I would like to finish reading them,

15 | if I could.

16 |        MR. CHASE:  If I may, his preference is to continue

17 | reading them.  I will indicate that we will submit them as

18 | well so there is a clear record of what was said.

19 |        MR. TIERNEY:  That's fine with the government as

20 | well.

21 |        THE DEFENDANT:  I am hurt over all the lives I have

22 | hurt, such as the victims, their families, as well as mine.

23 |        I have learned my lesson for the wrongs I have

24 | committed.  I swear and can reassure you, this will never

25 | happen again, and that in no way am I a threat or a danger to

1  society.

2         Seeing how Probation, law enforcement, the courts,

3  and my family --

4         THE REPORTER:  I'm sorry --

5         THE DEFENDANT:  -- will have strict rules and

6  regulations, continuous watch, and supervision over me, I

7  will, without a doubt, follow and abide by all I'm told to do.

8         Given my brain disorder and what it does, and finding

9  out about this last year, including the few years I have left

10 to live, I ask that you please take into consideration the

11 doctors that are -- and allow me to get the help and medical

12 treatment I have been deprived of while incarcerated.

13        As you looked into my criminal record, I have no

14 long, ongoing criminal past implying I am in any way a danger

15 or a threat to society.

16        I wish I had known of my disorder and gotten the help

17 I have needed.  More than likely, this would have never

18 happened if I was aware of it then.

19        Please, I beg you, your Honor, allow me to go home,

20 receive the proper medical care, and help me to commence a

21 healthy lifestyle, given the few years I have left to live due

22 to my condition, with my family.

23        May God forgive me for what I have done and turned

24 away from.  Also, may God be with you and everyone else

25 involved.  Thank you.

1          MR. CHASE:  Your Honor, if I may, the second one is

2     one very short paragraph and it is a proposed letter of

3     apology to the victims.

4          THE COURT:  All right.

5          THE DEFENDANT:  To whom I have wronged and their

6     families, I highly apologize for this letter being written

7     now.  I just found out to what extent of the things I have

8     done, and the pain and helplessness I have caused you.

9          May I please ask that one day you could find it in

10    your hearts to forgive me, as I am truly hurt and saddened by

11    this ordeal.  I wasn't in the right state of mind when I

12    acted.

13         May God bless you all, granting you peace, love,

14    security, and a long, happy life, and give you rest and

15    protection from all of life's worries.  I apologize for my

16    stupidity.

17         MR. CHASE:  Your Honor, for the record, the court

18    reporter indicated to me and the Court during the reading that

19    she was having difficulty taking it down.

20         I am now submitting both statements for the record to

21    additionally supplement whatever the court reporter was unable

22    to transcribe.

23         THE COURT:  We will mark those as Exhibits 1 and 2 of

24    the sentencing hearing and provide them to the court reporter

25    for the clarity of her record.

1          THE REPORTER:  Thank you, your Honor.  Thank you,

2    Counsel.

3       (Court's Exhibits 1 and 2 were marked for identification.)

4          THE COURT:  Mr. Chase, anything further?

5          MR. CHASE:  Yes, your Honor.  Just one moment.  His

6    mother, Patricia Caputo, will speak first.

7          PATRICIA CAPUTO:  Where do I stand?

8          THE COURT:  Right up here would be fine.  Up here at

9    the screen, there is a microphone for you.

10         PATRICIA CAPUTO:  Okay.

11         THE COURT:  Could you tell us your name, please.

12         PATRICIA CAPUTO:  Patricia Caputo.

13         THE COURT:  Thank you.

14         PATRICIA CAPUTO:  Well, I want to begin with offering

15   my condolences to everyone involved, all the victims and

16   everyone.

17         I also want to bring out that we did find out about

18   Brian's medical condition and the crime only after his arrest.

19         And that we would take every measure and apply every

20   measure possible and follow all the rules that are applied to

21   us to keep this from ever happening again, such as locking

22   down the Internet, constant supervision, et cetera.

23         And I just want you to please, you know, have mercy

24   on his actions and have compassion, with knowing his

25   circumstances and the time that it began with his medical

1   condition or his major stroke that occurred.

2        You know, he did suffer liquid in his brain at that

3   time, and it was very -- just a very terrible situation that

4   we went through.

5        But I would like to ask that you please consider all

6   of this, and also that if you do sentence him, it will most

7   likely become a life sentence.  And I can't bear the thought

8   of thinking of him passing in a prison, your Honor, when we

9   can prevent this from ever happening again.

10        THE COURT:  Well, you know, Ms. Caputo, this is a

11   nightmare for you and your family, I know that.  But it was

12   also a nightmare for the victims and their families too.

13        PATRICIA CAPUTO:  I understand.

14        THE COURT:  I'm sure that you can understand how

15   devastating this sort of thing would be to somebody in their

16   early teen years.

