1  Carolyn D. Phillips,  #103045
   Attorney-At-Law
2  P.O. Box 5622
   Fresno, California  93755-5722
3  Telephone: (559)248-9833
   Facsimile:  (559) 248-9820

4  Attorney for Defendant BRIAN CAPUTO

5

6

7                  IN THE UNITED STATES DISTRICT COURT

8                 FOR THE EASTERN DISTRICT OF CALIFORNIA

9

10  UNITED STATES OF AMERICA,              Case No. 1:14-cr-41

11        *Plaintiff*,                     EMERGENCY MOTION TO REDUCE
                                           SENTENCE PURSUANT TO
12        v.                               18 U.S.C. § 3582(c)(1)(A)(i)

13  BRIAN CAPUTO,                          [COMPASSIONATE RELEASE]

14        *Defendant*.
    _____

15

16        To:    McGREGOR SCOTT, United States Attorney:

17        Defendant, BRIAN CAPUTO, by and through his appointed counsel, Carolyn D.

    Phillips, moves for an order reducing his sentence to time served under 18 U.S.C. §

18  3582(c)(1)(A)(i) and Section 603 of the First Step Act of 2018, P.L. 115-391.

19        Dated:  October 13, 2020

20                                         Respectfully submitted,

21                                         Carolyn D. Phillips
                                           CAROLYN D. PHILLIPS
22                                         Attorney for Defendant
                                           BRIAN CAPUTO
23

                                      1

1  Carolyn D. Phillips,  #103045
   Attorney-At-Law
2  P.O. Box 5622
   Fresno, California  93755-5722
   Telephone: (559)248-9833
3  Facsimile:  (559) 248-9820

4  Attorney for Defendant BRIAN CAPUTO

5

6

7              IN THE UNITED STATES DISTRICT COURT

8          FOR THE EASTERN DISTRICT OF CALIFORNIA

9

10

   UNITED STATES OF AMERICA,            Case No. 1:14-cr-41
11
          Plaintiff,                    **MEMORANDUM IN SUPPORT OF**
12                                       **EMERGENCY MOTION TO REDUCE**
          v.                            **SENTENCE PURSUANT TO**
13                                       **18 U.S.C. § 3582(c)(1)(A)(i);**
   BRIAN CAPUTO,                        **DECLARATION OF CAROLYN**
14                                       **PHILLIPS**
          *Defendant.*
15  _____

16

17

18

19

20

21

22

23

2

# TABLE OF CONTENTS

I.      Introduction................................................................................................................1

II.     Jurisdiction................................................................................................................1

III.    Statutory Framework for Sentence Reduction Authority.........................................2

IV.     Relevant Factual and Procedural Background.........................................................3

V.      Mr. Caputo Meets the Statutory Requirements; Therefore, ....................................4
        This Court has the Authority to Reduce his Sentence

        A.   Extraordinary and Compelling Reasons Exist in Mr. Caputo's Case .............4

             1. COVID-19 Presents an Extreme Danger to Mr. Caputo ........................5

             2. Mr. Caputo's Incarceration Increases his Risk for COVID-19......................8
                Infection

             3. Staffing Shortages at USP Yazoo City Exacerbates Risk.............................11
                of Infection

             4. Mr. Caputo's Impending Transfer Increases Risk of COVID-19 ................12
                Infection

        B.   The Relevant 18 U.S.C. 3553(a) Sentencing Factors Favor  ...............................12
             Mr. Caputo's Sentence to Time Served

        C.   The Requested Reduction is Consistent with Applicable ...............................14
             Policy Statements

        D.   This Court Should Grant This Motion for Compassionate Release ...............16

        List of Exhibits................................................................................................................18

        Certificate of Service

# TABLE OF AUTHORITIES

**Federal Cases**

*Pepper v. United States* ...................................................................................................13
    (2011) 562 U.S. 476

*United States v. Bass* ............................................................................................................6
    (N.D.N.Y. May 27, 2020) 2020 WL 2831851

*United States v. Bin Wen* ...................................................................................................16
    (W.D.N.Y. Apr. 13, 2020) 2020 WL 1845104

*United States v. Brown* .......................................................................................................14
    (S.D. Iowa 2019) 411 F.Supp.3d 446

*United States v. Cantu* ........................................................................................................15
    (S.D. Tex. June 17, 2019) 2019 WL 2498923

*United States v. Dailey* .........................................................................................................3
    (E.D.Cal. Aug. 5, 2020) 2020 WL 4504449

*United States v. Darling* .......................................................................................................3
    (E.D.Cal. July 28, 2020) 2020 WL 4339987

*United States v. Davis* ..........................................................................................................3
    (E.D.Cal. June 23, 2020) 2020 WL 3443400

*United States v. Fox* ...........................................................................................................15
    (D. Me. July 11, 2019) 2019 WL 3046086

*United States v. Head* ...........................................................................................................3
    (E.D.Cal. June 15, 2020) 2020 WL 3180149

*United States v. Heffinton* .....................................................................................................3
    (E.D.Cal. Aug. 4, 2020) 2020 WL 4476485

*United States v. Jackson* .......................................................................................................4
    (S.D.Cal. June 22, 2020) 2020 U.S. Dist LEXIS 114760

