McGREGOR W. SCOTT
United States Attorney
MICHAEL G. TIERNEY
Assistant United States Attorney
2500 Tulare Street, Suite 4401
Fresno, CA 93721
Telephone: (559) 497-4000
Facsimile: (559) 497-4099

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 1:14-CR-00041-LJO-SKO |
| Plaintiff, | UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO REDUCE SENTENCE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A) |
| v. | |
| BRIAN CAPUTO, | |
| Defendant. | |

## I.     **INTRODUCTION**

The United States of America respectfully submits this brief in opposition to defendant Brian Caputo's ("Caputo" or "Defendant") Motion for Compassionate Release pursuant to 18 U.S.C. § 3582(c)(1)(A). Doc. 90. Caputo moves for a time-served sentence, resulting in a 75-month reduction. Caputo poses a continuing danger to the community. The seriousness of his crimes, which involved extorting young girls into sending him images of child pornography, weighs against his release. The Court should deny his motion.

///

///

///

///

## II. FACTUAL BACKGROUND

### A. Caputo Threatens Multiple Young Girls and Extorts Them Into Sending him Nude Pictures of Themselves

In May 2016, Caputo was convicted of distributing child pornography. PSR ¶ 1. Caputo's conviction was based on a long-running campaign, lasting from approximately late 2012 to early 2014, to terrorize preteen and young teenage girls into taking sexually explicit pictures of themselves to him. PSR ¶ 4-25. When his victims did not comply with his requests, Caputo threatened them, including by telling them that he would kidnap them or hurt their families. PSR ¶ 4; Doc. 16 at 4-5. The accounts of several of his victims serve to illustrate the scope of his crimes.

#### 1. Victims EA and SH

In June 2013, 12-year-old victim EA reported that someone had contacted her on Facebook using the Facebook screen name "Giavanna Derann." "Derann" was supposedly a teenage girl, but the person behind the account was Caputo. PSR ¶¶ 6, 25. Caputo told EA to send nude images of herself or he would distribute nude images of EA's 11-year-old friend, SH, to everyone on the internet. PSR ¶ 4. Caputo also threatened to kidnap EA and SH if EA did not send nude pictures. PSR ¶ 4.

SH also met "Derann" on Facebook. Caputo manipulated SH by acting like a friend, then asking her to send nude pictures of herself, and claiming that "Derann" would hurt "herself" if SH did not comply. PSR ¶ 5–6. Eventually, SH agreed to send pictures if "Derann" would send one first. Caputo send a picture of a nude girl that he said was "Derann," and SH sent him the explicit photos he requested. PSR ¶ 6. When SH balked at sending additional pictures and videos, Caputo messaged her "Do you want everyone in texas to see you like this it will even be all over the world or send what you owe and this stops." [sic]. PSR ¶ 7. Caputo continued to contact friends of SH, sending them nude photos of SH and attempting to use to obtain further images of child pornography. PSR ¶ 8–9.

#### 2. Victim AB

In July 2013, Caputo used another fake Facebook profile to contact 12-year-old AB, a friend of SH. PSR ¶ 9. Caputo told AB to send nude pictures of herself or SH, or Caputo would "ruin[]" SH's life by posting pictures he already had. PSR ¶ 9. AB ultimately agreed and sent nude pictures. PSR ¶ 9.

3.  Victim SS

Caputo contacted 12-year-old SS in June 2013, once again via a fake online profile. Caputo befriended SS and immediately started asking for nude pictures. Eventually, SS agreed and sent topless and fully nude pictures. PSR ¶ 11. Caputo proceeded to contact several of SS' friends on Facebook. He repeatedly distributed pictures of SS to each of her friends and threatened to send the pictures to everyone. PSR ¶ 12. He claimed SS would go to jail if the pictures were discovered and her life would be ruined. PSR ¶ 12.

