1

Carolyn D. Phillips,   #103045
Attorney-At-Law
P.O. Box 5622

2

Fresno, California  93755-5722
Telephone: (559)248-9833
Facsimile:  (559) 248-9820

3

4

Attorney for Defendant BRIAN CAPUTO

5

6

### IN THE UNITED STATES DISTRICT COURT

7

### FOR THE EASTERN DISTRICT OF CALIFORNIA

8

9

UNITED STATES OF AMERICA,

Case No. 1:14-cr-41

10

*Plaintiff*,

DEFENDANT BRIAN CAPUTO'S REPLY TO GOVERNMENT'S OBJECTIONS TO

11

v.

*EMERGENCY* MOTION FOR SENTENCE REDUCTION PURSUANT TO

12

BRIAN CAPUTO,

18 U.S.C. § 3582(c)(1)(A)(i)

13

*Defendant*.

[Compassionate Release/COVID-19 FCI-Marianna]

14

15

### I. Introduction

16

Defendant Brian Caputo has been incarcerated at FCI Marianna, Florida since

17

October 20, 2020, having been transferred from USP Yazoo City, Mississippi.  Within

18

eight days of his transfer, a staff person and two inmates from Mr. Caputo's unit tested

19

positive for COVID-19[1].  As of December 10, 2020, the total positive cases at FCI-

Marianna reported by BOP.gov were 4 inmates, 11 staff.  That figure was modified to 2

20

inmates, 12 staff, December 11, 2020.   These figures reflect an uptick in the overall

21

infection rates in the United States and the inability of FCI-Marianna to protect staff or

22

inmates from becoming infected with this deadly virus.  Because of Mr. Caputo's

23

---

[1] Please see the Declaration of Brian Caputo which is filed with this brief as Attachment B.

serious, incurable degenerative medical conditions including a genetic stroke disorder, CADASIL, and his history of strokes beginning when he was 25, he is at much greater risk for serious illness or death should he contract COVID-19.  Within the prison environment Mr. Caputo, is unable to adhere to the basic CDC guidelines of social distancing, or sanitization of his environment as he has extremely limited access to protective gear such as plastic gloves, nor is he able to follow "strict adherence" as recommended by NIH because of his particular vulnerability as a result of CADASIL. He has one paper mask, but cannot control whether staff wears protective gear, sanitize common areas or practice safe distancing.  As long as he remains incarcerated Mr. Caputo is in grave peril of contracting COVID-19.

The government's opposition focused on the assertions that:  1) Mr. Caputo's multiple serious medical conditions are insufficient to establish "extraordinary and compelling circumstances" as defined by U.S.S.G. §1B1.13; 2)  he remains a danger to the community, and 3)  under section 3553(a) sentencing factors, the need for just punishment, require he remain in custody.  These contentions are unavailing.

While Mr. Caputo's underlying conviction was serious it did not and does not support a death sentence.  Remaining in prison during the pandemic could kill him, given his degenerative health conditions, specific vulnerability to COVID-19, lack of access to specialized medical care, the risk of infection, and the inability to protect himself by taking the preventive measures recommended by CDC.

Mandatory prerequisites to compassionate release are satisfied, and the merits unequivocally favor Mr. Caputo.  Under the circumstances, no justification exits for Mr. Caputo's continued incarceration in the midst of a global pandemic.  Time is of the essence because we are now reeling from the impact of a third wave[2] which has proven to be more devastating than the previous peaks of COVID deaths and infections.

---

[2] Lauren Leatherby, *US Virus Cases Climb Toward a Third Peak*, New York Times.  Oct. 15, 2020, available at https://www.nytimes.com/interactive/2020/10/15/us/coronavirus-cases-us-surge.html.

Importantly, Mr. Caputo proposes a reasonable release plan where he would live with his mother, Patricia Caputo, in Bakersfield, California.  (This is not the same home where he lived at the time of his arrest.) Patricia Caputo will be Mr. Caputo's caretaker upon his release, ensuring that he has the specialized medical care he requires, and she will oversee compliance by Mr. Caputo to all terms and conditions of supervised release, including locking screens on any device with access to the internet.  (See Exhibit. 9, Declaration of Patricia Caputo).

Given the extreme risk posed by COVID-19 to Mr. Caputo as a result of his stroke disorder and history of strokes, along with the surge of coronavirus cases in his housing unit, we respectfully call on this Court to show Mr. Caputo a measure of compassion, as permitted under 18 U.S.C. § 3582(c), by reducing his term of imprisonment to time served and replacing the unserved custodial sentence with home detention on those supervised release conditions the Court deems just.

