1
2
3
4
5
6
7
8                    **UNITED STATES DISTRICT COURT**
9                  **EASTERN DISTRICT OF CALIFORNIA**
10

11  UNITED STATES OF AMERICA,              )  Case No.: 1:14-cr-00041 JLT SKO
                                           )
12             Plaintiff,                  )  ████████  ORDER DENYING DEFENDANT'S
                                           )  MOTION FOR COMPASSIONATE RELEASE
13        v.                               )  PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)
                                           )
14  BRIAN CAPUTO,                          )  (Doc. 175)
                                           )
15             Defendant.                  )
                                           )
16  _____ )

17        Brian Caputo is a federal prisoner moving, by and through appointed counsel, for

18  compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i) based on a combination of rare,

19  degenerative neurological disorders manifesting in, *inter alia*, migraine headaches, ischemic strokes,

20  tremors, muscle spasms, and progressive motor disability. (*See* Sealed Docs. 186, 194; Doc. 174-2 at

21  11.) The government opposes the motion, arguing that Defendant presents a danger to the community

22  and fails to demonstrate extraordinary and compelling reasons justifying his release. (Doc. 190.)

23  Defendant filed a reply to the government's opposition on June 25, 2025. (Doc. 197.) For the reasons

24  set forth below, Defendant's motion is **DENIED**.

25  <u>**I.**</u>    <u>**Background**</u>

26        **A.    Procedural History**

27        In 2016, Defendant pled guilty to one count of receipt or distribution of material involving the

28  sexual exploitation of minors in violation of 18 U.S.C. § 2252(a)(2). (Docs. 80, 81.) In advance of

sentencing, the probation officer filed a Presentence Investigation Report. (PSR, Doc. 91.) The PSR assigned a total offense level of 37, which included an 18-level enhancement pursuant to U.S. Sentencing Guidelines §§ 2G2.2(b)(3)(E), (b)(5), (b)(6), and (b)(7)(C); and a 3-level decrease based on Defendant's acceptance of responsibility. (PSR ¶¶ 33-37, 43-45.) Defendant was assessed 2 criminal history points based on prior convictions and 2 status points under the prior U.S.S.G. § 4A1.1(d), for a total criminal history score of 4. (*See* PSR ¶¶ 47-53.) This placed him in criminal history category II and resulted in an advisory sentencing guideline range of 235-240 months.[1] (*See* Statement of Reasons (SOR) at 1; Doc. 113 at 29:25, 30:1, 45:19-25.)

At the sentencing hearing, the Court adopted the findings in the PSR, except for an amendment to reflect the correct sentencing guideline range, as discussed above. (*See supra* n.1; SOR at 1.) On November 7, 2016, Defendant was sentenced to 180 months in custody followed by 180 months of supervised release. (Doc. 97 at 2-3.)

On October 13, 2020, Defendant moved for compassionate release based on his medical conditions and risks associated with the COVID-19 virus. (Doc. 139.) Defendant's motion, along with his subsequent motion for reconsideration, were denied. (Docs. 165-67.) Defendant is currently incarcerated at Federal Medical Center, Rochester in Rochester, Minnesota. *Find an inmate*, FEDERAL BUREAU OF PRISONS, https://www.bop.gov/inmateloc/ (last visited September 1, 2025). His projected release date is February 2, 2026. *Id.*

**B.     Defendant's Medical Circumstances**

In April 2024, neurologist and Harvard professor, Alan Leviton, M.D., reviewed Defendant's medical records from 2013 to 2023. He summarized Defendant's circumstances as follows:

---

[1] The PSR calculated a sentencing guideline range of 210 to 262 months, which the probation officer reduced to 210 to 240 months because the statutory maximum sentence under 18 U.S.C. § 2252(a)(2) is 20 years. (*See* PSR ¶¶ 54, 80-81, citing U.S.S.G. § 5G1.1(c)(1).) At sentencing, the Court corrected the PSR's original guideline calculation, noting that a criminal history category of III and offense level of 37 results in a guideline range of 262 to 327 months. (*See* Sentencing Tr. at 5:6-9.) However, it also found that Defendant's criminal history category was overstated and should have been category II. (*Id.* at 45:22-23.) This resulted in a guideline range calculation of 235 to 293 months, which was reduced to 235 to 240 months based on the statutory maximum discussed above. (*See id.* at 32:11-20, 45:23-25; *see also* SOR at 1.)