17        PATRICIA CAPUTO:  I do.

18        THE COURT:  And so even though you can prevent it, I

19   still have an obligation for sentencing when it comes to

20   punishment.  And it is a real duty; it is not just something

21   that I can say, "Well, it is not that big of a deal."  It

22   certainly is to the victims.

23        And that doesn't mean that I just simply look at

24   victims.  It doesn't mean I simply look at the defendant, to

25   your son.  I have an obligation to look at both.

1              And this job isn't always easy, but it is still a

2    duty that I have to do.  I don't know any judge who enjoys

3    sentencings.  They are the hardest part of the job.

4              But when you say you think you know his prognosis, as

5    far as his longevity of life, in the medical literature that's

6    been provided, it's not so definite as you are.

7              PATRICIA CAPUTO:  I believe that that's because --

8    I'm just saying I believe it's because doctors, they really

9    can't put a time of someone's passing, but according to his

10   condition, from the onset of his first major attack, he has

11   maybe ten years to live afterward -- he has already spent

12   three in jail -- and that's only if he gets proper medical

13   care, and the elements all included are in good care for him,

14   such as the proper rest, exercise, food, water, and medical

15   care.  Without those things, it speeds it up.

16             THE COURT:  Again, though, the medical information

17   that's been provided to me does not substantiate that.  In

18   other words, it doesn't just simply say, "Ten years from

19   onset."

20             As a matter of fact, it said in some, they have

21   average intelligence and live normal lives, which is not ten

22   years from onset.  It is much different.

23             PATRICIA CAPUTO:  Well, I don't want to put a

24   specific date on it, but I have clicked on some links myself

25   to study the diagnosis, and I have read that.  I have actually

1  |  seen it and read it off of one of the links.

2  |          THE COURT:  The treating physician doesn't indicate

3  |  that, does he?

4  |          MR. CHASE:  If I may, your Honor?

5  |          After initially receiving Dr. Sabow's report, I

6  |  contacted him with that specific question.  And he informed me

7  |  that he was unable to put a prognosis date on life expectancy.

8  |  He just reaffirmed what he had written, and what the

9  |  literature says, which is the disease is degenerative.

10 |          There is no specific treatment for it to make it

11 |  better.  There are ameliorative treatments, but no curative

12 |  treatment.  And so Brian will keep getting worse.  At what

13 |  pace, it is impossible for him to predict, which is why he was

14 |  unable to write that in his letter.

15 |          THE COURT:  I understand.

16 |          Is there anything else you want to tell me?

17 |          PATRICIA CAPUTO:  I just want to end with please.

18 |          THE COURT:  I get it.  I know what you are thinking

19 |  and I know what you are feeling.  I understand how hard this

20 |  is for you.

21 |          PATRICIA CAPUTO:  Thank you.

22 |          THE COURT:  Okay.

23 |          MR. CHASE:  I believe Tiffany Caputo would like to

24 |  make a short statement, Mr. Caputo's sister.

25 |          THE COURT:  Okay.  Could you tell us your name,

1   please.

2          TIFFANY CAPUTO:  Hi, your Honor.  My name is Tiffany

3   Caputo, and I would like to start off by saying my nerves are

4   high.  This is my brother.

5          I personally was a victim of rape at the age of 14,

6   by a man that had no brain disorders and was fully

7   understanding of what he was doing.  And I forgave that man

8   for my own heart so that I can move on with my life, and I

9   didn't hold anything against him.

10          I think that Brian has made a very, very bad mistake.

11   I am a victim too.  I understand what the victims are going

12   through.  And I don't think that it was right.  But I think

13   that with Brian's brain disorder, it is a disease, it is not a

14   syndrome, I think that we kind of need to take it into

15   consideration.

16          THE COURT:  I am taking it into consideration.  I'm

17   not ignoring it.

18          TIFFANY CAPUTO:  I know you are not.  But I am so

19   terrified of losing one of my best friends for something that

20   he did was wrong.

21          But I think that he is not going to have very long;

22   I'm not going to put a date on it.  But growing up with my

23   brother, seeing the deterioration of what has gone on, it's

24   tremendous.  He is not the same brother I was growing up

25   with -- sickly-wise, I'm talking about -- and I think that has

1  a huge role in this whole thing and what has gone on.

2          And I am very sorry for the victims too.  I am.  I

3  understand what they go through.  And I know that it is a

4  lifelong thing to kind of overcome.

5          But my brother is sick.  And the guy that took over

6  me wasn't.  And I think that everything needs to be

7  considered.

8          I am perfectly normal.  I am a great person to

9  society.  I have my family.  And I am fine.  I did -- I had

10  to -- in my heart, I had to make peace with God, and I had to

11  forgive him because I knew it was the right thing to do.  Even

12  though it wasn't right, I knew it was the right thing to do,

13  but I have moved on, and I am perfectly normal.

14          THE COURT:  Well, Ms. Caputo, I will make one comment

15  to you from an objective standpoint.