*United States v. Jenkins* ...................................................................................................6-7
    (D.Colo. May 8, 2020) 2020 WL 2466911

*United States v. Ludwig* .........................................................................................................3
    (E.D.Cal. Aug. 6, 2020) 2020 WL 4547347

*United States v. Mondaca* ...............................................................................................2, 14
    (S.D.Cal. Mar. 3, 2020) 2020 WL 1029024

*United States v. Owens*.................................................................................14
    (S.D.Cal. March 20, 2020) No. 97-cr-2546

*United States v. Padilla* ..................................................................................7
    (S.D.Cal. June 11, 2020) 2020 WL 3100046

*United States v. Perez* ....................................................................................15
    (S.D.N.Y. Mar. 19, 2020) 2020 WL 1329225

*United States v. Pickard*..................................................................................3
    (E.D.Cal. July 23, 2020) 2020 WL 4227510

*United States v. Recinos* .................................................................................3
    (E.D.Cal. June 21, 2020) 2020 WL 4194080

*United States v. Redd*..................................................................................1, 15
    (E.D. Va. Mar. 16, 2020) 2020 WL 1248493

*United States v. Richardson* ...........................................................................3
    (E.D.Cal. June 19, 2020) 2020 WL 3402410

*United States v. Sewell* ...................................................................................3
    (E.D.Cal. June 5, 2020) 2020 WL 4251071

*United States v. Young* ...................................................................................16
    (M.D. Tenn. Mar. 4, 2020) 2020 WL 1047815


**Federal Statutes**

18 U.S.C. § 2252(a)(2)......................................................................................3

18 U.S.C. § 3553  .................................................................. 1, 4, 12-13, 17

18 U.S.C. § 3582  ..................................................................................*passim*

28 U.S.C. § 994   .........................................................................................3, 16


**United States Sentencing Guidelines**

USSG Manual § 1B1.13................................................................ 3, 14, 15-16

**Other Authorities**

Black's Law Dictionary (11th ed. 2019) ........................................................4

Bop.gov, "BOP Implementing Modified Operations" ........................................10

businessinsider.com, April 25, 2020, "'Between 25% and 50% of .....................10
    people who get the coronavirus may show no symptoms but still

be contagious, Anthony Fauci said.  Here's the latest research on
asymptomatic carriers."

CDC COVID-19 Response Team, Preliminary Estimates of the Prevalence of ............. 6-7
    Selected Underlying Health Conditions Among Patients with Coronavirus
    Disease 2019 – United States, February 12-March 28, 2020, 69 Morbidity &
    Mortality Weekly Rep. 382, 384 (Apr. 3, 2020),
    https://www.cdcgov/mmwr/volumes/69/wr/mm6913e2.htm)

cdc.gov/coronavirus, "Interim Guidance on Management of Coronavirus ...................... 9
    Disease 2019 (COVID-19) in Correctional and Detention Facilities

Interim Clinical Guidance for Management of Patients with Confirmed ......................... 7
    Coronavirus Disease, Centers for Disease Control and Prevention,
    https://www.cdc.gov/coronavirus/209-ncov/hcp/clinical-guidance-
        management-patients.html

Memorandum for all Chief Executive Officer, from Andre Matevousian, ...................... 12
    Assistant Director Correctional Programs Division, dated August 5, 2020,
    subject:  Coronavirus (COVID-19) Phase Nine Action Plan.

ncbi.nim.nih.gov, "Multiple internal border zone infarcts in a patient with
    COVID-19", June 9, 2020, doi:  10.1016/j.jns.2020.116980, Owen Hedd
    Williams, et al..................................................................................................... 6

nytimes/JailsarePetriDishes ................................................................................. 9

The marshall project.org, "BOP wardens blocked compassionate releases .................... 10
    as COVID-19 spread." October 7, 2020

The Office of Inspector General Pandemic Response Report 20-186, ............................... 11
    "Remote Inspection of Federal Correctional Complex Lompoc", July 2020

Thomas J. Oxley, et al., Large-Vessel Stroke as a Presenting Feature of ........................... 7
    Covid-19 in the Young NEJM.org (April 28, 2020),
    https://www.nejm.org/doi/full/10.1056/NEJMc2009787?amp/=

## I.      INTRODUCTION

Defendant-Movant BRIAN CAPUTO moves for an order reducing his sentence to time served pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) for "extraordinary and compelling circumstances."  The COVID-19 pandemic and its outbreak within the Federal Bureau of Prisons, combined with Mr. Caputo's extremely serious, degenerative, and incurable health conditions make him especially vulnerable to serious disease or death should he contract COVID-19, and all the sentencing factors set forth in 18 U.S.C. § 3553(a), support a grant of compassionate release.

Mr. Caputo has served the majority of his sentence and has a viable release plan. He will not pose a danger to the community while on supervised release.  In these circumstances, a sentence reduction to time served will greatly reduce the likelihood that Mr. Caputo will contract COVID-19, and thus avoid a great risk of serious illness or death.

## II.     JURISDICTION

On December 21, 2018, the First Step Act was signed into law.  One of the criminal justice reforms it included was an amendment to 18 U.S.C. § 3582(c)(1)(A)(i), which now provides sentencing judges with jurisdiction to consider a defendant's motion for reduction of sentence.  Prior to this amendment such sentence reductions could occur only on the motion of the BOP Director.