4.  Victim CA

In January 2013, Caputo, using another fake Facebook profile, contacted a female minor identified as CA. PSR ¶ 14. Caputo demanded and ultimately received sexually-explicit images of CA. After CA grew reluctant, Caputo wrote, "So ur going to be that retard? I hope I could talk someone into kidnapping and killing u! Im not going to stop until I get what I want do u want the entire world to see u naked? Cause it will happen if u don't do it for me!...." *[sic]* PSR ¶ 14. Caputo also sent the images of CA as part of an attempt to trade them for additional child pornography. PSR ¶ 15.

5.  Victim BG

BG was in 7th or 8th grade at the time she was first contacted by Caputo, who was then claiming to be a 12- or 13-year-old female. PSR ¶ 18. Caputo also deceived BG into a friendship and BG voluntarily sent him nude images; she later became reluctant to provide additional images. PSR ¶ 18. Caputo threatened her: "If you don't send the images, I am going to hurt your family." PSR ¶ 20. The threats cowed her and she produced sexually-explicit images on a near daily basis for the majority of 2013. PSR ¶ 20. Caputo at one point instructed BG to masturbate and insert a marker into her vagina. BG complied, and also sent numerous other videos of herself masturbating to Caputo. PSR ¶ 21.

**B.   Caputo Deceives Federal Agents, Continues his Crimes, and is Later Caught**

On January 3, 2014, agents of Immigration and Customs Enforcement questioned Caputo and his mother at their shared residence. PSR ¶ 26; Doc. 16 at 3. Caputo denied viewing child pornography and suggested that someone else had used the residence's internet connection. PSR ¶ 26; Doc. 16 at 3; Doc. 75 (12/8/14 Hrg. Tr.) at 24. Those denials were false, as Caputo later admitted. Doc. 75 at 24. During that same visit, agents informed Caputo's mother of the allegations and she denied any knowledge of his

crimes. Doc. 16 at 3. Caputo continued to extort the victims afterward. For example, on January 18, 2014, Caputo emailed victim BG: "Your pics and vids. I'm going to send them all out." Doc. 63-1 at 8.

On February 28, 2014, FBI served a search warrant at the joint residence. PSR ¶ 25. Caputo this time confessed to creating fake Facebook accounts and messaging underage girls. PSR ¶ 25. He admitted that he asked them for nude photos of themselves and threatened the girls when they did not provide them. Doc. 1 (Compl.) at 10-11.

### C.   Caputo is Detained as a Flight Risk and Danger to the Community

In late February 2016, a magistrate judge issued an arrest warrant based on a criminal complaint against Caputo. Doc. 1 at 12; Doc. 2. Following his arrest another magistrate judge ordered him released on bail conditions. Doc. 12. The government sought review by the district court. Doc. 16. At a detention hearing, District Judge O'Neill noted that Caputo's offense involved direct online contact with the victims, and that Caputo had requested (among other things) that victims penetrate themselves and masturbate on camera. Doc. 55 (3/12/15 Hrg. Tr.) at 20. He noted that the offense involved threats towards the victims. Doc. 55 at 20. Judge O'Neill also noted that Caputo's offenses continued even though Caputo was living with his mother at the time and after law enforcement had informed both of them that someone in the home was accessing child pornography. Doc. 55 at 20–21. (Caputo had argued, as he does here, that he be released to the custody of his family, Doc. 55 at 19). Judge O'Neill accordingly detained Caputo as a flight risk and danger to the community. Doc. 55 at 22–23.

### D.   Caputo Pleads Guilty to Receiving Child Pornography

In May 2016, pursuant to a written plea agreement, Caputo pleaded guilty to receipt of child pornography, in violation of 18 U.S.C. § 2252(a)(2). Docs. 80, 81.