**II.     Mr. Caputo's High-Risk Medical Conditions and the Outbreak of COVID-19 in Mr. Caputo's Housing Unit at FCI-Marianna Constitute "Extraordinary and Compelling" Reasons Warranting a Reduction to Time Served Under 18 U.S.C. § 3582(c)(1)(A)**

**A.     The Government Concedes that Mr. Caputo has Satisfied the "Exhaustion" Requirement in 18 U.S.C. § 3582(c)(1)(A)**

The government has meaningfully narrowed the issues in dispute, as it has conceded that Mr. Caputo has satisfied the statutory requirement of administrative exhaustion in 18 U.S.C. § 3582(c)(1).  As set forth in Mr. Caputo's motion and this reply, the Court has the authority to reduce a defendant's sentence under § 3582(c)(1)(A) for "extraordinary and compelling reasons," such as the spread of COVID-19 in Mr. Caputo's housing unit at FCI-Marianna and Mr. Caputo's high-risk medical conditions that make him particularly susceptible to serious complications or death if infected.  As part of a § 3583(c)(1)(A) sentence reduction, the court can replace a portion of the remaining sentence of imprisonment with an additional period of home confinement as a condition of supervised release.  *See, e.g., United States v. Etzel*, No. 6:17-cr-0001-AA,

2020 U.S. Dist. Lexis 77198, at * 11 (D. Or. May 1, 2020) ("While defendant requested that any term of confinement be limited to six months, the Court will impose home confinement equal to the remaining time on his in-custody sentence" in granting § 3582(c)(1)(A) sentence reduction."). Thus, the Court may reduce Mr. Caputo's sentence to time served and add a period of home confinement in an amount the court deems appropriate.

> **B.** **Mr. Caputo's Stroke Disorder and History of Strokes Constitute "Extraordinary and Compelling Reasons" Warranting a Sentence Reduction Under § 3582(c)(1)(A) The Recent Outbreak of COVID-19 in Mr. Caputo's Housing Unit at FCI-Marianna and Custody Staff's Failure to Honor Mr. Caputo's Needs Caused by his Many Medical Conditions**

In his motion to reduce sentence, Mr. Caputo described his multiple neurological conditions or brain abnormalities: colpocephaly, a cephalic disorder involving the disproportionate enlargement of the occipital horns of the lateral ventricles of the brain, associated with multiple neurological syndromes including agenesis of the corpus callosum. Mr. Caputo has a complete absence of the corpus callosum, the band of white matter connecting the two hemispheres in the brain, resulting in vision impairments, low muscle tone, poor motor coordination, *seizures*, difficulty transferring more complex information from one hemisphere to the other, difficulty in minding subtle social cues even with a normal intelligence quotient; and, Cerebral Autosomal Dominant Arteriopathy with Subcortical Infarcts and Leukoencephalopathy ("CADASIL"), an inherited *stroke disorder* caused by obstruction of blood supply in the blood vessels, this degenerative organic brain abnormality causes infarctions, strokes and progresses to dementia, Mr. Caputo has suffered several strokes since his first stroke when he was 25 years old. Exs. 2 and 4.

Mr. Caputo has also been diagnosed with Multiple Sclerosis ("MS"), a disease in which the immune system eats away at the protective covering of nerves resulting in

1  disrupted communication between the brain and the body, symptoms include vision

2  loss, pain, fatigue, and impaired coordination.  These serious degenerative conditions

3  are treatable but not curable.

4         The government does not dispute that Mr. Caputo suffers from CADASIL, that

5  he has had numerous strokes since he was 25, the most recent on August 16, 2020, or

6  that he has colpocephaly, agenesis of corpus collosum and multiple sclerosis.  The

7  government asserts that CDC 's identification of cerebrovascular diseases, in general, as

8  conditions that might increase the risk of severe illness from COVID-19, preclude Mr.

9  Caputo from establishing that the stroke disease, CADASIL, did not automatically

10  equate to a finding of "extraordinary and compelling circumstances."  Doc. 146, p. 9.