> [Defendant] is a 35-year-old[2] man with a complex medical history notable for presumed diagnosis of learning difficulties (prompting him to "drop out" of school at age 11), a family history of tuberous sclerosis (brother's son), documented colpocephaly and agenesis of the corpus callosum, both attributed to developmental arrest of cerebral white matter, and a variety of presumed neurological diagnoses, including multiple sclerosis and CADASIL (Cerebral Autosomal-Dominant Arteriopathy with Subcortical Infarcts and Leukoencephalopathy), each has some clinical, laboratory or imaging support.

(Declaration of Dr. Alan Leviton, Doc. 174-6 ¶ 6.) He identified the following limitations attributable to these diagnoses:

> [Defendant] has significant balance difficulty that interferes with walking, or standing without support, increased risk of falling, along with clumsiness of hand coordination due to ataxia (poor muscle control that causes clumsy movements), and tremor resulting in difficulty feeding himself, dropping things and knocking over objects. His speech and writing are unclear. These limitations coupled with his persistently severe back pain, have progressively interfered with [Defendant's] ability to complete activities of daily living and has resulted in [Defendant's] loss of his ability ambulate on his own.

(*Id.* ¶ 7.) Dr. Leviton noted that despite medications for MS and CADASIL, Defendant's condition has "slowly deteriorated" and is not expected to improve. (*Id.* ¶ 8.) He expressed particular concern about repeated falls, which carry the potential of permanent brain damage, and the risk of stroke from Defendant's CADASIL diagnosis. (*Id.* ¶¶ 8-9.)[3] While there is no cure for Defendant's "life-shortening" conditions, Dr. Leviton explained that "symptoms may be managed with medication for pain relief, baby aspirin to help reduce blood clots, speech therapy, occupational therapy, and physical therapy." (*Id.* ¶¶ 8, 10.) As such, Dr. Leviton opined that Defendant had "appropriately asked to be housed in a facility which can provide a higher level of care and assistance with routine activities." (*Id.* ¶ 7.)

Indeed, on September 18, 2023, BOP physical therapist, T. Nobles, DPT/OCS, SER, completed a functional assessment of Defendant via telehealth ███████████

---

[2] Defendant is now 37 years old. *Find an inmate*, FEDERAL BUREAU OF PRISONS, https://www.bop.gov/inmateloc/ (last visited September 1, 2025).

[3] Since 2013, Defendant has suffered approximately 14 strokes secondary to CADASIL. (Doc. 175 at 18, citing Sealed Doc. 186 at 115.)

1  ██████████████████████████████████████████████████████████████

2  ████████████  (Sealed Doc. 184 at 11-12.) ███████████████████████

3  ████████████████████████████████████████████████████████

4  ███ ██████████████████████████████████████████████████████

5  ████████ █ ████████████████████████████████████████

6  ████████████████████████████████████████████████████████████

7  ██████████████████████████████████████████████████████████

8  ███ ████████

## II.    Legal Standard

A court generally "may not modify a term of imprisonment once it has been imposed." 18

U.S.C. § 3582(c); *see also Dillon v. United States*, 560 U.S. 817, 824 (2010) ("'[A] judgment of

conviction that includes [a sentence of imprisonment] constitutes a final judgment' and may not be

modified by a district court except in limited circumstances."). Those limited circumstances include

compassionate release in extraordinary cases. *See United States v. Holden*, 452 F. Supp. 3d 964, 968

(D. Or. 2020). Under the First Step Act of 2018, a defendant, or the Director of the Bureau of Prisons

on the defendant's behalf, may move for a sentence reduction in the district court. 18 U.S.C.

§ 3582(c)(1)(A). Upon such motion,

> district courts may reduce [a defendant's] term of imprisonment if four
> conditions are met: (1) the defendant exhausted administrative remedies;
> (2) "extraordinary and compelling reasons" warrant a sentence
> reduction; (3) a sentence reduction is "consistent with applicable policy
> statements" issued by the U.S. Sentencing Commission; and (4) the
> district court considered the factors set forth in 18 U.S.C. § 3553(a)."