16          TIFFANY CAPUTO:  Okay.

17          THE COURT:  I don't know you.  I don't know the

18  circumstances other than what you have just described.  But

19  you are still very, very deeply affected by that incident and

20  that crime that was perpetrated against you.  That is clear to

21  me, just listening to you.

22          And being, as you say, perfectly normal, I don't know

23  if anybody is perfectly normal after they are the victim of a

24  serious, violent, and physical crime.

25          And so I'm not in any way trying to debate you or

1    argue with you.  I am just telling you that from where I sit

2    and what I'm viewing, as I look at you as you present, you

3    still hurt a great deal.  And I don't think we need to debate

4    it.  I think you know it, and I know it, and anybody who has

5    ever heard you talk about it knows it.

6         So I understand that you are torn.  You are torn, not

7    only being a victim of an unbelievably horrid crime, but you

8    are also trying to protect a brother that you love very, very

9    much.  And I understand.

10        TIFFANY CAPUTO:  But if I can say something.  I want

11   to let it be known that people make mistakes.  This man that

12   wasn't sick took control of me and did what he did.

13        My brother is sick.

14        THE COURT:  Believe me --

15        TIFFANY CAPUTO:  He is not in the right state of

16   mind.  He needs the help he needs.  And he has tons of mentors

17   that are willing and fully ready to help him and make sure

18   that this never happens again.

19        And I am willing to be one of those right there at

20   the very top.  And I can bet you my life that this, that

21   something like this would never, ever happen again.

22        We are all aware of it.  We want to help him, get him

23   the right kind of help, and go on with living life.

24        I mean let him become the person that society wants,

25   a good person, productive, positive.  And he can do that with

1  the right help.

2          THE COURT:  Two things.  One, I believe you.  I

3  believe that you want to make sure that, and will do

4  everything in your power to make sure it doesn't happen again.

5  I believe you.

6          But understand this.  If the person who raped you

7  were before me at the same moment that I would be sentencing

8  your brother, they would be very different sentences.

9          So I understand the point you are making, that we are

10  dealing with two different types of situations.  I get that

11  part.

12          So be assured that they would not be getting the same

13  sentences.

14          TIFFANY CAPUTO:  Like I was never sentenced and never

15  tooken care of.  The law enforcement let him go.  Even though

16  I knew where he was at, they let him go.  So the justice

17  system failed me, but that's okay, because he was okay.  He

18  was fine.  He was a grown man with nothing wrong with him.

19  And I was young.  So that was -- that wasn't okay.

20          But I still found in my heart to forgive him and move

21  on with life.

22          THE COURT:  Your case is not before me.

23          TIFFANY CAPUTO:  I know.  I'm just saying, the

24  understanding is there, the guy was okay.  My brother is not.

25          THE COURT:  I understand.  And that's why I brought

1    it up, that they would be totally different sentences if both

2    of them were before me.  One of them is not.

3         TIFFANY CAPUTO:  I understand.  I understand.  Your

4    Honor, this is my best friend, my only brother.

5         THE COURT:  I know.

6         TIFFANY CAPUTO:  And I think that we have all, all

7    come to an agreement that we are going to take care of him.

8    We are going to make him a positive, productive person, as

9    long as he lives.  And we can guarantee you that.

10        And there is other rules that come along with it in

11   the justice system that can't go unseen, so all of that

12   together, he would be helped.

13        THE COURT:  I understand.  Thank you.

14        TIFFANY CAPUTO:  Thank you.

15        MR. CHASE:  If I may, your Honor, before handing off

16   to Mr. Tierney, I did neglect to address the two requests for

17   variance in my brief, and I will do so very, very briefly.

18        The first one was on criminal history.  I spoke to

19   Mr. Tierney before we began today, and based on the mistake

20   that was in the PSR, using as a Criminal History Category I,

21   the remoteness in time of the other offenses, and most

22   importantly, the uncertainty regarding the beginning, given

23   that the actual serious offenses that were the focus of the

24   hearing began in 2013, that the Court should consider Criminal

25   History Category I.

1          Is that correct, Mr. Tierney?

2          MR. TIERNEY:  I think it was II, but.

3          MR. CHASE:  Was it II?  Thank you.

4          THE COURT:  Even if it were I, it would be 210 to

5    262.

6          MR. CHASE:  Correct.

7          The second request for variance is based on the

8    application of two enhancements, one for five points for a

9    pattern and practice of abuse of minors, and the other one for

10   seven points, which is distribution for the purpose of

11   enticing a minor to engage in -- I will use for the

12   similarity, abusive conduct, both of which, in both sections,

13   include the production of child pornography, which is the

14   girls being asked to make pictures of themselves.

15         I would suggest to the Court that although it's not

16   double-counting pursuant to the Note 4 that I cite in my brief

17   that the Court can consider, that it does overstate the

18   seriousness of the offense.