After Congress expanded the First Step Act, defendants were given the power to file such motions if they either exhausted their administrative rights to appeal a failure of the BOP to bring a motion on their behalf, or after 30 days have lapsed since the defendant's submission of a request to the warden of his facility to bring such a motion, whichever is earlier.  18 U.S.C. § 3582(c)(1)(A).  This change was inter alia precipitated by concern over the infrequency with which the BOP brought forward such applications.  See *United States v. Redd*, No. 1:97-cr-00006-AJT, 2020 WL 1248493, at *7 (E.D. Va. Mar. 16, 2020).  Thus, though the First Step Act preserves the BOP's ability to bring motions for sentence reductions on an inmate's behalf, that is no longer the

1   exclusive avenue through which a sentencing judge may consider and grant a motion to

2   reduce a defendant's sentence.

3       Mr. Caputo submitted a written request for compassionate release to the Warden

4   of USP Yazoo City on September 4, 2020[1].  Exhibit 1.  More than thirty days have

    elapsed since the initial request, and therefore Mr. Caputo is entitled to file the instant

5   motion and need not further exhaust administrative remedies.

6   **III.      STATUTORY FRAMEWORK FOR SENTENCE REDUCTION AUTHORITY**

7       The compassionate release statute grants sentencing courts the authority to

8   reduce an otherwise final term of imprisonment for "extraordinary and compelling

    reasons."  18 U.S.C. § 3582(c)(1)(A)(i).  This provision states that the sentencing judge

9   may modify an imposed term of imprisonment, as follows:

10      (1)  in any case—
        (A)  the court, upon motion of the Director of the Bureau of Prisons, *or upon*
11      *motion of the defendant* after the defendant has fully exhausted all
        administrative rights to appeal a failure of the Bureau of Prisons to bring a
12      motion on the defendant's behalf or the *lapse of 30 days from the receipt of such*
        *a request by the warden of the defendant's facility, whichever is earlier,* may
13      reduce the term of imprisonment (and may impose a term of probation or
        supervised release with or without conditions that does not exceed the
14      unserved portion of the original term of imprisonment), after considering
        the factors set forth in section 3553(a) to the extent that they are applicable,
15      if it finds that—

16      (i)  extraordinary and compelling reasons warrant such a reduction [ . . . ]
        and that such a reduction is consistent with applicable policy statements
17      issued by the Sentencing Commission[.]

18  (Emphasis added).  In addition, "[e]xhaustion occurs when the BOP denies a

    defendant's [motion for compassionate release]."  *United States v. Mondaca*, No. 89-cr-

19  0655 DMS, 2020 WL 1029024, at *2 (S.D. Cal. March 3, 2020).  Thus, this Court has

20  discretion to reduce the term of imprisonment imposed in this case, as Mr. Caputo

21  meets these statutory requirements, as detailed below.

22

23      [1]    The attached Declaration of Carolyn Phillips sets out the chronology of requests
            for compassionate release and the warden's silence regarding those requests.

In 28 U.S.C. § 994(t), Congress delegated to the Sentencing Commission the authority to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples."  As discussed below, following the superseding passage of the First Step Act, ("FSA"), the Sentencing Commission's Policy Statement regarding reduction of prison terms under 18 U.S.C. § 3582(c)(1)(A), contained at U.S.S.G. § 1B1.13, is no longer relevant.  However, even if this policy statement remains in effect, the "extraordinary and compelling reasons" included in U.S.S.G. § 1B1.13 describe Mr. Caupto's circumstances, as detailed below.

Further, this Court has the authority to consider whether the worsening global pandemic, combined with the other relevant circumstances, present an extraordinary and compelling basis for a sentence reduction, whether or not it falls within one of the existing categories in § 1B1.13 commentary.  See *United States v. Head*, No. 2:08-cr-93, 2020 WL 3180149, at *7 (E.D. Cal. June 15, 2020) (risk of contracting COVID-19 in prison and medical condition putting defendant at high risk of suffering serious, possible life-threatening, medical consequences if that happens, "suffices to show an 'extraordinary and compelling reason' to grant defendant compassionate release.").[2]

## IV.   RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

On May 10, 2016, Mr. Caputo pled guilty pursuant to a plea agreement to a single count of receipt and distribution of a visual depiction of a minor engaged in sexually explicit conduct, in violation of 18 U.S.C. § 2252(a)(2).  ECF 80, 81.  On

_____

[2] See also *United States v. Ludwig*, No. 2:14-cr-43, 2020 WL 4547347 (E.D. Cal. Aug. 6, 2020) (granting compassionate release to federal prisoner with COVID-19 risk factor); *United States v. Dailey*, No. 2:13-cr-118, 2020 WL 4504449 (E.D. Cal. Aug. 5, 2020) (same); *United States v. Heffington*, No. 1:93-cr-05021, 2020 WL 4476485 (E.D. Cal. Aug. 4, 2020) (same); *United States v. Darling*, No. 2:04-cr-250, 2020 WL 4339987 (E.D. Cal. July 28, 2020) (same); *United States v. Pickard*, No. 2:11-cr-449, 2020 WL 4227510 (E.D. Cal. July 23, 2020) (same); *United States v. Recinos*, No. 1:12-cr-35, 2020 WL 4194080 (E.D. Cal. July 21, 2020) (same); *United States v. Davis*, No. 2:15-cr-62, 2020 WL 3443400 (E.D.Cal. June 23, 2020) (same); *United States v. Richardson*, No. 2:17-cr-48, 2020 WL 3402410 (.D. Cal. June 19, 2020) (same); *United States v. Sewell*, No. 2:05-cr-554, 2020 WL 4251071 (E.D. Cal. June 5, 2020 ) (same).