Prior to sentencing, the PSR noted that Caputo had been diagnosed with a genetic chromosomal anomaly called CADASIL (cerebral autosomal dominant arteriopathy with subcortical infarcts and leukoencephalopathy). PSR ¶ 71. The PSR recommended that the Court consider Caputo's medical condition (along with his poor socialization and difficult childhood) to vary downward from a Guidelines Range of 210–240 months to 180 months. PSR ¶ 107. At sentencing, the Court noted that Caputo's medical problems were "very serious," that they appeared to have caused strokes, and that they might shorten his life expectancy. Doc. 113 (11/7/16 Hrg. Tr.) at 43–44. The Court indicated that the

1  PSR's balancing of the medical issues with the severity of Caputo's crimes was "appropriate," and

2  imposed a downward variance of 180 months.  Doc. 113 at 46–47; Doc. 97 at 2.[1]  The United States

3  Court of Appeals for the Ninth Circuit affirmed the Court's judgment of guilt and its sentence. *United*

4  *States v. Caputo*, 770 Fed. App'x 400, 401 (9th Cir. 2019).

5         Caputo is currently serving his 180-month sentence in FCI Marianna.[2]  His projected release date

6  is February 2, 2027, based upon application of his GCT. Thus, Caputo has served about 80 months

7  (44%) of his 180-month sentence. Exhibit 1 (BOP Inmate Data).

8         **E.      Administrative Remedies**

9         Pursuant to 18 U.S.C. § 3582(c)(1), an inmate may file a motion for sentence reduction after

10 completing the BOP exhaustion requirements or after waiting 30 days from receipt of a request by the

11 Warden, whichever is earlier.  On August 4, 2020, through counsel, Caputo submitted a request for

12 compassionate release/reduction in sentence to the Warden. Def. Mot. Exhibit 1 at 2-5.  More than 30

13 days have elapsed since receipt of Caputo's request, satisfying the statutory requirement in 18 U.S.C. §

14 3582(c)(1).

15        **F.      Caputo's Motion for Compassionate Release**

16        Caputo moves for compassionate release, claiming that he is at high risk for serious

17 complications from COVID-19 because of his health conditions.  Doc. 139 at 7.  BOP medical records

18 indicate Caputo's current health conditions as CADASIL (Cerebral Autosomal Dominant Arteriopathy

19 with Sub-Cortical Infarcts and Leukoencephalopathy), MS (Multiple Sclerosis), migraine,

20 hypemetropia, astigmatism, unspecified disorder of refraction, pulpitis, ingrown toenail, and low back

21 pain. Exhibit 2 at 111-113 (BOP Medical Records Filed Under Seal).  Caputo requests a time-served

22 sentence.

23 **III.     THE BUREAU OF PRISONS' AND CONGRESS'S RESPONSE TO COVID-19**

24        In the face of the global COVID-19 pandemic, BOP has taken steps to try to protect inmates' and

25 employees' health and to try to keep COVID-19 outside of its facilities.  *See* BOP, *Implementing*

26 *Modified Operations*, www.bop.gov/coronavirus/covid19_status.jsp (last visited Oct. 11, 2020).  BOP

27        [1] The Court ultimately found the Guidelines Range to be 235–240 months.  Doc. 113 at 45.

28        [2] On October 20, 2020, Caputo was transferred to FCI Marianna from USP Yazoo City.

continues to revise and update its action plan in response to the fluid nature of the COVID-19 pandemic. For example, on October 1, 2020, BOP implemented Phase 10 of its COVID-19 Action Plan. As part of that planning effort, BOP has continued working with the CDC to ensure that its approach aligns with current guidance for COVID management in correctional facilities. *See* BOP, *Correcting Myths About BOP And COVID-19*, www.bop.gov/coronavirus/docs/correcting_myths_and_misinformation_bop_ covid19.pdf (last visited Oct. 6, 2020) (hereinafter "Correcting Myths").