11  CDC's overview of broad categories of medical conditions was not intended to identify

12  and categorize all possible variables and combinations of medical conditions.  This

13  interim guide could not and did not address rare medical conditions such as CADASIL

14  or render an opinion as to the particular vulnerability of an individual who suffered

15  from a combination of CADASIL, colpocephaly, agenesis of corpus callosum and

16  Multiple Sclerosis[3].  Contrary to the government's position, the National Institutes of

17  Health identified individuals with CADASIL as a vulnerable group who should abide

18  by "strict infection prevention measures for the duration of the pandemic" because

19  COVID-19 elevated the likelihood of a catastrophic stroke leading to severe permanent

20  disability or death.  See ncbi.nim.nih.gov, "Multiple internal border zone infarcts in a

21  patient with COVID-19 and CADASIL", June 9, 2020, doi:  10.1016/j.jns.2020.116980,

---

[3] CADASIL affects approximately 2 to 5 of 1000,000 people.  There are no incidence estimates for colpocephaly since its identification in 1940, but it is rare., only 50 cases have been reported in medical literature.   Agenesis of corpus callosum affects 3-7 out of 1,000 people.  (rarediseases.org, "Agenesis of Corpus Callosum," NORD (National Organization for Rare Disorders.)

Owen Hedd Williams, *et al*.   It is impossible for Mr. Caputo to adhere to strict infection prevention measures while incarcerated at FCI-Marianna.

Contrary to the government's assertion, BOP is not adhering to COVID-19 protocols. Mr. Caputo has reported to counsel the following[4]:  Mr. Caputo lives in a housing unit consisting of 64 cells and approximately 120 to 130 inmates.  The unit was in lockdown for several weeks because of a case manager for Mr. Caputo's unit tested positive and two inmates tested positive to coronavirus around October 28, 2020 about a week after Mr. Caputo was transferred from USP-Yazoo City.  Since his transfer, Mr. Caputo has had one brief visit with a doctor.  This is of grave concern because of the serious nature of Mr. Caputo's medical conditions which requires constant monitoring of his medications.  One of his symptoms is extremely painful back spasms.  He has not received the appropriate and necessary medications to adequately address this condition, other than over the counter pain relievers which do not address the pain.  Mr. Caputo stated that when he sneezed it felt as if his back was going to snap in two.  He had requested an MRI of his back and head, but none has been scheduled.

When Mr. Caputo had a stroke October 29, 2018, he was sent to Dr. Weldon the Chief of Staff, Chairman of Neurology, Director of Neuro Critical Care & Neuro Rehab, Merit Central Hospital, Jackson, MS.  Doc. 139.  Dr. Weldon made recommendations for medications including a follow-up visit after an MRI.  Mr. Caputo was not provided Aricept, generic Donepezil, to reduce risk of cognitive impairment and risk of conversion to full dementia, nor was there a follow-up visit with Dr. Weldon.  Medical staff at FCI Marianna does not conduct rounds once a day.  Temperatures are taken every other week not daily.  When Mr. Caputo arrived at FCI Marianna he was not provided a cloth mask.  Staff are inconsistent about wearing gloves and masks when in

---

[4] A declaration was mailed to Mr. Caputo Nov. 20, 2020.  He placed the declaration within the prison mailing system over ten days ago.  Counsel has yet to receive it.

his unit, and orderlies do not change gloves between contact with other inmates or tasks, like handling food.  The only cleaning supplies provided has been a bar of soap which is changed once a week.  There is no hand sanitizer or disinfectant wipes or any other cleaner.  Common areas including telephones are not sanitized between use.  The physical condition of Mr. Caputo's cell makes it impossible to keep clean.  The floors in his cell consist of a very thin layer of concrete over dirt.  With little effort he can scratch through to the dirt with his fingernail.  There is a hole in the wall between his cell and the cell next door making it impossible to ensure social distancing. Because of his conditions he experiences weakness in his muscles which affects his balance, causes muscle spasms, severe back pain and migraines.  He is afraid that while he is incarcerated, he will be infected with the coronavirus which will result in a severe debilitating stroke or death.  He needs a higher level of medical care to address his ongoing and worsening medical conditions.