---

[4] There are four levels in the BOP medical care level classification system. *Care Level Classification for Medical and Mental Health Conditions or Disabilities* (May 2019), FEDERAL BUREAU OF PRISONS, https://www.bop.gov/resources/pdfs/care_level_classification_guide.pdf [https://perma.cc/2S7A-7R58]. Each BOP institution is assigned a care level based primarily on its clinical capabilities, resources, and missions. *Id.* at 1. "Inmate care levels are determined by their medical and/or mental health needs and are based primarily on the chronicity, complexity, intensity, and frequency of interventions and services that are required, as well as an inmate's functional capability." *Id.* Care Level 3 inmates are categorized as "outpatients who have complex, and usually chronic, medical or mental health conditions and who require frequent clinical contacts to maintain control or stability of their condition, or to prevent hospitalization or complications." *Id.* at 3. Care Level 4 inmates "require services available only at a BOP Medical Referral Center (MRC), which provides significantly enhanced medical services and limited inpatient care." *Id.*

4

1    *United States v. Chen*, 48 F.4th 1092, 1094-95 (9th Cir. 2022). "Although a district court must

2    conclude that a defendant satisfies all three predicates before granting a motion for compassionate

3    release, it may deny compassionate release if a defendant fails to satisfy any of these grounds." *United*

4    *States v. Wright*, 46 F.4th 938, 945 (9th Cir. 2022) (citing *United States v. Keller*, 2 F.4th 1278, 1284

5    (9th Cir. 2021)). The defendant bears the burden of "establish[ing] his eligibility for compassionate

6    release." *Wright*, 46 F.4th at 951.

7           In 2023, the U.S. Sentencing Commission issued an amended policy statement outlining the

8    circumstances under which "extraordinary and compelling reasons" exist to reduce a defendant's

9    sentence. *See* U.S. Sent'g Guidelines Manual (U.S.S.G.) §§ 1B1.13(b)(1)-(6) (U.S. Sent'g Comm'n

10   2023). These include the defendant's medical circumstances, age and other related factors, family

11   circumstances, victimization, unusually long sentence, or "other reasons." *Id*. A defendant must show,

12   and the Court must consider, "extraordinary and compelling reasons" according to the current version

13   of U.S.S.G. § 1B1.13. *See United States v. Arcila*, 716 F. Supp. 3d 1052, 1055 (D. Or. 2024),

14   *reconsideration denied*, 2024 WL 2048643 (D. Or. May 6, 2024); *see also United States v. Neal*, 2024

15   WL 1886476, at *2 n.2 (E.D. Cal. Apr. 30, 2024).[5]

16   **III.    Discussion and Analysis**

17          **A.    Administrative Exhaustion**

18          Section 3582(c) permits a defendant to apply to a federal district court for a sentence

19   modification only "after the defendant has fully exhausted all administrative rights to appeal a failure

20   of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the

21   receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]" 18 U.S.C.

22

23

24   [5] Before the November 2023 amendments, the Ninth Circuit held that "[t]he Sentencing Commission's
     statements in U.S.S.G. § 1B1.13 may inform a district court's discretion for § 3582(c)(1)(A) motions filed by a
25   defendant, but they are not binding." *United States v. Aruda*, 993 F.3d 797, 802 (9th Cir. 2021). The Ninth
     Circuit has not yet issued an opinion as to whether the recently amended § 1B1.13 is binding, but several
26   district courts within this Circuit have treated it as such. *See, e.g., United States v. Neal*, 2024 WL 1886476, at
     *2 n.2 (E.D. Cal. Apr. 30, 2024) (collecting cases and concluding that "the current version of § 1B1.13 is
27   binding"); *United States v. Naki*, 2024 WL 4145638, at *3 (D. Haw. Sept. 11, 2024) ("Since the amendments,
     *Aruda* is no longer good law to the extent that it held that the policy statements of the United States Sentencing
28   Commission are not binding on motions for compassionate release.").