19         You are basically taking the exact same conduct,

20   which is the enticing of minors to engage in the making of

21   images, and adding five points in one section and seven points

22   in another section.  And the five-point section is wholly

23   covered by the seven-point section, except the seven-point

24   section has the addition of distribution.

25         And I do suggest that using Criminal History Category

1   II, and if only the seven points, the higher, was applied, it

2   would be 135 to 168 months.  And that a similar reduction,

3   taking into consideration Brian's mental disabilities, which

4   are, again, organic, the recommended sentence of 80 months is

5   not unreasonable.

6         Thank you.

7         THE COURT:  Mr. Tierney?

8         MR. TIERNEY:  Thank you, your Honor.  I will begin

9   with the guidelines issues.

10        First, as the Court stated on the record, the --

11   under the Sentencing Table, at the offense level 37, in

12   Criminal History Category III, we are at a range of 262 to

13   327.  That, of course, exceeds the statutory maximum here,

14   which is 240 months.  So I believe that under the Guidelines,

15   that the guideline range is 240 months, if we take Criminal

16   History Category III.

17        THE COURT:  Right.

18        MR. TIERNEY:  This issue regarding timing of

19   offenses, Count 2, to which the defendant pled guilty, charges

20   him with receiving and distributing child pornography from

21   December 2008 through 2014, I believe.  It is not the end date

22   that's material here, but it is the beginning date.

23        The defendant, in his statement to law enforcement,

24   indicated that he had been receiving images, or he had seen

25   images of very young girls as early as 2004.  And it's not a

1   hundred percent clear how long that period of time continued

2   until he started the behavior that is at the heartland of this

3   offense.  So his plea of guilty -- which is the late 2012,

4   early 2013 time frame.

5          His plea of guilty to Count 2 admits receipt and

6   distribution.  Those earlier viewings of child pornography, if

7   they occurred via means of interstate commerce, make him

8   guilty to the charge even at that beginning date.

9          It is just that the -- you know, the very, very

10  serious aggravating circumstances didn't begin -- we don't

11  have any evidence that they began prior to 2012.

12         And the reason why that makes a difference for

13  guidelines purposes -- well, first of all, it doesn't make a

14  difference regarding whether he is guilty of this offense.  He

15  pled guilty.

16         Even if we take the offense as being the distributing

17  of images to minors and the request that they produce child

18  pornography and send it to him, he is guilty within that range

19  that's charged in Count 2.  So he is guilty of the offense.

20         But where it makes a difference for guidelines

21  calculations is because he was on probation in -- he was on

22  state probation from February of 2007 to February of 2010, if

23  the Court really views the conduct at issue here as not having

24  begun until 2012, there is some argument that he wouldn't have

25  been under the probationary sentence at the time the offense

1    occurred.

2         I don't think it is necessary to do that, because

3    like I said, your Honor, there is some evidence that the

4    offense of receipt and distribution of child pornography goes

5    all the way back to 2008, as charged, and as the defendant

6    admitted to, but because there is this issue here, what we

7    would ask the Court to do is either sentence in the

8    alternative, by saying, hey, listen, it doesn't matter, even

9    if you take him down to Criminal History Category I, he is at

10   210 to 267, but if -- it wouldn't affect the Court's sentence.

11        I think under the Guidelines calculations, if you

12   take that out, his criminal history points are still there, so

13   it gives him two criminal history points, 37 offense level,

14   which is a range of 235 to 293.  Because that exceeds the

15   statutory maximum, it is 235 to 240.

16        So even granting the benefit of that doubt, I would

17   have the Court sentence him as if he were Criminal History

18   Category II, or make an alternative sentencing, that whatever

19   the Court is imposing wouldn't matter, whether his Criminal

20   History Category was III or II.

21        In terms of the double-counting argument that

22   Mr. Chase just made, I don't really find that compelling.  The

23   two enhancements have different purposes.

24        The fact of the matter is for this defendant, is that

25   he reached out to a broad range of young girls online and

1    asked them to send him child pornography.

2            Some instances, in which he sent them images of child

3    pornography; some instances, in which he did not.  Many

4    instances, in which he -- in which they terminated the

5    encounter very quickly.

6            His criminal behavior, in terms of trying to get them

7    to produce and send to him child pornography, is a bit

8    distinct from his behavior in sending multiple images of child

9    pornography to other victims and having them give him child

10   pornography back.

11           So there is a -- his offense conduct includes both

12   types of things that the guidelines are reaching at.  One is,

13   did you do this to multiple people?  Second, did you

14   distribute child pornography to them in an attempt to get them

15   to make child pornography and distribute it back to you?

16           Sometimes he did the former, and that sentencing

17   guideline can apply to that conduct.  Many times, he did the

18   latter.  That sentencing guideline can apply to that conduct.

19   And there is a big circumstance in the middle, where both

20   types of conduct occur as well.