November 7, 2016, Mr. Caputo was sentenced to 180 months of imprisonment and 180 months of supervised release.  ECF 97.  His current release date is February 2, 2027.  He has served 80 months, or over 60% of the total sentence (including conduct credits), for the period of February 28, 2014 to October 20, 2020.

As discussed above, on or about September 4, 2020, Mr. Caputo submitted a written request for compassionate release to the Warden. Exhibit 1.  The Warden has not responded to Mr. Caputo's request.  Because more than thirty days have passed since the initial request, the statute does not require Mr. Caputo to await the BOP's final decision on his appeal.  *United States v. Jackson*, 2020 U.S. Dist LEXIS 114760, *5 (S.D. Cal. June 22, 2020) (agreeing with government's concession that defendant "exhausted his administrative remedies for the purpose of this motion" by filing request that the warden denied).

## V.     MR. CAPUTO MEETS THE STATUTORY REQUIREMENTS; THEREFORE, THIS COURT HAS THE AUTHORITY TO REDUCE HIS SENTENCE

As detailed above, the statutory requirements for sentence reduction are that the Court (1) find extraordinary and compelling reasons for the reduction, (2) consider the relevant sentencing factors under 18 U.S.C. § 3553(a), and (3) ensure any reduction is consistent with applicable policy statements.  Mr. Caputo meets all these requirements.  Therefore, this Court can, and should, grant his motion for sentence reduction.

### A.     Extraordinary and Compelling Reasons Exist in Mr. Caputo's Case

Though the compassionate release statute does not define "extraordinary and compelling," it is clear the current pandemic meets this definition.  Black's Law Dictionary defines "extraordinary" as "[b]eyond what is usual, customary, regular, or common."  Black's Law Dictionary (11th ed. 2019).  Its definition of "compelling need," is one "so great that irreparable harm or injustice would result if [the relief] is not [granted]."  *Id*.  The current pandemic is the very quintessence of these terms.

4

### 1.     COVID-19 Presents an Extreme Danger to Mr. Caputo

Mr. Caputo's health makes him uniquely vulnerable to this pandemic.  Mr. Caputo was born with a spectrum of congenital brain abnormalities, which were not identified until 2013 following his hospitalization for a stroke.  Ex. 2, Dr. Sabow's Report, ECF 91-3; Ex. 3, Kern Medical Center records filed under seal.  Each of Mr. Caputo's abnormalities is a structural brain defect.  The brain abnormalities include: colpocephaly, a cephalic disorder involving the disproportionate enlargement of the occipital horns of the lateral ventricles of the brain, associated with multiple neurological syndromes including agenesis of the corpus callosum; Mr. Caputo has a complete absence of the corpus callosum, the band of white matter connecting the two hemispheres in the brain, resulting in vision impairments, low muscle tone, poor motor coordination, *seizures*, difficulty transferring more complex information from one hemisphere to the other, difficulty in minding subtle social cues even with a normal intelligence quotient; and, Cerebral Autosomal Dominant Arteriopathy with Subcortical Infarcts and Leukoencephalopathy ("CADASIL"), an inherited *stroke disorder* caused by obstruction of blood supply in the blood vessels, this degenerative organic brain abnormality causes infarctions, strokes and progresses to dementia, Mr. Caputo has suffered several strokes since his first stroke when he was 25 years old.  Exs. 2 and 4.

Mr. Caputo has also been diagnosed with Multiple Sclerosis ("MS"), a disease in which the immune system eats away at the protective covering of nerves resulting in disrupted communication between the brain and the body, symptoms include vision loss, pain, fatigue, and impaired coordination.  These serious degenerative conditions are treatable but not curable.

COVID-19 poses an extreme danger to Mr. Caputo due to these multiple serious medical conditions, especially CADASIL.  "There is an association between COVID-19 and strokes, described with characteristics including large vessel occlusion, multi-

5

territory infarcts, concomitant venous thromboembolism, raised inflammatory markers, antiphospholipid antibody production, younger age of stroke, premorbid vascular co-morbidities, and a higher incidence of stroke with increasing COVDI-19 severity."   See ncbi.nim.nih.gov, "Multiple internal border zone infarcts in a patient with COVID-19 and CADASIL", June 9, 2020, doi:  10.1016/j.jns.2020.116980, Owen Hedd Williams, *et al*.

The association of COVID-19 with CADASIL for increased strokes, presents an extreme risk that the pre-existing propensity for strokes from CADASIL is exacerbated when a person is infected with COVID-19, elevating the likelihood of a catastrophic stroke leading to severe permanent disability or death.  As a result of this high risk, the National Institute of Health has determined that **patients with CADASIL, such as Mr. Caputo, are to be considered a vulnerable group during the pandemic who should abide by "strict infection prevention measures for the duration of the pandemic**." *Ibid*.  (emphasis added.)