Consistent with the CDC's guidance, BOP medical staff are "conducting rounds and checking inmate temperatures at least once a day"—twice a day where inmates are quarantined or in isolation. *See id.* Moreover, all BOP staff and inmates have been issued cloth masks to wear on a daily basis, and staff are required to wear masks, gloves, and potentially gowns when dealing with isolated and quarantined inmates. *See id.* at 1, 3. Finally, "[c]leaning supplies have been provided to inmates," the BOP has provided training on CDC best practices regarding disease transmission and prevention (including sanitation), and prison common areas are sanitized multiple times a day. *See id.* at 2, 3.

Despite these substantial risk-mitigation efforts, BOP facilities have not been immune from the COVID-19 pandemic. As of November 2, 2020, 1,849 BOP inmates in BOP custody—out of a total of approximately 140,000—have thus far been diagnosed with COVID-19. *See* BOP, *COVID-19 Coronavirus*, www.bop.gov/coronavirus (last visited November 2, 2020) (hereinafter "BOP Coronavirus Data"). All of these positive cases are (or were) isolated from fellow inmates and are (or were) receiving medical treatment for this disease. *See* Correcting Myths at 2. And "[i]nmates whose conditions cannot be managed within the institution are sent to the local hospital." *Id.* In light of these treatment efforts, there are currently 16,944 BOP inmates and 1,383 staff members who have recovered from COVID-19, while 130 inmates and 2 BOP staff members have died of the disease. Of those inmate deaths, 4 occurred while the inmate was on home confinement. *See id.*

Currently, 8 staff members at FCI Marianna have positive diagnoses for COVID-19; 6 inmates and 11 staff members have recovered. *See* BOP Coronavirus Data.

///

///

///

## IV.     LEGAL FRAMEWORK FOR COMPASSIONATE RELEASE

A compassionate-release motion is a request for a permanent reduction in a defendant's federal sentence. A district court generally "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see Dillon v. United States*, 560 U.S. 817, 824–25 (2010). Compassionate release is one of the few exceptions to this rule, allowing a court to "reduce the term of imprisonment (and . . . impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment)." 18 U.S.C. § 3582(c)(1).

Because this relief is both drastic and permanent, it is subject to strict statutory conditions. For example, aside from the administrative exhaustion requirement described above, in evaluating compassionate-release requests, courts must follow both the statute and the relevant policy statements. *See* 28 U.S.C. § 994(t); U.S.S.G. § 1B1.13; *see also Dillon*, 560 U.S. at 827 (holding that because Section 3582(c) permits a sentencing reduction only where it is "consistent with applicable policy statements issued by the Sentencing Commission," such policy statements are binding on a court determining eligibility). Pursuant to those authorities, to be eligible for compassionate release, a defendant must demonstrate: (1) the existence of extraordinary and compelling reasons within the meaning of the statute; (2) that he or she is not a danger to the community; and (3) that the reduction is consistent with the Sentencing Guidelines' policy statements. *See* 18 U.S.C. § 3582(c)(1)(A); *see also* U.S.S.G. § 1B1.13(1)–(3).[3]

As relevant here, Section 1B1.13 of the Sentencing Guidelines explicitly defines the "extraordinary and compelling reasons" that make a defendant eligible for compassionate release. *See* 28 U.S.C. § 994(t). Those reasons include: (1) a "terminal illness"; (2) a serious medical condition "that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover"; or (3) a defendant who is at least 65 years old, is experiencing a serious deterioration in physical or mental health because of the

---

[3] The government is aware that the Court has formulated the basic requirements somewhat differently: 1) administrative exhaustion; 2) existence of extraordinary and compelling reasons and consistency with the Guidelines' policy statements; 3) the factors set forth in 18 U.S.C. 3553(a). *See, e.g. United States v. Ramirez*, No. 1:17-CR-00032-NONE, 2020 WL 5909496, at *3 (E.D. Cal. Oct. 6, 2020). Though formulated in a slightly different manner, the government's response addresses each of the requirements articulated by the Court.

aging process, and "has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less." U.S.S.G. § 1B1.13; *see also* U.S.S.G. § 1B1.13, n.1(A)–(B).[4]