The government offers no evidence contradicting Drs. John Sabow and Patrick Weldon's diagnoses, prognoses or treatment plans.  See Exs. 2 and 4.  Dr. Sabow found Mr. Caputo had been born with "a spectrum of congenital brain abnormalities."  One abnormality was colpocephaly, a cephalic disorder associated with "agenesis of the corpus callosum".   In Mr. Caputo's case the band of white matter connecting the two hemispheres of his brain is missing resulting in "unusual social behavior" and poor communication skills.  Drs. Sabow and Weldon also found that Mr. Caputo had another form of genetic chromosomal anomaly CADASIL, a disease belonging to a family of disorders called leukodystrophies.  The most common clinical manifestations which Mr. Caputo suffers are migraine headaches and ischemic attacks or strokes.  On April 12, 2019, Dr. Weldon confirmed this diagnosis of CADASIL, hereditary stroke disorder and confirmed Mr. Caputo's history of strokes starting in 2013.  Exs. 2 and 4.  Both

specialists described medication protocols to slow the symptoms from Multiple Sclerosis, and the cognitive failures of CADASIL.

Manifestations of CADASIL include recurrent strokes, cognitive decline, and psychiatric disturbance as well as migraine with aura.  It usually takes a progressive course and may lead to severe disability and premature death; males have a shorter survival rates than females with CADASIL. Many patients become immobilized at an early age, with cognitive deficits and other frequent manifestations, such as dysphagia and incontinence. Stroke is the main manifestation of CADASIL, and it is likely Mr. Caputo will continue to have strokes.

The combination of CADASIL and COVID-19 increases probability of a stroke resulting in death. The mounting evidence supports a link between COVID-19 infection and the incidence of stroke[5].  Dr. Babak Navi, Associate Professor of Neurology and Neuroscience at Weill Cornell Medicine and Medical Direct of the Weill Cornell Stroke Center, has described the complex connection between stroke and COVID-19.  From the beginning of the pandemic there has been an increase in strokes among young and middle-aged people who have contracted COVID-19.  There are multiple factors, first, infections and inflammation increase the risk of stroke.  COVID-19 is an infection that produces a strong inflammatory reaction from the body.   Second COVID-19 seems to

---

[5] Avula, A., Nalleballe, K., Narula, N. Sapozhnikov, S., Dandu, V., Toom, S., Glaser, A., & Esayegh, D. (2020) COVID-19 presenting as stroke.  Brain, behavior, and immunity, 87, 115-119.  https://doi.org/10.1016/j.bbi.2020.04.077; Belani, P., Schefflein, J., Kihira, S. Rigney, B., Delman, B.N., Mahmoudi, K., Mocca, J., Majidi, Yeckley, J., Arrarwal, A., Lefton, D., & Doshi, A.H. (2020). COVID-19 Is an Independent Risk Factor for Acute Ischemic Stroke.  American Journal of Neuroradiology. https://doi.org/10.3174/ajnr.A6650; Cowan, L.T., Lutsey, P.L., Pankow, J.S., Matsushita, K., Ishigami, J. & Lakshminarayan, K. (2018). Inpatient and outpatient infection as a trigger of cardiovascular disease:  The ARIC study.Journal of the American Heart Association, 7(22), 1-15. https://doi.org/10.1161/JAHA.118.009683; Zayet, S., Klopfenstein, T., Kovacs R. Stancescu, S. & Hagenkotter, B. (2020). Acute Cerebral Stroke with Multiple Infarctions and COVID-19, France, 2020. Emerging Infectious Diseases. 26(9). https://wwwnc.cdc.gov/eid/article/26/9/20-1791_article.

trigger cardiac events such as heart attack, and dangerous heart rhythms.  All of these factors can lead to a stroke.  Third, COVID-19 causes a severe critical illness, which can lead to multi-organ failure, including kidney failure.  Being critically ill and having multiple organs fail can place patients at a higher risk for stroke.  Fourth, COVID-19 affects the body's clotting system, promoting clot formation.  Weilcornell.org, "What to Know about Stroke and COVID-19", August 26, 2020.

"Management" through medication may address symptoms and may delay the full realization of his disorders, i.e., full dementia and incapacity, they will not cure Mr. Caputo's conditions or reduce his extreme susceptibility to a serious permanent if he contracts COVID-19.  Further, BOP has failed miserably to provide Mr. Caputo with adequate health care.  This failure is best described by BOP's response to Mr. Caputo's last stroke.