1  § 3582(c)(1)(A).[6]

2  On October 21, 2024, defense counsel submitted a request for compassionate release to the

3  warden at FMC Rochester on Defendant's behalf. (Doc. 175 at 12; Doc. 174.) This request was denied

4  on November 8, 2024. (Doc. 174-8.) Thus, as the government concedes, Defendant has satisfied the

5  statutory exhaustion requirement under 18 U.S.C. § 3582(c)(1)(A). (*See* Doc. 190 at 5.)[7]

6  **B.    Extraordinary and Compelling Reasons**

7  According to the Sentencing Commission's policy statement, a defendant's medical

8  circumstances may provide extraordinary and compelling reasons for compassionate release if he or

9  she "is suffering from a serious physical or medical condition … that substantially diminishes [his or

10  her] ability … to provide self-care within the environment of a correctional facility and from which he

11  or she is not expected to recover." U.S.S.G. § 1B1.13(b)(1)(B)(i). Extraordinary and compelling

12  reasons may also exist where a defendant "is suffering from a medical condition that requires long-

13  term or specialized medical care that is not being provided and without which the defendant is at risk

14  of serious deterioration in health or death." U.S.S.G. § 1B1.13(b)(1)(C).[8]

15  Defendant invokes both subsections, arguing that his medical conditions have progressively

16  reduced his capacity to provide self-care and require specialized care that the BOP has been "unable or

17  unwilling" to adequately or consistently provide. (*See* Doc. 175 at 8, 14, 17, 21-22.)

18

19

---

20  [6] If the BOP denies a defendant's request within 30 days of receipt of such a request, in order to exhaust his
administrative remedies, the defendant must appeal that denial to the BOP's "Regional Director within 20

21  calendar days of the date the Warden signed the response." 28 C.F.R. § 542.15(a). If the Regional Director
denies the defendant's administrative appeal, the defendant must appeal again to the BOP's "General Counsel

22  within 30 calendar days of the date the Regional Director signed." *Id.* "Appeal to the General Counsel is the
final administrative appeal." *Id.* When the final administrative appeal is resolved, the defendant has "fully

23  exhausted all administrative rights." *See* 18 U.S.C. § 3582(c)(1)(A).

24  [7] *See, e.g., United States v. Velasco*, 2024 WL 245638, at *2 (E.D. Cal. Jan. 23, 2024) ("Since Velasco's
request has been denied, he has exhausted his administrative remedies and is permitted to file this

25  motion."); *United States v. Portillo*, 2023 WL 5955999, at *1 (E.D. Cal. Sept. 13, 2023) (finding that because
more than 30 days had elapsed since defendant filed his request to the warden for compassionate release, he

26  satisfied the exhaustion requirement).

27  [8] Additional medical circumstances are provided, including when a defendant suffers from a terminal illness,
experiences deteriorating health because of the aging process, or is at higher risk of encountering medical

28  complications or death during an outbreak of infectious disease. *See generally* U.S.S.G. § 1B1.13(b). These
circumstances are not at issue here.

1        1.  <u>Defendant's ability to provide self-care</u>

Defendant asserts that during his eleven years in BOP custody, his medical conditions have "significantly worsened" and, as a result, his ability to provide self-care has become "increasingly limited." (Doc. 175 at 22.) His motion states:

> It is undeniable that [Defendant's] medical conditions are life-shortening, incurable, degenerative diseases of the nervous system. They interfere with [Defendant's] activities of daily living due to the loss of muscle control of his arms, hands, and recently right leg, and cause ataxia resulting in clumsy movements affecting his balance and elevating the likelihood of falling. Without the ability to "catch" himself when he falls, the probability of a disastrous and life-threatening results is multiplied. [¶] These conditions also increase the likelihood of strokes (lacunar infarcts), and cognitive decline leading to dementia.

(*Id.* at 17.)

There is no dispute that Defendant is suffering from serious medical conditions from which he is not expected to recover. (*See* Leviton Decl. ¶ 11; *see also* Doc. 113 at 44:5-6, 43:23-25; Doc. 190 at 7 [acknowledging that Defendant's conditions "are serious and involve strokes and severe neurological problems"].) Unfortunately, the natural consequence of degenerative diseases such as those suffered by Defendant is that they are expected to worsen over time, irrespective of one's custodial status. (*See* Leviton Decl. ¶ 8 [stating that Defendant's *diagnosis*, rather than his incarceration, "increases his risk of further deterioration"].) Therefore, the fact that Defendant's medical conditions are incurable, progressive, and life-shortening is not alone sufficient to justify his release, particularly if he is receiving adequate medical care. Defendant was transferred to a designated BOP medical facility *because* of his deteriorating condition and increasing need for assistance. If this were enough to warrant compassionate release, more than 7,500 inmates housed in BOP federal medical centers would arguably be eligible.[9] Surely this is not what the Sentencing Commission contemplated when drafting its policy statement. Rather, Defendant must show that his self-care abilities are "substantially diminishe[d]." U.S.S.G. § 1B1.13(b)(1)(B)(i). He has not done so.