21           So I don't think it is duplicative enough that the

22   Court should only impose one of those two enhancements.

23           So that's the guidelines calculation, your Honor.

24   And I can pause there if the Court wants to talk to defense

25   counsel or to me anymore about those guidelines issues.

1          THE COURT:  I don't.

2          MR. CHASE:  No, your Honor.

3          MR. TIERNEY:  Then just a few words about the offense

4     as a whole.  The Court obviously understands how serious this

5     offense was, that it involved not just getting these young,

6     vulnerable girls to trust him, but then exploiting that trust.

7          THE COURT:  It wasn't just trust, it was scaring them

8     into things, among other things -- and again, these are

9     unpleasant topics, but the record needs to be made -- we are

10    talking about frightening young girls into masturbating, and

11    making a record of it, and then sending that record to him,

12    and to have him share it.

13         This is an incredibly serious, serious factual

14    pattern.  As a matter of fact, I'm not real sure, other than

15    an out-and-out physical contact rape, I'm not -- I can't

16    imagine anything more serious factually.

17         MR. TIERNEY:  That's where we come out as well, your

18    Honor.

19         I just wanted to note for a lot of these instances

20    before it came to threats, the defendant was playing on these

21    young girls' trust, where he was saying, "I'm a young girl."

22    And so he was portraying him to be a 12-year-old girl.  "I'm

23    attracted to other women.  That's made me lonely and

24    miserable."  "No one likes me."  "I see you on line, and you

25    are friendly to me, and I'm attracted to you," and "I would

1  like to have a picture of you because I love you so much."

2  "You are my only friend."  "Please send me pictures."

3  Once he got that first picture, that's when he

4  leveraged it up to extortion.  But I think it is important to

5  note that that wasn't the only trick in his bag.  It wasn't

6  the only way that he manipulated these young girls.  Those

7  threats are horrible, and I think they are the headline of

8  what he did, that he threatens to kidnap them, to send people

9  to forcibly take off their clothes, and take pictures.  That's

10  what I remember when I think about this case.

11  But I think it is also important to not just read the

12  headline, but read the rest of the story.  His ways, his tools

13  of manipulation, and his ways of manipulation included a lot

14  more than threats.  And I think that's important because I

15  think in many ways, it goes to rebut what the defense counsel

16  and what others have said are assurances that he is not going

17  to commit this conduct again.

18  So he begins with manipulation, and he -- and it is a

19  fairly sophisticated, in my view, offense.  He is creating

20  multiple different fake identities.  He is using many

21  different platforms of social media to do it:  Messaging

22  platforms, Facebook, TextMe, Dropbox.

23  And even after he is initially confronted by law

24  enforcement in January of 2014, he doesn't stop.

25  THE COURT:  Well, if we concede that we have probably

1    dealt with, if one can believe it, the easy part, what do you

2    believe the Court should do and what do you believe your

3    argument should be with regard to the organic brain disease?

4            MR. TIERNEY:  Yes, your Honor.  That's where I was

5    going.  I don't think that we can say that the defendant had

6    an aberrant period in his life from early 2013, until when he

7    was arrested, in 2014, and now that he has been diagnosed,

8    then we are fine, and he is not going to be a danger to other

9    people.

10           And there is two things that tell me that.  First of

11   all, because the offense involved manipulation, and he was

12   still trying to strategically manipulate people many, many

13   months later when he testified at the suppression hearing in

14   front of this Court.

15           This is past the time when we are supposedly dealing

16   with neurological issues.  He comes in and he tells the Court

17   that the consent forms that he signed and the waiver forms

18   that he signed for the FBI were products of fraud because they

19   placed blank pieces of paper in front of him, and he signed

20   those blank pieces of paper, and he didn't know what he was

21   doing, and the FBI must have later put waivers of rights on

22   those forms.  And the Court, I think rightly, found that to be

23   not credible.

24           Also, when the defendant wrote a letter to this Court

25   in July of 2016, he displayed significant -- I think, I read

1  it this way -- bursts of anger at the Court and the

2  government, accusing -- so he was talking about this

3  difference in times, where the indictment charges him with

4  beginning the offense in 2008, and the evidence shows that he

5  didn't begin extorting these girls until 2012 or 2013.

6  He described the indictment and the conduct of the

7  government as lies, frauds, forgeries, to the point where they

8  might make, you know, the opinions or determinations of this

9  Court crooked or corrupt.

10  So I just don't think it is the case that the

11  defendant had a swerve in his conduct that is not

12  representative of what he would be like for the rest of his

13  life.

14  And that's why I think, if you combine that with the

15  intelligence and articulation that he has displayed in court

16  to this point -- again, as I began this morning, I can't say

17  that he doesn't suffer from this condition, but what I can

18  look at is, what has it caused him to do?

19  And I don't think that he has the willingness or the

20  capacity to curb the uncontrolled anger that led to these

21  crimes or the manipulative behavior that he used to commit the

22  crimes.