Numerous courts have granted compassionate release for defendants who have suffered prior strokes.  For example, in *United States v. Bass*, 2020 WL 2831851 (N.D.N.Y 5/27/2020), the defendant, a 63-year-old prisoner who had suffered a mild heart attack and stroke moved for compassionate release due to COVID-19 pandemic.  The district court determined that based on its review of defendant's health conditions Bass was at risk of severe illness should he contract the virus because "strokes have been linked to severe illness from COVID-19."  *Id*. at *7.  The court cited *United States v. Jenkins*, No. 99-cr-439, -- F.Supp.3d ---, ---, 2020 WL 2466911, at *6 (D. Colo. May 8, 2020) ("noting that 'according to preliminary CDC data, individuals with neurologic disorders such as stroke and migraine are more likely to require hospitalization after contracting COVID-19.') (citing CDC COVID-19 Response Team, Preliminary Estimates of the Prevalence of Selected Underlying Health Conditions Among Patients with Coronavirus Disease 2019

– United States, February 12-March 28, 2020, 69 Morbidity & Mortality Weekly Rep.

382, 384 (Apr. 3, 2020),

https://www.cdcgov/mmwr/volumes/69/wr/mm6913e2.htm); Interim Clinical

Guidance for Management of Patients with Confirmed Coronavirus Disease, Centers

for Disease Control and Prevention, https://www.cdc.gov/coronavirus/209-

ncov/hcp/clinical-guidance-management-patients.html (last accessed May 27, 2020)

('Heart disease, hypertension, *prior stroke*, diabetes, chronic lung disease, and chronic

kidney disease have all been associated with increased illness severity and adverse

outcomes.') (emphasis added); Thomas J. Oxley, et al., Large-Vessel Stroke as a

Presenting Feature of Covid-19 in the Young NEJM.org (April 28, 2020),

https://www.nejm.org/doi/full/10.1056/NEJMc2009787?amp/= (noting that 'data

from the Covid-19 was approximately 5%' and suggesting that even young victims of

COVID-19 may be vulnerable to strokes)." *Ibid*. (See also *Jenkins*, the district court

found extraordinary and compelling reasons on the basis of the inmate's obesity and

history of strokes in a facility with one reported case. *Jenkins, supra*, -- F.Supp.3d at --, --

-, 2020 WL 2466911, at *6-7.)

   "Any incarcerated person with one of the underlying conditions identified by the

CDC is unlikely to be able to provide self-care within the environment of a correctional

facility to avoid contracting COVID-19 . . . . [and] is unlikely to be able to get the

medical care she needs in the midst of this ongoing pandemic." *United States v. Padilla*,

2020 WL 3100046 (S.D. Cal. June 11, 2020.) Mr. Caputo falls squarely within this

category of individuals. He has been unable to get the medical care he needs in the

midst of this ongoing pandemic and unable to adhere to the strict measures necessary

for his safety while incarcerated in a correctional facility.

   Mr. Caputo has also been confronted with a lack of adequate medical care from

his detention in Lerdo forward. There has been a lack of continuity of care or

adherence to medical protocols for treating and monitoring Mr. Caputo's many medical conditions.  On November 17, 2016, the district court intervened on Mr. Caputo's behalf, requiring the Lerdo detention facility to respond to Mr. Caputo's complaint of medical neglect.   ECF 96, *Caputo v. Kern County Sheriff's Office*, Case No. 1:15-cv-1008.  The first priority of the district court at sentencing was to recommend Mr. Caputo be incarcerated in a facility "in which he can receive the proper medical treatment for his condition."  ECF 97.  However, understaffed BOP facilities have continued to ignore treatment protocols of Mr. Caputo's documented medical conditions.  While medical reports have consistently verified that Mr. Caputo has suffered strokes since 2013 staff at USP Yazoo City have failed to take necessary steps to ascertain the extent of reported stroke or provide adequate medical care.  See Ex. 4, Dr. Weldon identified "multiple areas of demyelination as well as several areas of lacunar infarcts," following Mr. Caputo's October 29, 2018 stroke.

Nor will he receive adequate medical care with his expected return to FCI Marianna, Florida, another Care Level II medical provider.  Mr. Caputo's rare and severe degenerative medical conditions are life threatening.  CADASIL alone is a challenge to not only diagnose but also to treat.  However, the combination of CADASIL with colpocephaly and MS presents a trifecta of conditions which strain even the most sophisticated medical providers.  Mr. Caputo's medical needs are well beyond the capacity of a Care Level 2 medical facility.

On April 12, 2019, Dr. Weldon stated that Mr. Caputo's conditions of CADASIL and Multiple Sclerosis were "obviously worsening" and set forth a plan to address Mr. Caputo's neurological issues.  See report, Ex. 4.  Those protocols were not followed but were abandoned by USP Yazoo City in August 2020.  Ex. 5, BOP medical records.  The lack of consistent medical care while in the midst of this ongoing pandemic, places Mr. Caputo in extreme risk of infection.