"In the past, when moving for relief under 18 U.S.C. § 3582(c), it was recognized that the defendant bore the initial burden of demonstrating that a sentence reduction was warranted," and district courts have generally followed that practice following the enactment of the First Step Act (FSA). *United States v. Recinos*, 2020 WL 4194080, at *3 (E.D. Cal. July 21, 2020) (citing *United States v. Sprague*, 135 F.3d 1301, 1306–07 (9th Cir. 1998)). Thus, Caputo bears the burden of proving that "extraordinary and compelling reasons" exist to support his motion. 18 U.S.C. § 3582(c)(1)(A).

That is no small burden. Even for defendants who are statutorily eligible for compassionate release, numerous courts have recognized that such releases are "rare" and "extraordinary" remedies that are within the district courts' discretion to deny. *See, e.g.*, *United States v. Chambliss*, 948 F.3d 691, 693–94 (5th Cir. 2020); *United States v. Mangarella*, 2020 WL 1291835, at *2–3 (W.D.N.C. Mar. 16, 2020). As the Tenth Circuit has explained, "it is a rare case in which health conditions present an 'exceptional reason'" that might allow for early release where detention would otherwise be warranted. *United States v. Wages*, 271 F. App'x 726, 728 (10th Cir. 2008) (collecting pre-trial detention cases); *accord United States v. Willis*, 382 F. Supp. 3d 1185, 1188 (D.N.M. 2019) (explaining that "most courts treat compassionate release 'due to medical conditions [a]s . . . a rare event."). This reluctance to expansively apply compassionate release is grounded in a concern that any less narrow application would yield significant sentencing disparities. *See United States v. Ebbers*, 432 F. Supp. 3d. 421, 2020 WL 91399, at *6 (S.D.N.Y. Jan. 8, 2020).

## V.   ARGUMENT

### A.   Caputo Has Failed to Demonstrate That Any "Extraordinary and Compelling Reasons" Justify His Early Release

Caputo must conclusively establish that "extraordinary and compelling reasons" justify his

---

[4] The government is aware that the Court has previously noted that a number of courts throughout the country have determined that "courts are not limited by the pre-FSA categories" described in Section 1B.13. *See Rodriguez*, 2020 WL 5909496, at *3. The government maintains that the Guidelines' categories are definitive; a contrary reading untethers Section 3582 compassionate release motions from the "general rule of finality" in sentencing. *Dillon*, 560 U.S. at 824. Section 1B1.13 provides appropriate and fitting guidance for the assessment of whether a defendant has established extraordinary and compelling circumstances justifying early release.

requested sentence reduction, but it is not apparent that he has done so.  Caputo notes that there is an association between CADASIL and increased risk of stroke or other dangerous vascular event.  Doc. 139 at 11–12.  The CDC includes cerebrovascular disease (such as CASASIL) in a group of conditions that "might be at increased risk" of severe illness from COVID-19.  *See generally* [https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html](https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html).  But placement in this group of possible increased risk does not automatically equate to a finding of "extraordinary and compelling circumstances."  *See United States v. Cordova*, No. 1:18-CR-00145-DAD-BAM,  2020 WL 4899938, at *5 (E.D. Cal. Aug. 20, 2020) (declining to hold that defendant had met his burden of showing "extraordinary and compelling circumstances" despite a showing of hypertension, another "might be at increased risk" condition).  Caputo's BOP medical records indicate that the BOP has been able to sufficiently monitor and treat Caputo's medical conditions.  *Id.*  The records indicate that Caputo has been receiving medication to manage his CADASIL and MS.  *See* Exhibit 2 at 124-129.   Accordingly, Caputo has not convincingly demonstrated that extraordinary circumstances exist.  Even if he had, the Court should deny his motion for release, as demonstrated below, because Caputo remains a danger to the community.