Mr. Caputo has continued to suffer strokes while in BOP custody.  According to Dr. Weldon, who reviewed records of Mr. Caputo's stroke history beginning in 2013 (Ex. 3 filed under seal), Mr. Caputo had suffered a stroke almost every six months after his first stroke at the age of 25.  Mr. Caputo's consultation with Dr. Weldon April 12, 2019, followed an October 29, 2018, stroke while Mr. Caputo was incarcerated at USP-Yazoo City, MS.  On August 16, 2020, Mr. Caputo had another stroke.  When he requested medical assistance, BOP staff punished Mr. Caputo, placing him in the Lieutenant's cage for two hours before allowing him to return to his unit.  The medical staff did not conduct an MRI to determine the extent of the stroke or provide any treatment.  This medical neglect left Mr. Caputo with a weakened left hand.

This punitive approach to Mr. Caputo's medical care has continued at FCI-Marianna.  Mr. Caputo had been designated as requiring single-cell housing due to his medical conditions, and provided a medical single-cell pass, however, on December 7, 2020, correctional staff advised Mr. Caputo that an influx of out-of-state inmates

required Mr. Caputo to share his cell.  When Mr. Caputo opposed sharing his cell due to his medical conditions, correctional staff threatened Mr. Caputo with removal to a disciplinary cell in the Secure Housing Unit with its incumbent significant restrictions, if he resisted.  Counsel spoke with the case manager for Mr. Caputo, reminding her of Mr. Caputo's medical conditions that had impetus for the issuance of a medical single-cell pass.  The case manager angrily denied that an inmate could have a medical single-cell pass and refused to commit that Mr. Caputo's medical single-cell pass would be honored.  After calls to health care services department and Southeast Regional Offices, the inmate who had already been placed into Mr. Caputo's cell was removed.  (See Declaration of Carolyn Phillips, attached hereto as Exhibit 10)

From my conversations with custody staff and the health services staff it was clear that there was little to no communication between the two departments and as a result Mr. Caputo has been left to fend for himself which often times has been interpreted as noncompliance to a direct order.  This perception that Mr. Caputo does not need special care because of his medical conditions, coupled with correctional staff's power discipline noncompliant inmates, places Mr. Caputo in extreme danger that his medical needs will be ignored, and he will suffer the consequences.

C.      **Reducing Mr. Caputo's Sentence to Time Served is Consistent with all the Sentencing Factors set Forth in 18 U.S.C. § 3553(a) Given his High-Risk Medical Conditions, the Deadly Surge of COVID-19 in FCI-Marianna and All the Factors of his Case**

Under all of the circumstances in this case, the Court should conclude that the term of imprisonment that Mr. Caputo has already served, 7 years over 50% of the statutory term[6], is sufficient to satisfy the purposes of sentencing.  Here, the overriding

---

[6] The government has stated that Mr. Caputo had served 44% of the 180-month sentence, however, that was the percentage of the full term rather than the statutory term.  As of the date of the Sentencing Monitoring Computation data, August 5, 2020, Mr. Caputo had served 49.7 % of the statutory term.  By December 5, 2020, that percentage will be well over 50%

factor under § 3553(a) that was not present at the time of sentencing is the spread of COVID-19 and the grave danger it poses to inmates and staff of suffering serious illness or death from its complications, especially to an inmate like Mr. Caputo who suffers from a stroke disorder and has a history of strokes the latest occurrence on August 16, 2020.

The government points to the nature of Mr. Caputo's offenses in arguing that a sentence reduction is not warranted because he would be a danger to the community. Doc. 146, at 9-10; see also U.S.S.G. § 1B1.13(2).  Although these offenses are undoubtedly serious, it is worth noting that he accepted responsibility for his conduct and did not receive any enhancements for obstructing justice in his guideline scoring. Moreover, he had a minor criminal record, two misdemeanors petty theft offenses.  PSR p. 11, ¶¶49-50.

The district court's sentence balanced Mr. Caputo's medical issues with the severity of his crimes and imposed a downward variance of 180 months.  Doc. 113 at 46-47; Doc. 97 at 2.  However, Mr. Caputo was sentenced years before the outbreak of the COVID-19 deadly coronavirus.  The court could not have taken into consideration the grave danger incarceration during the pandemic would have for Mr. Caputo. However, it is clear that this court took Mr. Caputo's severe medical conditions seriously, stating in the Abstract of Judgment that the first priority was for Mr. Caputo to be incarcerated in a facility in which he could receive the proper medical treatment for his condition.  Doc. 97, p. 2.  While Mr. Caputo's medical needs continue to worsen, the pandemic increases his chance of infection resulting in serious permanent disability or death.  As noted above, his medical needs far exceed the capacity of BOP to address in a manner that is not punitive in nature.