---

[9] As of September 1, 2025, the inmate populations at BOP's seven medical facilities were as follows: FMC Butner: 853; FMC Carswell: 1,097; FMC Devens: 1,083; FMC Fort Worth: 1,539; FMC Lexington: 1,081; FMC Rochester: 810; and MCFP (Medical Center for Federal Prisoners) Springfield: 1,084; for a total of 7,547 inmates. *Our Locations*, FEDERAL BUREAU OF PRISONS, https://www.bop.gov/locations/list.jsp (last visited September 1, 2025).

Though the record generally evinces Defendant's difficulties with ambulation, balance, strength, and coordination, among other ailments, a review of his recent medical records reveals that, at least as of May 2025, he remains independent with ADLs. ████████████████████████████████████████████████████████████████████████████████████████████████████████ (*See* Sealed Doc. 194 at 210-277.) ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

Defendant's reply brief, filed June 25, 2025, claims that Defendant's "independence has continued to decline" since his motion was filed in March. (*See* Doc. 197 at 4.) Defense counsel's declaration details Defendant's current condition:

> On June 19, 2025, I spoke with [Defendant] during a phone call. … [Defendant] said he could not tell whether his conditions are "worsening like crazy", but everything is getting harder for him like moving his wheelchair with his feet. He cannot hold onto anything. Brushing his teeth has become more difficult despite the electric toothbrush because his hands "go crazy" out of control. He is now being assisted with bathing and is on a shower list. He must be seated when he showers but he cannot hold the shower nozzle. He has not wanted to have assistance with eating, but now he must because of the extreme difficulty he has with the uncontrolled shaking of his hands which prevents food from reaching his mouth. He has lost weight as a result. Dressing has become extremely hard for him to complete on his own. He said he cannot complete daily grooming such as shaving, combing his hair or trimming his nails. Someone else must complete these tasks for him. Once or twice a month he must ask for assistance to clean himself after using the toilet. He no longer gets out of bed at night to use the toilet because he has no balance and falls, instead he uses a portable urinal. He is unable to sit up in bed to use it. His uncontrolled tremors make it impossible for him to hold the urinal steady which results in spillage. [¶] His eyesight is "bugging" him

8

1
2
3
4
5
6

more as his eyes shake and he cannot focus. Glasses do not seem to improve this. [¶] He continues to have a "constant migraine" which is not improved with medications, and his back is painful in every position. [¶] [Defendant] said his main contact with his family is through phone calls, which are limited to 15 minutes every other day. He used to write letters, but he is no longer able to write anything because of the uncontrolled shaking of his hands. He believes he is close to being unable to use the phone because of the tremors which makes dialing increasingly difficult. He has tried to hold the phone steady by pressing it into his face, but the phone slips down anyway and he struggles to keep the phone in place.

7    (Declaration of Carolyn D. Phillips, Doc. 197-2 at 2-3 ¶¶ 7-10.)

8           The Court does not doubt that Defendant's self-care abilities are diminishing. This is evident

9    from Defendant's transfer to FMC Rochester alone. However, BOP treatment notes identify many of

10   the needs now cited by counsel, and yet, these notes nonetheless indicate that Defendant remains

11   independent with ADLs.



9



With that said, the Court is not entirely convinced that Defendant can care for himself to the extent the present record reflects. As discussed, BOP medical providers continue to report that Defendant is functionally independent, despite recognizing Defendant's increasing need for assistance. Faced with these competing narratives, Defendant is strongly encouraged to voice his concerns, communicate his needs, and make a record to the best of his ability. In the event such requests go unheeded, this evidence may be considered upon a renewed motion for compassionate release, should Defendant remain at FMC Rochester and wish to pursue one.[12]

In sum, Defendant has not met his burden of demonstrating a substantial diminution of his ability to provide self-care while in BOP custody. Thus, he cannot obtain relief under U.S.S.G. § 1B1.13(b)(1)(B)(i).