23  THE COURT:  Well, so what do you expect me to do?

24  MR. TIERNEY:  Your Honor, I expect and I hope that

25  the Court will sentence him according to the guidelines.  And

1  I think those guidelines, giving him a break, should be 235 to
2  240 months.

3      I think that given the extreme seriousness of this
4  offense -- and, in my view, I don't think that the mitigation
5  that he has presented should move the Court off of the
6  guidelines for the reasons I just presented.

7      THE COURT:  You disagree with Probation?

8      MR. TIERNEY:  I do, your Honor.  I do.  And I respect
9  Mr. Armistead, I respect his opinion, but I would note that
10  one of the things that he wrote in the PSR as well was that
11  the statutory maximum would be fully justified in this case.

12      Mr. Armistead thought that the defendant's condition
13  was sufficient to bring him down to 180 months.  I
14  respectfully disagree.

15      There are some factors going in his way.  He
16  obviously has family support.  He was able to hold a job for a
17  while there with their support.  I acknowledge that there are
18  some factors pointing the other direction.

19      THE COURT:  The biggest factor is medical, isn't it?

20      MR. TIERNEY:  It's a matter of perspective, your
21  Honor.  Again, I don't think that he -- I don't have a reason
22  to suspect, or I don't have a reason to think that he doesn't
23  have this condition.  But just like any condition, it's not
24  just --

25      THE COURT:  Well, I think it is exactly the opposite.

1  I think there is every reason to believe he does.

2          MR. TIERNEY:  Sure.

3          THE COURT:  This is based on what I'm seeing, unless

4  we have a physician who is jeopardizing his license, and there

5  is nothing before the Court to indicate that, I have

6  absolutely nothing before me to indicate anything except he

7  has a very serious brain organic problem.

8          MR. TIERNEY:  And then that being the case, your

9  Honor, we ask, where does that get us in the end?

10          THE COURT:  That's exactly what I'm asking you.

11          MR. TIERNEY:  Right.  So when I answer that question,

12  what I say, your Honor, is that, well, he very -- it appears

13  he has this condition.  Has it affected his behavior in a way

14  that where, if he gets treatment, it is not -- he is not going

15  to commit any criminal offenses anymore?

16          THE COURT:  Well, nobody has said that.

17          MR. TIERNEY:  Okay.  Then to me, that's the most

18  important factor.  Will it, if he receives treatment for this

19  medical offense, will he continue to be a danger in the

20  future?  I think that he will be.

21          Looking back on it, in the past, does his -- did his

22  condition lead him to commit these offenses?  I don't think it

23  did.  Because now that he has -- at least not in the ways that

24  are important for us today.  Because when I take a look at how

25  he has acted since then, I still see the same sorts of

1   behaviors that led him to commit the offense in the first

2   place.

3          So the Court may view it differently, defense counsel

4   may view it differently, but when I have to make a

5   recommendation that takes into account his medical condition,

6   those are the hallmarks that I look at.

7          And I don't believe that the defendant should be cut

8   a break from the guidelines when I think that both of the

9   answers to those key questions, if we do medical treatment

10  that addresses the condition, will it stop his criminal

11  behavior?  I say no.

12         Did the criminal behavior meaningfully cause his

13  criminal offense?  I say no.

14         And so I don't see any reason to deviate from the

15  guidelines.

16         THE COURT:  Well, I think it is more than just what

17  you have argued.  I think it is also an issue of prevention.

18  In other words, no matter when he gets out, he is going to

19  have many controls that are going to be in full force and

20  effect that I believe certainly will have a major factor on

21  prevention.

22         Are you disagreeing with that?

23         MR. TIERNEY:  I think I would to an extent, your

24  Honor.

25         THE COURT:  Where do you think he would get access to

1  do anything near what he has done here?

2          MR. TIERNEY:  In order to commit these crimes, your

3  Honor, all he needs is a phone that's Internet-capable and a

4  place where he can access the Internet.

5          And as I'm sure the Court knows, that second one is

6  virtually unlimited these days.  McDonald's, Burger King,

7  public libraries, where he did access the Internet, airports.

8  If you want to be out in public and you want to find an

9  Internet connection, you can do it.  A phone --

10          THE COURT:  Wouldn't he need a computer?

11          MR. TIERNEY:  No, your Honor.  All he needs is an

12  Internet-capable phone.  As a matter of fact, that's what he

13  used to commit all these offenses, was just a smartphone.

14          THE COURT:  And your position is that even though

15  there would be such terms and conditions of ultimate release,

16  whenever he is released, that that's not enough?

17          MR. TIERNEY:  I don't think it is, your Honor, for a

18  couple of reasons.  First of all, because those entry costs

19  are so low.  You can get one these days, a phone that's not

20  capable of connecting to the Internet, but it is becoming

21  increasingly difficult to do.  And if the defendant wanted to

22  get one despite his conditions, he could easily, very easily,

23  obtain one.