Mr. Caputo's serious neurological disorders including CADASIL, the stroke disorder, along with the fact that he is incarcerated in a prison setting where social distancing and other safety measures are impossible to achieve, itself is an extraordinary circumstance that warrants compassionate release.

## 2. Mr. Caputo's Incarceration Increases His Risk for COVID-19 Infection

Public health officials and epidemiologists have identified the particular dangers presented to people within congregate environments which heighten the potential for COVID-19 to spread once introduced.  Center for Disease Control (CDC) issued interim guidance on management of Coronavirus disease March 23, 2020[3]. These guidelines recognize the extreme challenge presented by jails and prisons making them "petri dishes"[4] for spread of the virus.

The CDC, identifies several reasons prisons are in danger of exploding numbers of COVID-19 infections:

- adhering to social distancing guidelines is "virtually impossible";

- adhering to proper decontamination of surfaces is "virtually impossible"'

- inmates have limited access to basic hygiene products;

- there are too many shared spaces, including toilets, showers, and mess halls;

- there is not only a high turnover rate in the inmate population, but also staff mix with inmates and then return to their homes; and

- they are ill-equipped (not only in medical equipment, but also protective gear). *Id*.

---

[3] cdc.gov/coronavirus, "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities
[4] nytimes/JailsarePetriDishes

The modified operations put into place by BOP included "screening" incoming inmates for COVID-19.  This screening does not include testing even for those who are symptomatic[5].  Public health experts and epidemiologists agree that individuals may be asymptomatic and contagious with COVID-19[6].  The failure of facilities to test all inmates poses a particular threat to the health of both inmates and correctional staff.  According to Robert Redfield, the director of the Centers for Disease Control and Prevention, 25 percent of people infected with the new coronavirus do not present any symptoms or fall ill but can still transmit the illness to others.  Asymptomatic carriers are most likely contributing to the rapid spread of the coronavirus worldwide, the number of confirmed cases passed 1 million the first week of April, making it challenging for experts to assess the true extent of the pandemic.  That figure now stands at 7,569,500 with 211,400 deaths from the virus.  Public-health approaches that "rely on the presence of signs and symptoms to identify and isolate residents or patients who might have COVD-19 explains how rapidly the virus continues to spread, asymptomatic transmitters"[7].

New coronavirus infections nation-wide are again rising, climbing 6% in the last two weeks.  New York Times, October 8, 2020, "Coronavirus Update".  For inmate populations the rise in infections generally parallel or exceed the rates of infections of those outside among the general public.  With the increased presence of the coronavirus in the prison systems more prisoners sought compassionate release, however, 98 % of those requests were denied or ignored.  Themarshall project.org, "BOP wardens blocked compassionate releases as COVID-19 spread." October 7, 2020.

---

[5]   Bop.gov, "BOP Implementing Modified Operations"
[6]   businessinsider.com, "'Between 25% and 50%' of people who get the coronavirus may show no symptoms but still be contagious, Anthony Fauci said.  Here's the latest research on asymptomatic carriers." April 6, 2020.
[7]   *Id*.

Of the 10,940 federal prisoners who applied for compassionate release from March through May, wardens approved 156.  Some wardens did not respond to any request during that time frame.  Of the 156 approved releases, 84 were reviewed in the BOP hierarchy and all but eleven approvals were overturned.  More than 15,800 federal prisoners have fallen ill with COVID-19, 134 federal prisoners have died from the coronavirus.  (*Ibid.*)

### 3. Staffing Shortages at USP Yazoo City Exacerbates Risk of Infection

As of September 22, 2020, reported cases of COVID-19 in USP Yazoo City out of the 381 inmates tested (total inmate population of 986), 57 inmates and 7 staff have tested positive.  The presence of COVD-19 in Mr. Caputo's environment places him in extreme danger of suffering a catastrophic and likely lethal medical emergency.

Beginning September 1, 2020 approximately 400 inmates were sent to Yazoo City, including inmates who have tested positive for the coronavirus.  Not only did the influx of inmates create a parallel uptick in coronavirus cases at the facility, it overburdened the facility which was already woefully understaffed.  According to the president of the American Federation of Government Employees, Local 1013, Yazoo City was short 143 staff, resulting in staff working 16 hours or more daily.  Even though the inmate population had increased, staff levels did not.  Exhibit 6.

The increase of inmates to the facility along with a substantial shortage of staff, not only contributes to the failure of the facility to provide Mr. Caputo essential medical care, but places Mr. Caputo in extreme risk of contracting the virus.  The Office of Inspector General Pandemic Response Report 20-186, "Remote Inspection of Federal Correctional Complex Lompoc", July 2020, described how staffing shortages increased the risk of COVID-19 transmission and hampered the facility's response to the virus especially with the arrival of new inmates.  As noted by Ms. Price, after September 1,

2020, USP Yazoo City, became a Care Level II and In-Transit Holdover facility increasing the influx of new inmates to the facility with insufficient staff to ensure adherence to COVID-19 mitigation efforts to help control the spread of infection.  Mr. Caputo's medical vulnerabilities and high risk of becoming infected with the virus place his life in peril.  These circumstances clearly constitute extraordinary and compelling circumstances.