**B.    Caputo's Continuing Danger Makes Him Ineligible for Compassionate Release.**

  1.    Caputo is a danger to the community

To qualify for compassionate release, a defendant must demonstrate that he is "not a danger to the safety of any other person or to the community."  U.S.S.G. § 1B1.13(2).  Specifically, this Court may not reduce a defendant's sentence unless it finds that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."  U.S.S.G. § 1B1.13; *see United States v. Gotti*, 433 F.Supp.3d 613, 615, 619-620 (S.D.N.Y. 2020) (release was inappropriate regardless of extraordinary and compelling circumstances; defendant posed a continuing danger to the public).  Courts have regularly denied motions for compassionate release on dangerousness grounds for defendants like Caputo convicted of child pornography offenses where the offender is at risk for re-offending.  *See United States v. Mitchell*, No. 2:12-CR-0401 KJM, 2020 WL 2770070, at *3 (E.D. Cal.

May 28, 2020) (collecting cases and denying motion for compassionate release). This Court should likewise deny Caputo's release.

Caputo terrorized a series of preteen and teenage girls using no more than an internet-enabled phone. Doc. 113 at 41. Using that phone, Caputo began by manipulating their emotions, claiming love for the targeted minor or threatening to hurt himself if the relationship did not continue. Doc. 113 at 34–35. If those tactics did not work, the defendant would threaten to kidnap them, hurt their families, or widely share the nude images online, exposing them to friends and family. Doc. 113 at 34–35; PSR ¶¶ 4–23, 27. As the PSR noted, "it is likely the victims will suffer lifelong negative consequences as a result of the defendant's predatory acts." PSR ¶ 106. Caputo refused to stop his terrorization of the victims, even when law enforcement questioned him and his family. Doc. 55 at 20–23. That led Judge O'Neill to order Caputo's confinement as a danger to the community. Doc. 55 at 23. Caputo continues to be a danger and the Court should deny his motion for release.

2. <u>Caputo's release to his home would not mitigate his danger.</u>

Caputo's release plan offers no mechanism to mitigate his danger; in fact, it proposes that he return to his mother's home, Doc. 139 at 19-20, where he was living when he committed the instant offense. As this Court has previously noted, such a request argues against release. *See United States v. Mootz*, No. 1:17-CR-00053-DAD-BAM, 2020 WL 5763814, at \*8 (E.D. Cal. Sept. 28, 2020) (denying compassionate release in case involving receipt and distribution of child pornography). *See also Mitchell*, 2020 WL 2770070, at \*4 (same). In addition, as another court in this circuit has noted, "the pandemic and the CDC's recommended guidelines would only serve to make it more difficult to monitor [the defendant]'s behavior. Because [the defendant] could engage in his prior criminal conduct [of possessing child pornography] at any time from his place of home confinement, effectively monitoring him would require repeated visits to his home. Such visits would enhance the risk of the spread of COVID-19 to the individuals charged with monitoring his compliance." *United States v. Sims*, 2020 WL 2838611, at \*6 (W.D. Wash. June 1, 2020). Based on this analysis, the court in *Sims* concluded that the defendant "would be a danger to the community if he were released," even if confined to his home. *Id*. Here, where the defendant proposes release to his mother's home, with no restrictions on his movements, the danger to the community posed by his release is even clearer. Caputo would therefore

pose a danger to the community if released early.

This inherent danger to the community is the reason BOP as a matter of policy does not release sex offenders to home confinement. *See* BOP Operations Memorandum 001-2020, Home Confinement under the First Step Act, April 3, 2020. As detailed above, Caputo presents a current and ongoing danger to his potential victims. This fact cuts significantly against Caputo's demand for a time-served sentence and undermines his ability to prove he is "not a danger to the safety of any other person or to the community." U.S.S.G. § 1B1.13(2).