Upon his release Mr. Caputo can reside with his mother under the supervision of the U.S. Probation Office. See *United States v. Marks*, No. 03-cr-6033, 2020 WL 1908911, at *15 (W.D.N.Y. Apr. 20, 2020) (finding any risk of danger "can be further mitigated by supervised release").  Ms. Caputo has declared that she will be Mr. Caputo's caretaker,

make medical appointments, transport him to those appointments, and ensure that he remains in compliance with the terms of supervision.  See Ex. 9.

With good time credits, Mr. Caputo's projected final release date is February 2, 2027.  Doc. 146-1, p. 2.  As of November 2, 2020, he has completed 51.6% of the statutory term.  Doc. 146-1, p. 4.

As part of a § 3582(c)(1)(A) sentence reduction, the Court can replace any portion of the remaining sentence of imprisonment with additional period of home confinement as condition of supervised release.  *See e.g., Etzel*, 2020 U.S. Dist. Lexis 77198, at *11. ("While defendant requested that any term of confinement be limited to six months, the Court will impose home confinement equal to the remaining time on his in-custody sentence" in granting § 3582(c)(1)(A) sentence reduction.); *United States v. Pabon*, No. 17-165-1, 2020 U.S. Dist. Lexis 78245, at *22 (E.D. Pa. May 4, 2020) (reducing defendant's sentence to time served and supervised release under § 3582(c)(1)(A) "with the conditions that he be placed on home confinement and location monitoring until his current projected release date of February 2, 2027").  Mr. Caputo is a U.S. Citizen and has no detainers that would block his release to home confinement.  Given all the circumstances, reducing Mr. Caputo's sentence to time served (with an additional period of home confinement during his term of supervised release if the Court deems appropriate), is consistent with all the purposes of sentencing set forth in § 3553(a)

1

**IV.     Conclusion**

2

        For these reasons and those in his initial motion to reduce sentence, the Court

3

should reduce defendant Brian Caputo's sentence to time served under 18 U.S.C. §

4

3582(c)(1)(A), with an additional period of home confinement as a condition of

5

supervised release as the Court deems appropriate.

6

Dated:  December 14, 2020                              Respectfully submitted,

7

8

                                                        /s/ Carolyn D. Phillips
                                                        CAROLYN D. PHILLIPS
                                                        Attorney for Defendant

9

                                                        BRIAN CAPUTO

10

11

12

13

14

15

16

17

18

19

20

21

22

23

1

**LIST OF EXHIBITS**

2

Exhibit 9        -        Declaration of Patricia Caputo

3

Exhibit 10       -        Declaration of Carolyn D. Phillips

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

**EXHIBIT 9**
**Patricia Caputo's Declaration**

Carolyn D. Phillips, #103045
Attorney-At-Law
P.O. Box 5622
Fresno, California 93755-5722
Telephone: (559)248-9833
Facsimile: (559) 248-9820

Attorney for Defendant BRIAN CAPUTO

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 1:14-cr-41 |
| *Plaintiff,* | DECLARATION OF PATRICIA CAPUTO IN SUPPORT OF DEFENDANT'S |
| v. | MOTION TO REDUCE SENTENCE PURSUANT TO |
| BRIAN CAPUTO, | 18 U.S.C. § 3582(c)(1)(A)(i) |
| *Defendant.* | [COMPASSIONATE RELEASE] |

I, Patricia Caputo, declare as follows:

      1.    I am the mother of defendant Brian Caputo.

      2.    My plan is to be Brian's caretaker once he is returned home.

      3.    I will provide Brian housing with me at 710 Washington Avenue, Bakersfield, California, when Brian is released from prison. This is not the same home where we lived when Brian was arrested in 2014.

      4.    No one other than Brian and I will reside at 710 Washington Avenue.

Declaration of Brian Caputo

1

1    5.    I will comply with and will ensure Brian complies with the terms and

2  conditions of his supervision including precluding his access to the internet by locking

3  the screens on all devices that connect to the internet.

4    6.    I will ensure Brian has access to appropriate medical care.

     I declare that the foregoing is true and correct to the best of my knowledge.