[12] According to BOP records, Defendant became eligible for home confinement on August 2, 2025. (*See* Doc. 174-17 at 2.)

2.    Long-term or specialized care

Defendant claims that the BOP "has been unable or unwilling to provide [him] with consistent specialized care to address his pain or to provide needed therapies to forestall the decline of his physical strength." (Doc. 175 at 17.) He contends that "[t]hese failures have resulted in a loss of independent mobility, increased the number of significant falls and made him more dependent on others to complete self-care." (*Id.*)[13]

a.    *Specialized care to address pain*

As an initial matter, Defendant focuses many of his arguments on the adequacy of the care he received while incarcerated at FCI Marianna and FCI Yazoo City.[14] (*See* Doc. 175 at 16-18.) This includes arguments relating to gaps in neurology visits, delays in treatment, and FCI Yazoo City's response to a stroke Defendant suffered in August 2020. However, because many of these arguments were raised in Defendant's earlier motion for compassionate release, the Court does not reconsider them here. (*See* Doc. 139 at 14; Doc. 157 at 6-10.) As for his remaining arguments, Defendant fails to demonstrate that the care he requires is not being provided. U.S.S.G. § 1B1.13(b)(1)(C).

Defendant's transfer to a designated BOP medical facility itself weighs against a finding that he is not receiving the care he needs. His claims is further belied by roughly 500 pages of BOP medical records from June 2024 to May 2025 detailing the medical care Defendant is receiving at

---

[13] The Court rejects this argument even assuming that Defendant is not receiving the specialized care he claims. Accepting Defendant's argument would require the Court to also assume that any deterioration in Defendant's health—or risk of deterioration—can be directly attributed to a lack of specialized care. The record does not support such a finding. █████████████████████████████████████████████████████████████████

[14] FCI Yazoo City Medium, formerly a high security institution known as United States Penitentiary, Yazoo City, recently underwent a name change and security level reclassification. It is one of three institutions comprising the Federal Correctional Complex in Yazoo City, Mississippi. *Our Locations, FCI Yazoo City Medium,* FEDERAL BUREAU OF PRISONS, https://www.bop.gov/locations/institutions/yap/ (last visited September 1, 2025). Defendant refers to the institution by its former name, USP Yazoo City.

11

FMC Rochester. ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████ It
is highly unlikely that Defendant will find better care elsewhere. As Judge Shubb noted in his order

denying Defendant's motion for reconsideration:

> [N]otwithstanding defendant's claims that he is not being properly treated for his preexisting medical conditions, defendant has made no showing that he would receive any better care outside of the Bureau of Prisons than he will receive in custody. To the contrary, defendant represents that if he is released he will have to rely on Medicare for his medical treatment, and although his mother is "working to identify specialists" to treat his conditions, the court has no assurance that whatever arrangements she might be able to make for his treatment would be any better than the care available for him through the Bureau of Prisons.

(Doc. 167 at 3.) Though Defendant now adds that his mother will involve either UCLA Medical

Center or Keck Medical Center at the University of Southern California, he will still have to rely on

Medicare for his medical coverage. (Doc. 175 at 27.) In any event, the Court will briefly address

Defendant's arguments within the context of § 1B1.13(b)(1)(C).

*i.*    *Denial of gabapentin*

Defendant first challenges FCI Marianna's October 2022 denial of gabapentin injections to

treat his back spasms, which he claims were instead treated with topical lidocaine cream. (Doc. 175 at

17-18; *see also* Doc. 174-13 at 2.)[15]

---

[15] "Gabapentin can be effective in managing severe or chronic back pain due to spinal injury or dysfunction, but is highly regulated in the correctional setting due to the potential for abuse, misuse, and diversion." *Williams v. Ryan*, 2019 WL 2173682, at *3 (D. Ariz. May 20, 2019).