24          And two, because, your Honor, I believe that the --

25  that what I have seen from the defendant is that he is

1   unwilling or incapable of conforming -- well, I guess I would

2   have to say unwilling to conform his conduct to those legal

3   requirements.

4          And the thing that I point to there is his interview

5   with Homeland Security in January of 2014.  Anybody who is

6   thinking about the ultimate consequences of what they are

7   going to do is going to stop the behavior then.

8          Instead, just less than ten days later, he is

9   threatening a victim to kidnap or harm her if she doesn't

10  comply with sending more pictures.

11         So the value of conditions is that if a person

12  understands them and believes that there are going to be

13  consequences for violating them, they will -- that will

14  prevent their conduct, that will shape their conduct.

15         I believe, based on this defendant's history, that

16  those conditions won't be adequate to shape his future

17  conduct.

18         THE COURT:  Okay.  Anything further?

19         MR. TIERNEY:  No, your Honor.

20         THE COURT:  Anything further?

21         MR. CHASE:  A brief response.  And I think the Court

22  already pointed out one, which is that the assurances apply to

23  the protections we can put in place.

24         And I want to point out that at the time Brian was

25  arrested, he was an almost 25-year-old man, living with his

mother, working at Burger King.

To think that he has the skills to circumvent supervised release and the now-aware-of-his-condition diligence of his family, to go sneak off to somewhere that has Wi-Fi to commit these offenses, I don't think is realistic.

In terms of the anger he expressed in that letter to the Court, I will tell you that's a discussion I have had with Brian on numerous occasions.  That it is at times difficult to understand the intricacy of the fact that the receipt portion can precede what the government has called the "heartland" of this offense.  And with the heartland of the offense, the direct contacting is during one period of time, but there is a charge that encompasses another period of time, that part felt unreasonable to him.  And that's why he expressed what he did. And I think that's just a lack of understanding of legal intricacies.  Thank you.

THE COURT:  Is the matter submitted?

MR. TIERNEY:  Yes, your Honor.

MR. CHASE:  Yes, your Honor.

THE COURT:  Certainly, there are many issues here to talk about on both sides, and we have talked about a lot of them here.

I am not unsympathetic to the organic brain damage issue pursuant to this disease that is involved and that is progressing.

1        I can't say with any certainty or make a specific

2   finding that the crimes were committed because of the medical

3   condition.  I don't have that sort of medical information

4   before me to make such a conclusion.

5        It goes without saying that we have problems, medical

6   problems on the side of Mr. Caputo that are very serious.  I

7   don't know what his prognosis is concerning life expectancy.

8   I can't speculate because the law doesn't allow me to

9   speculate.

10        I know that, certainly, that he has had some strokes,

11   and that at such a young age, that's serious.  And I just

12   don't know what that means with regard to life expectancy.

13        I am convinced that he will get better care at the

14   Bureau of Prisons medically than he will, and has been, at the

15   county jail.

16        On the other hand, as I have talked about a couple of

17   times during our back-and-forth discussion, I don't have the

18   authority oath-wise or statutorily, just to forget about the

19   victims.

20        Frankly, young girls who are between ages 11 and 15

21   whose bodies are just maturing, and they don't even understand

22   what's going on, they are trying to figure out what life is

23   about, they are trying to deal with their physical and other

24   maturing, emotional maturing, intellectual maturing, for this

25   to happen at that time in their lives is just devastating.

1   They will never get over it.

2         I don't think it takes a genius, and I certainly

3   don't think it takes a professional.  I think all it does is

4   take anyone with common sense to realize these young girls

5   moving into being young women, moving into being young adults,

6   and then, ultimately, becoming full-fledged adults, and then

7   older adults, these are circumstances, these are physical

8   things that have happened to them, even though Mr. Caputo was

9   not there next to them, to have somebody so afraid and so

10  threatened that they would commit, frankly, crimes of

11  molestation on themselves, and have it be photographed or

12  videoed and then sent back to somebody that they are scared to

13  death of, and then redistribute it, is just beyond awful,

14  beyond anything that should happen in a civilized society.

15        So I do have both sides to be concerned about, both

16  sides to, in some way, address.

17        And I believe, first of all, in dealing with the

18  objections that are before me -- frankly, I'm considering them

19  objections, not just suggestions -- I believe that the

20  objection on the Criminal History Category being overstated is

21  sustainable and is sustained.

22        I think that the offense level should be, and is, 37.

23  History Category is II.  And, therefore, the guideline range,

24  keeping in mind the statutory maximum here, the guideline

25  range under these circumstances are 235 to 240.

1        The issue that has been addressed by defense counsel

2   as it deals with the guidelines under 2G2.2(b), they are,

3   under those circumstances, are both the plus seven and the

4   plus five.  It gets further specifically divided, however,

5   when you add to the Code I just stated subdivision 5 versus

6   subdivision (3)(E), they are entirely separate and they do not

7   subsume one over the other.