### 4.    Mr. Caputo's Impending Transfer Increases Risk of COVID-19 Infection

Mr. Caputo's request for sentence modification is especially urgent because Mr. Caputo is scheduled to be transferred to FCI Marianna, Florida.  BOP has recognized that transfers of inmates between BOP institutions increases the risk of COVID-19 exposure and transmission increases as the complexity of the move increases.  "[E]ven a direct movement from one facility to another is not without some degree of risk due to the characteristics and communicability of COVID-19."  Memorandum for all Chief Executive Officer, from Andre Matevousian, Assistant Director Correctional Programs Division, dated August 5, 2020, subject:  Coronavirus (COVID-19) Phase Nine Action Plan.  Again, adherence to mitigation protocols during transfers is highly dependent on adequate staffing which is missing at USP Yazoo City. For Mr. Caputo such exposure, given his pre-existing medical conditions, could prove lethal.  Mr. Caputo's health will not be able to withstand a viral infection.

### B.    The Relevant 18 U.S.C. § 3553(a) Sentencing Factors Favor Reducing Mr. Caputo's Sentence to Time Served

When, as here extraordinary and compelling reasons are established, the Court must next consider the relevant sentencing factors under 18 U.S.C. § 3553(a) to determine whether a sentencing reduction or modification is warranted.  In making this determination, the Court can-and must-consider evidence of post-sentencing

rehabilitation, as it may be "highly relevant" to several of the § 3553(a) factors.  See *Pepper v. United States*, 562 U.S. 476, 491 (2011).

Since his incarceration at BOP facilities, Mr. Caputo took the necessary classes to obtain his GED which he received March 20, 2019.  He also completed drug education classes March 5, 2018, and passed the ServSafe Food Protection Manager Certification examination resulting in his certification August 28, 2020, for food protection manager.  Ex. 7.  The only rules violations consisted of two refusals to go to general population in early 2017, three refusals to work in 2017, two refusals to obey an order in 2017, and one violation for getting a tattoo in 2018.  There have been no further rules violations.

Mr. Caputo started work as PM service cook March 7, 2020.  He has paid his special assessment and has no restitution obligation.

Mr. Caputo has a release plan to ensure his safe transition to the community.  Mr Caputo will reside with his mother Patricia Caputo in Bakersfield, California.  Ms. Caputo will provide immediate care for Mr. Caputo including clothing and personal needs, food and supplies.  His sisters and extended family are ready to provide whatever support Mr. Caputo's needs upon his release.

Ms. Caputo's home has face masks, hand sanitizer and cleaning supplies.  No one other than Ms. Caputo and Brian Caputo will reside at the two-bedroom home where they will be able to limit physical contact.  Mr. Caputo will have his own bedroom so distancing will not be a problem during the 14-day quarantine period.

Ms. Caputo, family and friends will assist Mr. Caputo with transportation to appointments and needed personal errands.  Mr. Caputo does not drive due to his medical conditions, however, he will be able to utilize public transportation.

In terms of financial support, Mr. Caputo will be able to financially care for himself.  On May 11, 2015, the Department of Social Security determined Mr. Caputo

had been disabled since April 23, 2013, and upon his release from incarceration he will

be able to receive those benefits.  The bases for the disability finding were colpocephaly

(congenital absence of the corpus callosum), CADASIL, and depression.  Ex. 8.  As

colpocephaly and CADASIL are incurable, degenerative conditions, Mr. Caputo

remains eligible for SSDI disability.  He may also qualify for CalFresh food benefits to

assist with food costs.

Mr. Caputo is entitled to Medicare due to his classification by the Social Security

Administration as disabled.  His mother, Patricia Caputo, is working to identify

specialists and support groups to provide appropriate treatment and care for Mr.

Caputo's congenital brain abnormalities.

While incarcerated, Mr. Caputo has maintained relationships with family

members all of whom are eager for him to come home.

**C.     The Requested Reduction is Consistent with Applicable Policy Statements**

As noted above, following the passage of the First Step Act, the Sentencing

Commission's Policy Statement regarding reduction of prison terms under 18 U.S.C. §

3582(c)(1)(A), contained at U.S.S.G. § 1B1.13, is no longer relevant.  *See e.g., United States*

*v. Owens*, No. 97-cr-2546-CAB (S.D.Cal. March 20, 2020), at *9-10 (internal citation and

quotation omitted).  The policy statement was last amended in November 2018, before

the First Step Act passed, and as written, still requires a motion filed by the BOP,

evident in the first sentence of the policy.  For this reason, many district courts have

concluded that the Commission no longer has an applicable policy statement on this

subject.  *See, e.g., United States v. Mondaca, supra*, 2020 WL 1029024, (internal quotation

marks omitted); *United States v. Brown*, 411 F. Supp. 3d 446, 449-50 (S.D. Iowa 2019)

(citing cases); *United States v. Cantu*, 1:05-cr-458-1, 2019 WL 2498923, at *4 (S.D.Tex. June

17, 2019); *United States v. Redd, supra*, 2020 WL 1248493, at *6.