Moreover, the Sentencing Guidelines establish a policy that dangerous offenders, including sex offenders, should not be released early if that release would endanger the safety of the community. U.S.S.G. § 1B1.13(2). Caputo's dangerousness is established by the nature of his conviction, receipt of child pornography, 18 U.S.C. § 2252(a)(2), which is listed in 34 U.S.C. § 20911, the statute defining sex offenses. As a result, this Court should find that, consistent with the policy articulated in U.S.S.G. § 1B1.13(2), Caputo is a danger to the community and not entitled to a time-served sentence. Nothing about the COVID-19 pandemic reduces the danger Caputo poses to the community if he is prematurely released.

### 3. Caputo's rehabilitative efforts in prison do not mitigate his danger.

"Pursuant to 28 U.S.C. § 994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement." U.S.S.G. § 1B1.13, comment. (n.3). Even being a "model inmate" does not warrant an "abrupt departure from [a defendant's] current sentence." *United States v. Applewhite*, No. 08-CR-60037, 2020 WL 137452, at *2 (D. Or. Jan. 13, 2020). Moreover, because there is a significant difference between doing well in prison and doing well in society, this Court, in evaluating the danger posed by defendant, cannot ignore the nature and circumstances of the offense and his history. *See* 18 U.S.C. § 3142(g).

Moreover, Caputo has been sanctioned many times while in BOP custody. His disciplinary actions include: use of refusing to obey an order, refusing work/program assignments, and tattooing or self-mutilation. *See* Exhibit 3 (Inmate Discipline Data). This history substantially undermines any claim that he has been rehabilitated or that he is in any way a good candidate for the extraordinary relief he seeks. The Court should therefore deny his motion for release.

**C.    Even Assuming Caputo Were Otherwise Eligible, the 18 U.S.C. § 3553(a) Factors Do Not Support a Shorter Sentence.**

Any decision on a motion brought under § 3582(c)(1)(A)—even for a statutorily eligible defendant—must also consider the factors under 18 U.S.C. § 3553(a).  *See* 18 U.S.C. § 3582(c)(1)(A)(i). Those factors do not support Caputo's request for premature, permanent release after completing barely more than half of his mandatory minimum sentence. They support his current sentence. As Judge O'Neill noted, Caputo forced threatened girls between the ages of 11 and 15 into photographing and videotaping "crimes of molestation" that he forced them to perpetrate on themselves. Doc. 113 at 45. He then forced them to send these images to the very person who had so frightened them in the first place—crimes "beyond awful, beyond anything that should happen in a civilized society." Doc. 113 at 45. The original sentence in this case of 180 months included a substantial variance downward from the Sentencing Guidelines based on Caputo's medical condition. Doc. 113 at 46–47. Given the nature and circumstances of Caputo's crimes, and the need to protect to public—particularly young girls—from further crimes by him, terminating that already-reduced sentence to less than half its original amount "would not adequately reflect the seriousness of his offense of conviction, promote respect for the law, provide just punishment, or afford adequate deterrence to criminal conduct." *Mootz*, No. 2020 WL 5763814, at *9 (denying sentencing reduction from 108 months to less than 42 months). The Court should therefore deny Caputo's motion for compassionate release.

## VI.    QUARANTINE REQUESTED

Should the Court be inclined to grant Caputo's motion, the United States requests a 14-day quarantine period and medical clearance prior to release to minimize the possibility of any spread of COVID-19 from the inmate to the public. The government further requests that, if this Court ultimately grants relief, the government be given an opportunity to brief appropriate conditions—including a release plan, a mandatory quarantine, and a period of home confinement as a condition of supervised release. *See* 18 U.S.C. § 3582(c)(1)(A).

///

///

///

## VII.     CONCLUSION

For the reasons discussed above, the United States respectfully requests that the Court deny Caputo's motion for a time-served sentence.


Dated: November 3, 2020                                     McGREGOR W. SCOTT
                                                            United States Attorney


                                                    By:   /s/ *Michael G. Tierney*
                                                          MICHAEL G. TIERNEY
                                                          Assistant United States Attorney