5  Executed at Bakersfield, California on November 26 , 2020.

6

7

8    _____
     Declarant
     PATRICIA CAPUTO

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

**EXHIBIT 10**
**Carolyn D. Phillips' Declaration**

1  Carolyn D. Phillips,  #103045
   Attorney-At-Law
2  P.O. Box 5622
   Fresno, California  93755-5722
   Telephone: (559)248-9833
3  Facsimile:  (559) 248-9820

4  Attorney for Defendant BRIAN CAPUTO

5

6

7              IN THE UNITED STATES DISTRICT COURT

8            FOR THE EASTERN DISTRICT OF CALIFORNIA

9

10  UNITED STATES OF AMERICA,            Case No. 1:14-cr-41

11        *Plaintiff*,                   DECLARATION OF CAROLYN D.
                                         PHILLIPS IN SUPPORT OF
12        v.                             DEFENDANT'S MOTION TO REDUCE
                                         SENTENCE PURSUANT TO
13  BRIAN CAPUTO,                        18 U.S.C. § 3582(c)(1)(A)(i)

14        *Defendant*.                   [COMPASSIONATE RELEASE]
    _____

15

16

17      I, CAROLYN D. PHILLIPS, declare as follows:

18      1.      I am appointed counsel for defendant Brian Caputo in the above-entitled

    matter in this motion for Compassionate Release.

19      2.      On November 19, 2020, Mr. Caputo reported to me regarding the

20  conditions at FCI Marianna including COVID-19 protocols and access to medical care.

21  According to Mr. Caputo a case manager from his unit, case manager Childress, tested

    positive and had been absent since October 28, 2020.  Two inmates from his unit tested

22  positive to the virus and were removed from the unit with coronavirus symptoms. They

23

                    Declaration of Carolyn D. Phillips
                                                                              1

were placed in quarantine in the Secured Housing Unit (SHU).  His housing unit remained on lockdown but time for showering and telephone calls had been reduced to a ½ hour Monday, Wednesday and Friday.

3.     Mr. Caputo reported that he was tested for the coronavirus November 18, 2020.  While on lockdown there were no doctor's appointments, nor appointments with doctors outside the prison.  He had had one brief visit with a doctor since his transfer.  This is of grave concern to him because of the serious nature of his medical conditions which requires monitoring of his medications.  One of the symptoms were  extremely painful back spasms, but he had not received the appropriate medications to adequately address the pain and over the counter pain relievers had not alleviated this problem.  When he sneezed, it felt like his back was being snapped in two.  He had requested an MRI of his back and head, but none had been scheduled.

4.     The last stroke Mr. Caputo knew he had had was at USP Yazoo City August 16, 2020.  When he reported to medical staff that he had had a stroke, he was punished.  He was placed in the "lieutenant's cage" for two hours then sent back to his unit.  Medical staff did not conduct an MRI to determine the extent of the stroke nor did they provide any assistance with therapies to reduce physical impairments from the stroke.  As a result, he had significant reduction of strength in his left hand.

5.     The last consultation he had had with a neurologist was April 12, 2019 while he was incarcerated at USP Yazoo City.   The consultation was initiated to determine the extent of the damage from a stroke he had suffered October 29, 2018.  Dr. Patrick Weldon is the Chief of Staff, Chairman of Neurology, Director of Neuro Critical Care & Neuro Rehab, Merit Central Hospital, Select Specialty Hospital & LTAC, and Member, America Academy of Neurology, Jackson, Mississippi.  Dr. Weldon's summary of Mr. Caputo's visit along with his diagnosis and recommendations for treatment were attached to his motion for compassionate release filed with this court October 13, 2020.  ECF 139.  There was no follow-through with Dr. Weldon's

Declaration of Carolyn D. Phillips

2

recommendations for a return visit, additional medical record review, additional MRI or further consultation with Dr. Weldon, nor had Mr. Caputo been provided Aricept, generic Donepezil, to reduce risk of cognitive impairment and risk of conversion to full dementia. Currently no one was monitoring his medications or his medical conditions.

6.     As an example of lack of adequate medical care, Mr. Caputo reported that he had had an ingrown toenail that he had to rip out himself because he was not allowed to see a doctor.

7.     Medical staff at FCI Marianna did not conduct rounds once a day.  Mr. Caputo's temperature was taken every other week not daily.

8.     When he arrived at FCI Marianna he was not provided a cloth mask.  The only cloth mask he had received was from USP Yazoo City.  FCI Marianna had paper masks.

9.     Staff at FCI Marianna were inconsistent about wearing gloves and masks when in Mr. Caputo's housing unit.  Orderlies did not change gloves between contact with inmates or tasks, like handling food.