1    Defendant had a neurology consult with Mayra Montalvo, M.D., on June 6, 2023, ███

2    ████████████████████████████████████████████████████ (Sealed

3    Doc. 181 at 9-10.) ███████████████████████████████████████████████

4    ███████████████████████████████████████████████████████

5    ████████████████ █ ███████████████████████████████████████

6    ███████████████████████████████████████

7           ████████████████████████████████████████████████

8    Moreover, Defendant does not claim to be at risk of serious deterioration in health or death without it.

9    Thus, he fails to satisfy the requirements of § 1B1.13(b)(1)(C) as to the BOP's denial of gabapentin.

10                    *ii.     Inadequate treatment plan*

11           Next, Defendant claims that the BOP's "lack of continuity of care" has left him with "an

12    unresolved diagnosis and inadequate treatment plan." (*Id.* at 16-17.) Defendant summarizes progress

13    notes made by his treating neurologist, Orhun H. Kantarci, M.D., to support his claim. The Court is

14    not persuaded.

15           First, the Court finds no merit to Defendant's claim that the BOP is at fault for his unresolved

16    diagnosis. In fact, Defendant himself observes that his "multiple brain anomalies are complex and

17    have stymied neurologists in reaching an accurate diagnosis." (Doc. 175 at 8.) Elsewhere, he remarks

18    that "Dr. Kantarci's progress notes highlight the rare and complex nature of [Defendant's] medical

19    situation and the difficulty of an accurate diagnosis and treatment. Despite the number of MRIs over

20    the years and neurologists who reviewed them, there is still uncertainty regarding the diagnosis of

21    these progressive diseases." (*Id.* at 15.)

22           Turning to the adequacy of Defendant's care, the Court observes that upon his arrival at FMC

23    Rochester, ████████████████████████████████████████████████

24    ███████████████████████████████ On September 10, 2024, he was

25    evaluated by Dr. Kantarci, a neurologist at the Mayo Clinic Department of Neurology in Rochester.

26

27    ────────────────────

28    █ ██████████████████████████████████████████████████████

1   (*Id.* at 22.) Dr. Kantarci ordered an MRI of Defendant's brain, spinal cord, and thoracic cord. (*Id.* at

2   23.) A review of those findings revealed ████████████████████████████████

3   ████████████████████████████████ (Sealed Doc. 183 at 2.)

4   ████████████████████████████████

5   ████████████████████████████████

6   ████████████████████████████████

7   ████████████████████████████████

8   ████████████████████████████████

9   ████████████████████████████████

10  ████████████████████████████

11  ████████████████ Based on the declaration of defense

12  counsel, Defendant's follow-up MRI was completed on or about June 12, 2025. (Phillips Decl. ¶ 7.)

13          Insofar as Defendant takes the position that Dr. Kantarci's conclusion—that Copaxone was not

14  working for Defendant—illustrates that Defendant is not receiving the care he needs, this argument

15  carries little weight. To the contrary, it demonstrates that Defendant has, for years, received

16  medication to slow the progression of his MS, even if it was later determined that a stronger

17  medication was needed to accomplish this goal. In other words, Dr. Kantarci's medication change, in

18  response to Defendant's expectedly progressive disease course, does not demonstrate that Defendant

19  was not being cared for previously; it certainly does not show that he is not being cared for currently.

20  Unfortunately, it also does not confirm that the new medication will be more effective, as evinced by

21  Dr. Kantarci's plan to complete a follow-up MRI to assess the stability of Defendant's condition in

22

23  ─────────────────

24  ████████████████████████████████

25  ████████████████████████████████

26  ████████████████████████████████

27  ████████████████████████████████

28  ████████████████████████████

15

light of the medication change.

In sum, the Court is not persuaded that the BOP is failing to treat Defendant's pain. The record demonstrates quite the opposite. ████████████████████████████ ██████████████████████████ Defendant has received extensive treatment to slow his disease progression, reduce the risk of stroke, and manage his lower back pain, migraines, and muscle spasms secondary to these diagnoses. (*See, e.g.,* Sealed Doc. 186 at 74-78 [summarizing Defendant's medical history].) Therefore, the Court finds that despite the "rare and complex nature of [Defendant's] medical situation and the difficulty of an accurate diagnosis and treatment," (Doc. 175 at 15), BOP medical providers have continuously adapted to Defendant's changing needs to ensure his pain and symptoms are managed as effectively as possible. Defendant therefore cannot rely on § 1B1.13(b)(1)(C) for relief.