8        One deals with the distribution to a minor that was

9   intended to persuade, induce, entice, coerce, or facilitate

10  the travel of, the minor to engage in prohibited sexual

11  conduct.  That's the plus 7.

12       The plus 5 deals with a defendant engaged in a

13  pattern of activity involving the sexual abuse or exploitation

14  of a minor.

15       Those are two entirely separate, standalone

16  provisions, and that's why I'm finding that the applicable

17  offense level is appropriately a 37.

18       As far as the consideration of both the medical issue

19  on the defense side versus the facts involved with these young

20  teen girls, and the specific facts, the specific level, the

21  specific amount of activity that was involved with the number

22  of photographs, the number of videos, and then the

23  redistribution of them, I believe that Probation has gone into

24  specific detail and given the appropriate balancing of these

25  facts back and forth.

1          And, therefore, pursuant to the Sentencing Reform Act

2     of 1984, and adopting the reasoning of Probation, it is the

3     judgment of the Court that you are committed to the custody of

4     the Bureau of Prisons, to be imprisoned for a term of 180

5     months.

6          You shall pay a special assessment of a hundred

7     dollars, payment to begin immediately.  The Court finds you do

8     not have the ability to pay a fine, and that's waived.

9          Upon release from imprisonment, you shall be placed

10    on supervised release for a term of 180 months.  Within 72

11    hours of release from the custody of the Bureau of Prisons,

12    you shall report in person to Probation in the District where

13    you are released.

14          While on release, you shall not commit another

15    federal, state or local crime; not possess a firearm,

16    ammunition, destructive device, or any other dangerous weapon;

17    shall not illegally possess controlled substances; shall

18    cooperate in the collection of DNA, as directed by Probation;

19    shall comply with the standard conditions recommended by the

20    Sentencing Commission and adopted by the Court; shall comply

21    with the requirements of the Sex Offender Registration and

22    Notification Act, as directed by Probation and the Bureau of

23    Prisons or any state offender registration agency in which you

24    reside, work, are a student, or were convicted of, or you are

25    convicted of a qualifying offense.

1       (The Defendant's sister exited the courtroom.)

2           THE COURT:  I understand the catastrophic sentence

3   and the effect, but you need to leave the courtroom.

4       (Another spectator left the courtroom.)

5           THE COURT:  You shall refrain from any unlawful use

6   of a controlled substance; shall submit to one drug test

7   within 15 days of release from imprisonment, and at least two

8   periodic drug tests thereafter, not to exceed four drug tests

9   per month.

10          The Court is going to order the Special Conditions 1

11  through 13, which I can read or incorporate by reference.

12          MR. CHASE:  By reference, your Honor.

13          MR. TIERNEY:  Fine with the government, your Honor.

14          THE COURT:  Done and ordered.

15          I believe we have an additional count to deal with.

16          MR. TIERNEY:  Yes, your Honor.  The government moves

17  to dismiss Count 1.

18          THE COURT:  Granted.  Appellate rights have been

19  waived.  Is there a request concerning the geography?

20          MR. CHASE:  As close as possible to his home, to

21  Bakersfield.

22          THE COURT:  Court will make that recommendation as it

23  accords with --

24          MR. CHASE:  Sorry.  As close as possible to Los

25  Angeles.

1      THE COURT:  The Court will make that recommendation

2  as it accords with security classification and space

3  availability.  The Court is --

4      MR. CHASE:  If I may, your Honor, I should have added

5  that the Court should recommend that the location be selected

6  as best able to deal with his medical condition.

7      THE COURT:  That would actually be primary.  That is

8  of the greatest concern, and that will be certainly made.

9      MR. CHASE:  Thank you, your Honor.

10     THE COURT:  That will be number one.

11     Number two will be the location closest to Los

12  Angeles that you are talking about.

13     And, thirdly, will be a recommendation of the

14  500-hour Bureau of Prisons Substance Abuse Treatment Program.

15     Is there anything else we need to deal with?

16     MR. TIERNEY:  Your Honor, you may have said this

17  already and I missed it, but if you hadn't, I would ask that

18  the Court make the preliminary order of forfeiture entered on

19  August 1st, 2016, final, in accord with the judgment.

20     THE COURT:  Any objection?

21     MR. CHASE:  No objection.

22     THE COURT:  Anything else, Mr. Chase?

23     MR. CHASE:  No, your Honor.

24     THE COURT:  That's the order of the Court.

25     MR. TIERNEY:  Thank you, your Honor.

1          MR. CHASE:  Thanks.

2        (The proceedings were concluded at 11:16 a.m.)

3          I, PEGGY J. CRAWFORD, Official Reporter, do hereby

4      certify the foregoing transcript as true and correct.

5

6  Dated:  17th of March, 2017        /s/ Peggy J. Crawford

7                                     PEGGY J. CRAWFORD, RDR-CRR

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25