14

Even if this policy statement remains in effect, however, the "extraordinary and compelling reasons" set forth in § 1B1.13 describe Mr. Caputo's circumstances.  The statement at § 1B1.13 provides that "extraordinary and compelling reasons [for granting relief] exist" when the defendant is "suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover."  §1B1.13, p.s. (n. 1 (A)(ii)(I)).  In the current context of the COVID-19 pandemic, Mr. Caputo's congenital brain abnormalities, and CADASIL, stroke disorder, are serious medical conditions from which he will not recover.  At the time of his sentencing, it was not foreseeable that these conditions would become deadly within the context of a pandemic.

Finally, even if the Court finds that the policy still applies and Mr. Caputo's situation does not meet the "extraordinary and compelling reasons" set forth in § 1B1.13(1), Application Note 1(D) ("Other Reasons") is a catch-all provision that enables the Court to find extraordinary and compelling reasons other than, or in combination with, the above provisions.  *See, e.g., United States v. Fox*, No. 2:14-cr-03 DBH, 2019 WL 3046086, *3 (D. Me. July 11, 2019) (stating that the existing policy statement provides "helpful guidance," but "is not ultimately conclusive given the statutory change").  In *Redd*, the court explained that "Application Note 1(D)'s prefatory language, which requires a determination by the BOP Director, is, in substance, part and parcel of the eliminated requirement that relief must be sought by the BOP Director in the first instance."  2020 WL 1248493, at *7 (citing cases); see also *United States v. Perez*, No. 88-10094-1-JTM, 2020 WL 1180719, at *2 (D. Kan. Mar. 11, 2020) ("a majority of federal district courts have found that the most natural reading of the amended § 3582(c) and § 994(t) is that the district court assumes the same discretion as the BOP director when it

considers a compassionate release motion properly before it") (internal quotation marks omitted).  As another district court recently held:

> Granted, the Application Note does not reference a worldwide pandemic caused by a deadly virus where a defendant at a heightened risk is housed in a facility appearing to exhibit a callous disregard for the health and safety of its residents.  But the circumstances described in the Application Note are not all-inclusive, and the Court can safely conclude that the Sentencing Commission did not envision these extraordinary times when drafting the Application Note.

*United States v. Bin Wen*, No. 6:17-cr-06173, 2020 WL 1845104, at *8 (W.D.N.Y. Apr. 13, 2020).

The government conceded this point in *United States v. Young*, agreeing that "the dependence on the BOP to determine the existence of an extraordinary and compelling reason, like the requirement for a motion by the BOP Director, is a relic of the prior procedure that is inconsistent with the amendments implemented by the First Step Act."  No. 2:00-cr-2-1, 2020 WL 1047815, at *6 (M.D. Tenn. Mar. 4, 2020).  The *Young* court followed the majority of district courts in recognizing that § 1B1.13's defined categories are not exclusive, holding that "federal judges are no longer constrained by the BOP Director's determination of what constitutes extraordinary and compelling reasons for a sentence reduction."  *Id.*

Accordingly, this Court has authority to find that the worsening global pandemic, combined with the other relevant circumstances in this case, present an extraordinary and compelling basis for a sentence reduction, regardless of whether it falls within one of the existing categories in § 1B1.13's commentary.

**D.      This Court Should Grant This Motion for Compassionate Release**

This Court has the discretion to grant Mr. Caputo's motion for compassionate release.  He has strong family support for his return home. A home environment will allow Mr. Caputo, who is particularly vulnerable to COVID-19, to practice the strict

prevention measures to protect him from infection.  Further, Mr. Caputo will be able

obtain the necessary medical care his rare degenerative neurological conditions require.

Given the pandemic and Mr. Caputo's serious medical conditions, any

additional time in custody would be greater than necessary to achieve the relevant

sentencing objectives laid out at 18 U.S.C. § 3553(a).  Mr. Caputo respectfully moves this

Court to grant this expedited motion to modify his sentence by reducing his sentence to

time served.

Dated:  October 13, 2020                    Respectfully submitted,


Carolyn D. Phillips
CAROLYN D. PHILLIPS
Attorney for Defendant
BRIAN CAPUTO

**LIST OF EXHIBITS**

Exhibit 1    -    Request for Administrative Remedy

Exhibit 2    -    John David Sabow, M.D., Report with Attachments

Exhibit 3    -    Medical Records, Kern Medical Center (filed under seal)

Exhibit 4    -    Patrick Weldon, M.D., Neurological Report

Exhibit 5    -    Medical Records, BOP (filed under seal)

Exhibit 6    -    Letter Cyndee L. Price, President Local 1013

Exhibit 7    -    ServSafe Certification

Exhibit 8    -    Social Security Administration Decision Disability

**CERTIFICATE OF SERVICE**

COURT:          UNITED STATES DISTRICT COURT FOR THE EASTERN
                DISTRICT OF CALIFORNIA, FRESNO

CASE:           *United States v. Brian Caputo*

CASE NO:        1:14-cr-0041 DAD

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the district court's electronic filing system on October 13, 2020.

Participants in the case who are registered CM/ECF users will be served by the district court's electronic filing system.

I further certify that one of the participants in the case is not a registered ECF user. I have mailed the foregoing document by First Class Mail, postage prepaid to:

Brian Caputo, Reg. No. 71322-097
FCC Yazoo City
U.S. Penitentiary
P.O. Box 5000
Yazoo City, MS  39194

/s/ Carolyn D. Phillips