10.     The only "cleaning supplies" provided to Mr. Caputo at FCI Marianna was a bar of soap which was changed out once a week.  He had not been provided hand sanitizer or any type of disinfectant wipes or cleaner.

11.     Release to use the showers or telephone was conducted five cells at a time. There was no social distancing when inmates lined up to use the two telephones or one of the five functioning showers, nor were the telephones or showers sanitized between cell releases, or inmate usage.  Further, the telephones were less than two feet apart. The floors in the common areas consisted of thin layers of concrete over dirt, with several exposed dirt patches.  The floors in the common area were mopped once after all the cell releases had been completed.

12.     From the physical condition of Mr. Caputo's cell, it appeared to be incomplete or in mid construction.  The floors in his cell consisted of a very thin layer of

Declaration of Carolyn D. Phillips

3

concrete over dirt.  The concrete was so thin that he could easily reach dirt with a scratch of his fingernails.  These conditions made it difficult to keep the cell clean. There was a hole in the wall between Mr. Caputo's cell and the cell next door making it impossible to ensure social distancing or privacy.

13.   As a result of his degenerative and incurable conditions, Multiple Sclerosis, colpocephaly, absence of the corpus callosum and CADASIL, Mr. Caputo experienced weakness in his muscles which affects his balance, causes muscle spasms, severe back pain and migraines.  He was afraid that while he was incarcerated, he would be infected with coronavirus which would result in a severe debilitating stroke or death. In addition, Mr. Caputo had not received the medical attention he needed in order to address these concerns, no MRI of his spine and head, and no monitoring of his symptoms to ensure that he was taking adequate medications at the correct dosages. He needed a higher level of medical care to address his ongoing and worsening medical needs.

14.   On November 24, 2020, Mr. Caputo's unit was no longer in lockdown.

15.   On November 30, 2020, I was advised by Ms. Caputo, that FCI-Marianna intended on placing a cellmate into Mr. Caputo's cell even though he had a medical single-cell pass because of his medical conditions.  I telephoned and spoke with the Unit Team Case Manager Baker, advising her that Mr. Caputo had a medical single cell pass because of his medical conditions because of the extreme risk COVID exposure to his health.  Ms. Baker became extremely agitated and advised me that there was no such thing as a medical single-cell pass and that placement of another person into Mr. Caputo's cell was safe because everyone had been quarantined.

16.   Despite leaving numerous telephone messages with Mr. Caputo's counselor, Mr. Brackins, regarding his threat to move Mr. Caputo to another facility if he did not share his cell, I never received a return phone call.  On November 30, 2020, I

Declaration of Carolyn D. Phillips

4

wrote letters addressed to both the warden and SE Regional offices of the BOP regarding Mr. Caputo's situation.  No one responded.

17.      On December 7, 2020, Ms. Caputo advised that one of the out-of-state inmates transferred to FCI Marianna was placed in Mr. Caputo's cell, and Mr. Caputo had been warned that if he refused to allow an inmate into his cell could be placed in the Secured Housing Unit as punishment.

18.      On December 7, 2020 I discussed the situation with S.E. Region Administrative Offices in Atlanta, Georgia, and left messages for the Health Services Department at FCI -Marianna to please advise custody staff in Mr. Caputo's unit that he had a medical single-cell pass.

19.      On December 8, 2020, I was advised that the person placed in Mr. Caputo's cell had been removed.

I declare that the foregoing is true and correct to the best of my knowledge. Executed at Fresno, California, on December 14, 2020 .

/s/ Carolyn D. Phillips
Declarant
CAROLYN D. PHILLIPS

Declaration of Carolyn D. Phillips

5

**CERTIFICATE OF SERVICE**

COURT:        UNITED STATES DISTRICT COURT FOR THE EASTERN
DISTRICT OF CALIFORNIA, FRESNO

CASE:         *United States v. Brian Caputo*

CASE NO:     1:14-cr-0041 DAD

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the district court's electronic filing system on December 14, 2020.

Participants in the case who are registered CM/ECF users will be served by the district court's electronic filing system.

I further certify that one of the participants in the case is not a registered ECF user. I have mailed the foregoing document by First Class Mail, postage prepaid to:

Brian Caputo, Reg. No. 71322-097
FCI-Marianna
Federal Correctional Institution
P.O. Box 7007
Marianna, FL   32447

/s/ Carolyn D. Phillips

15