### b.     Specialized therapies

Next, Defendant asserts that he has received "minimal" therapy services at FMC Rochester, which are required "to forestall the decline of his physical strength." (Doc. 175 at 17-18.) Specifically, he notes that since being transferred, he has attended three physical therapy sessions and ten occupational therapy sessions but that these sessions ended in January. (*Id.* at 19.)[18] He submits that without additional therapy, his condition will continue to decline. (*Id.*)

### i.     Physical therapy

████████████████████████████████
██████████████████████████████████████
████████████████████████████████
████████████████████████████████
██████████████████████████████████████
████████████████████████████

---

[18] Defendant also notes that speech therapy has never been offered or provided at FMC Rochester. (Doc. 175 at 19.) While the Court does not doubt that Defendant would benefit from this type of therapy, (*see* Sealed Doc. 184 at 12; Leviton Decl. ¶ 10; Sealed Doc. 181 at 4), he does not meaningfully advance an argument that without it, he is at risk of serious deterioration in health or death. (*See* Doc. 175 at 19.) Furthermore, to the extent Defendant takes such a position, he has failed to support it by citation to the record.

16

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1 ████████████████████████████████████████████████

2 ██████████████████████████████████████████████████████

3 ░░████████████████████████████████████████████████████

4 ██████████████████████████████████████████████████

5 ██████████████████████████████████████████████████

6 ████████████████████████████████████████████████████████

7 ████████████████████████████████████████████████

8 ████████████████████████████████████████████████

9 ████████████████████████████████████████████████

10 ████████████████████████████████████████████████████

11 ██████████████████████████████████████████████████

12 ████████████████████████████████████████████████████████

13 ████████████████████████████████████████████████

14 ██████████████████████████████████████████████████████

15 ████████████████████████████████████████████████

16                              *ii.*      *Occupational therapy*

17 ░░████████████████████████████████████████████████████

18 ██████████████████████████████████████████████████████████

19 ██████████████████████████████████████████████████████

20 ██████████████████████████████████████████████████████

21 ██████████████████████████████████████████████████

22 ██████████████████████████████████████████████████████

23 ████████████████████████████████████████████████████

24 ████████████████░░██████████████████████████████████

25 ██████████████████████████████████████████████████████

26

27 ───────────────

28 ██░░████████████████████████████████████████████████



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

### iii.    Discussion

Upon review of the record, it is apparent that despite a few unexplained gaps in treatment, Defendant has received considerable physical and occupational therapy services since his transfer to FMC Rochester. Without the benefit of more recent medical records, the Court cannot conclude that the BOP is not providing him needed care. Importantly, after completion of Defendant's scheduled physical therapy sessions, BOP medical staff concluded that his condition had improved and, considering his potential MS relapse, established a new treatment plan consisting of independent exercises, rest, and hydration. There is no suggestion that this plan was unreasonable, and he has not

demonstrated that if no additional sessions are provided in the next five months,[22] he is at risk of serious deterioration in health or death. U.S.S.G. §1B1.13(b)(1)(C). As already discussed, physical and occupational therapies are not the only types of specialized care Defendant is receiving.

It gives the Court no pleasure to deny Defendant's motion in the face of his truly unfortunate circumstances. However, the record does not yet demonstrate that they are "extraordinary and compelling," as contemplated by the Sentencing Commission. U.S.S.G. §§ 1B1.13(b)(1)(B), (C).

### C.    18 U.S.C. § 3553 Sentencing Factors

Having concluded that Defendant's motion is not supported by extraordinary and compelling reasons, the Court need not reach the sentencing factors set forth at 18 U.S.C. § 3553(a). *See Keller*, 2 F.4th at 1284 ("[A]lthough a district court must perform this sequential inquiry before it grants compassionate release, a district court that properly denies compassionate release need not evaluate each step"); *see also Wright*, 46 F.4th at 945.

### IV.    Conclusion

Based upon the foregoing, Defendant's motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A), (Doc. 175), is **DENIED**.

IT IS SO ORDERED.

Dated:   **September 3, 2025**

UNITED STATES DISTRICT JUDGE

---

[22] This approximate calculation is based on Defendant's projected release date of February 2, 2026.